1   TODD M. LANDER (BAR NO. 173031)
    todd.lander@ffslaw.com
2   ARASH BERAL (BAR NO. 245219)
    arash.beral@ffslaw.com
3   MATTHEW A. YOUNG (BAR NO. 266291)
    matt.young@ffslaw.com
4   FREEMAN, FREEMAN & SMILEY, LLP
    1888 Century Park East, Suite 1900
5   Los Angeles, California 90067
    Telephone:  (310) 255-6100
6   Facsimile:  (310) 255-6200

7   Attorneys for Plaintiff
    GEMCAP LENDING I, LLC

8

9                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10               **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11

12   GEMCAP LENDING I, LLC, a Delaware      | Case No. 18STCV07133
     limited liability company,
13                                          | **PLAINTIFF GEMCAP LENDING I,**
                  Plaintiff,                | **LLC'S FIRST AMENDED COMPLAINT**
14                                          | **FOR:**
              vs.
15                                          | 1.  **CIVIL RICO VIOLATIONS**
     WILLIAM SHANE PERTL, an individual;    | 2.  **BREACH OF WRITTEN**
16   MINDY J. MONTGOMERY, an individual;    |     **CONTRACT (CONTINUING**
     BANCCENTRAL NATIONAL                   |     **GUARANTEES)**
17   ASSOCIATION, a national association;   | 3.  **BREACH OF WRITTEN**
     MARTIN MCNEIL, an individual, VAN      |     **CONTRACT (CONTINUING**
18   OSDOL, PC, a Missouri professional     |     **GUARANTEES)**
     corporation; JONATHON W. DAVIS, an     | 4.  **FRAUD**
19   individual; CHRISTOPHER TUCKER, an     | 5.  **NEGLIGENCE**
     individual; and DOES 1-25, inclusive,  | 6.  **PROFESSIONAL NEGLIGENCE**
20                                          | 7.  **FRAUD IN THE INDUCEMENT**
                  Defendants.               | 8.  **INTENTIONAL INTERFERENCE**
21                                          |     **WITH CONTRACTUAL**
                                            |     **RELATIONS**
22                                          | 9.  **INTENTIONAL INTERFERENCE**
                                            |     **WITH PROSPECTIVE ECONOMIC**
23                                          |     **ADVANTAGE**
                                            | 10. **NEGLIGENT INTERFERENCE**
24                                          |     **WITH PROSPECTIVE**
                                            |     **ECONOMIC ADVANTAGE**
25                                          | 11. **CONVERSION**
                                            | 12. **UNFAIR BUSINESS PRACTICES**
26
                                            | **Assigned for All Purposes to the**
27                                          | **Hon. Barbara M. Scheper, Dept. 30**

28                                          | Action Filed:      December 4, 2018

_FREEMAN, FREEMAN & SMILEY, LLP_
_1888 CENTURY PARK EAST, SUITE 1900_
_LOS ANGELES, CALIFORNIA 90067_
_(310) 255-6100_

1    Plaintiff GEMCAP LENDING I, LLC complains of Defendants WILLIAM SHANE

2   PERTL; MINDY J. MONTGOMERY; BANCCENTRAL NATIONAL ASSOCIATION;

3   MARTIN MCNEIL; VAN OSDOL, PC; JONATHAN W. DAVIS; CHRISTOPHER TUCKER;

4   and DOES 1-25 as follows:

5                            **THE PARTIES**

6       1.    Plaintiff GemCap Lending I, LLC ("Plaintiff" or "GemCap") is, and at all times

7   relevant was, a Delaware limited liability company with its principal place of business located in

8   Malibu, California.

9       2.    Plaintiff is informed and believes and thereon alleges that Defendant William

10  Shane Pertl ("Shane") is an individual residing in Lucas, Kansas.

11      3.    Plaintiff is informed and believes and thereon alleges that Defendant Mindy J.

12  Montgomery ("Mindy") is an individual residing in Lucas, Kansas. (Shane and Mindy may

13  hereinafter be referred to as the "Guarantors" and each a "Guarantor").

14      4.    Plaintiff is informed and believes and thereon alleges that Defendant BancCentral

15  National Association ("BancCentral") is a national association, headquartered in Alva, Oklahoma,

16  which transacts business in Los Angeles County, California.

17      5.    Plaintiff is informed and believes and thereon alleges that Defendant Martin

18  McNeil ("Martin") is an individual residing in Enid, Oklahoma.

19      6.    Plaintiff is informed and believes and thereon alleges that Defendant Van Osdol,

20  P.C. ("Van Osdol") is a Missouri professional corporation which transacts business in Los

21  Angeles County, California.

22      7.    Plaintiff is informed and believes and thereon alleges that Defendant Jonathon W.

23  Davis ("Jon") is an individual residing in Olathe, Kansas.

24      8.    Plaintiff is informed and believes and thereon alleges that Defendant Christopher

25  Tucker ("Chris") is an individual residing in Cheney, Kansas.

26      9.    The Guarantors, and each of them, have expressly agreed and consented to the

27  jurisdiction of this Court through the very contracts they executed that are the subject of this

28  Action.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

10.     BancCentral, Martin and Chris are subject to the jurisdiction of this Court through their dealings with GemCap and the Borrower which were transacted in Los Angeles, California, and in connection with an agreement specifying Los Angeles, California as the proper venue for the resolution of any disputes.

11.     Van Osdol and Jon have expressly agreed and consented to the jurisdiction of this Court through the very contracts and loan documents that they negotiated and drafted, on behalf of the Guarantors and Borrower, that are the subject of this Action.

12.     GemCap is presently unaware of the identity of defendants DOES 1 through 25, inclusive, because its investigation of the matters relating to this Complaint is ongoing and their identity has yet to be uncovered.  GemCap is informed and believes that these fictitiously named defendants, and each of them, are responsible for some or all of the acts alleged in this Complaint, and/or are participants in the scheme alleged below, and thus are wholly or partially responsible for the damages GemCap has incurred in this matter.  GemCap will, upon discovering the true identities of these fictitiously named defendants, amend this Complaint accordingly.

13.     GemCap is informed and believes and thereon alleges that each of the defendants named herein was the agent, servant or employee of each of the other defendants, and was acting within and pursuant to such agency, authority and employment.  Each of the defendants is responsible for the losses, damage and harm suffered by GemCap alleged herein.

14.     GemCap is informed and believes and thereon alleges that each of the defendants named herein conspired and agreed among themselves to do the acts complained of herein and were, in doing the acts complained of herein, acting pursuant to said conspiracy, and that each defendant sued herein is jointly and severally responsible and liable to GemCap for the damages alleged herein.

## GENERAL ALLEGATIONS

### *Introduction*

15.     Through this lawsuit, GemCap seeks redress from ongoing and concerted wrongful and fraudulent acts committed against it by i) the Guarantors to a secured loan GemCap issued in the summer of 2017 to Pertl Ranch, LLC ("PR"), Pertl Ranch Feeders LLC ("PRF"), and Outlaw

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Farms & Trucking LLC ("OFT", and together with PR and PRF, collectively, the "Borrower"), ii)

2  the Borrower's legal counsel, Jon and his law firm, Van Osdol, iii) a federally chartered national

3  bank, BancCentral and its Vice-President, Martin, and iv) the Borrower's former Chief Financial

4  Officer, Chris, who knowingly prepared, reported and presented falsified updates on the

5  Borrower's financial status to GemCap.  In short, and as more fully developed below, the

6  Defendants, and each of them, were active participants in a conspiracy to defraud GemCap by

7  denying it the benefits of the loan and security agreement it had with the Borrower, by, among

8  other things, converting, transferring, diverting and/or otherwise disposing of GemCap's collateral

9  on the underlying loan.  Specifically, Defendants plotted and effectuated a scheme whereby the

10  Guarantors and the Borrower, with the assistance of Van Osdol and Jon, who, for all intents and

11  purposes, acted as the Borrower's officer, absconded with tens of millions of dollars of GemCap's

12  funds, employing BancCentral as a willful and knowing vehicle for their deception.

13                                  *GemCap's Lending Business*

14        16.      GemCap is a family-run asset-based commercial lender that has established a

15  thriving niche serving small- and mid-sized businesses in need of funding unavailable from larger

16  and traditional lending institutions.  Formed in 2008, GemCap has built a reputation for integrity,

17  diligence and fair play among borrowers, and has consequently seen dramatic growth in its loan

18  portfolio in the past several years.

19        17.      The basic business blueprint is straightforward.  GemCap receives over $2 billion

20  in loan requests annually, many from distressed companies that cannot turn to or rely upon

21  conventional funding.  The company then assesses the asset base of each prospective borrower to

22  determine if sufficient tangible and recoverable assets – typically taking the form of equipment,

23  inventory and accounts receivable – exist to secure the requested loan and make GemCap whole in

24  the event of a default.  If so, and the borrower otherwise qualifies, appropriate funding and

25  security terms are negotiated.

26        18.      Once a loan is approved, GemCap typically funds on a revolving basis subject to a

27  specified limit, a structure under which the borrower must demonstrate that its asset base and

28  liquidity warrant continued lending.  More specifically, borrowers must accompany each request

4025153.1

PLAINTIFF GEMCAP LENDING I, LLC'S FIRST AMENDED COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   for funding with a borrowing base certificate delineating the available inventory, accounts

2   receivable and other loan security, and establishing that the borrower is entitled to receive funding

3   in the requested amount.  These certificates are essential for GemCap, given that they are the

4   central instrument in the funding process and are relied upon in making lending decisions.  Where

5   GemCap funds a request based on a certificate exaggerating the borrower's attachable asset base

6   and/or otherwise misrepresenting the financial picture such that the borrower is not eligible to

7   receive the funding it has requested, the result is an over-advance – *i.e.*, the borrower has been

8   funded in an amount exceeding its eligibility.  GemCap engages in ongoing due diligence

9   concerning certificates and the borrower's representations in them – by, among other things,

10   routinely auditing the borrower's certificates and financial circumstances – in order to avoid over-

11   advances.  But some inevitably occur, and GemCap's loan documents invariably require that they

12   be repaid immediately.  Where they are not, GemCap then pursues its rights against the pledged

13   security or, when necessary, initiates litigation.  By virtue of the transparency of its business

14   practices, the comprehensiveness of the security it obtains as part of its loan agreements, and its

15   willingness to work with borrowers toward constructive resolutions of disputes, litigation has been

16   rare for GemCap.  As explained below, however, it is necessary in this case.

### *The Subject Loan Transaction*

18       19.     On or about August 11, 2017, GemCap and the Borrower entered into a Loan and

19   Security Agreement, Secured Promissory Notes and a Loan Agreement Schedule, which were

20   subsequently amended from time to time resulting in a total of seven amendments to the

21   Agreement.  Starting with the Fourth Amendment to the Loan and Security Agreement, the parties

22   also entered into a Forbearance Agreement, which itself was amended three separate times.[1]  A

23   true and correct copy of: (a) the Loan and Security Agreement with all seven of its amendments,

24   including the Forbearance Agreement and the Amendments to Forbearance Agreement; (b) the

25   Loan Agreement Schedule; and (c) the Secured Promissory Notes on both a Revolving Loan

---

[1] The Forbearance Agreement and the Amendments to Forbearance Agreement are included within Amendment Nos. 4 through 7, respectively, to the Loan and Security Agreement.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   (which was amended and restated five times, in each case, to increase the principal amount) and a

2   Term Loan (collectively, the "Loan Documents") are attached hereto as **Exhibits "A", "B",** and

3   **"C"**, respectively, and are incorporated herein as though set forth in full.

4         20.      The Borrower operates a ranching and farm operation in Lucas, Kansas that

5   encompasses owned and leased land in several counties, operates a commercial feed yard in

6   Hayes, Kansas, and purports to provide farm management and commodity sales services to the

7   local community.  Through OFT, the Borrower also operates a trucking service, largely in support

8   of the Borrower's ranching and farming operations.

9         21.      The construct of the Loan Documents, such as it evolved over time, is relatively

10  simple.  GemCap agreed to, and did, provide both a term and revolving credit facility to the

11  Borrower.  In all, the outstanding amount now due on the loan, as of January 7, 2019, is

12  $14,931,953.08, exclusive of attorneys' fees and costs.

13        22.      Partly in exchange, GemCap received a first priority security interest in all of the

14  Borrower's assets, *i.e.*, "Collateral" as defined in Section 5.1 of the Loan and Security Agreement.

15        23.      The Loan Documents, and the Loan and Security Agreement in particular, include

16  standard but important provisions:

17        •      The Borrower "shall use the proceeds of the Loans solely for the purposes set forth

18        in Section 1(d) the Loan Agreement Schedule."  This restriction on use is critical,

19        because it ensures that GemCap loan funds are used for the operational purposes

20        for which the money is intended and as to which the collateral supporting the loan

21        relates.  Loan and Security Agreement, Exh. "A", ¶ 2.3.

22        •      GemCap maintains, as collateral for the loan, a first priority security interest in and

23        lien upon "all now owned and hereafter acquired property and assets of Borrower

24        and the Proceeds and Products thereof."  That pledge of security delineates the full

25        scope of assets and property comprising the collateral and, for purposes of this

26        action, indisputably includes all of the Borrower's accounts receivable, farm

27        products, and inventory – and any proceeds thereof.  Loan and Security Agreement,

28        Exh. "A", ¶ 5.1.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

- The Borrower may not dispose of any collateral except for legitimate business reasons, i.e., sale of inventory, disposition in the ordinary course of business with GemCap's consent.  Loan and Security Agreement, Exh. "A", ¶ 5.4(e).

- The Borrower must promptly notify GemCap within two business days of certain occurrences, including the depletion of any Collateral and material adverse information relating to the Borrower's financial condition.  Loan and Security Agreement, Exh. "A", ¶ 9.1.

- The Borrower "shall observe, perform and comply with the covenants, terms and conditions of this Agreement and the other Loan Documents."  Loan and Security Agreement, Exh. "A", ¶ 9.4.

- Events of default occur upon the Borrower's failure to pay monies when due, failure of insurance, failure to perform, or change in condition (among other events of default).  Loan and Security Agreement, Exh. "A", ¶¶ 11.1, 11.2, 11.3, 11.9.

- The Borrower, to further ensure GemCap's rights to the pledged collateral, irrevocably appointed GemCap as its attorney-in-fact.  Loan and Security Agreement, Exh. "A", ¶ 13.3.

- GemCap maintains rights to inspect the Borrower's books, records, and premises where any collateral is located at any time following an event of default.  Loan and Security Agreement, Exh. "A", ¶ 13.8.

24.     Importantly, the Borrower's "Breeding Livestock" and "Market Livestock" are defined in the Loan and Security Agreement to be expressly included within the meaning of "Inventory, Goods and/or Farm Products", which, as noted above, make up a portion of GemCap's collateral.  Loan and Security Agreement, Exh. "A", ¶¶ 1.21, 1.37, 1.74.

25.     Because GemCap's security interest is primarily in the Borrower's collateral, the preservation of that collateral is a centerpiece of the loan transaction.  Indeed, the representations and warranties in the Loan and Security Agreement further emphasize the existing preservation concerning the collateral and the records.  Loan and Security Agreement, Exh. "A", Sections 8 through 11.  These provisions exist for a reason.  They protect GemCap's rights under the Loan

7

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  and Security Agreement – and specifically relating to the "Collateral" securing the loan – by

2  requiring that all Collateral and records be maintained and preserved.  Thus, if these requirements

3  are not satisfied, the very essence of GemCap's benefit of the bargain concerning the Loan and

4  Security Agreement is sacrificed.

5                              ***The Loan Agreement Schedule***

6         26.    The Loan and Security Agreement was accompanied by a Loan Agreement

7  Schedule ("Schedule"), also executed on August 11, 2017, a true and correct copy of which is

8  attached to this Complaint as Exhibit "B" and is incorporated into this Complaint  as though set

9  forth in full.  The Schedule, at Section 1(c)(v), prescribes the specific manner in which the

10 Borrower could request funding and requires the submission of a borrowing base certificate (the

11 "Borrowing Certificate") substantiating the request and demonstrating the Borrower's entitlement

12 to the amount:

13         "**(v)    Borrowing Procedures.**  Whenever Borrower desires an Advance, Borrower will

14         notify Lender by delivery of a borrowing certificate certified by a Responsible Officer

15         ("Borrowing Certificate") no later than two (2) Business Days prior to the date of the

16         proposed Advance, setting forth in reasonable detail, as of the date set forth on the

17         Borrowing Certificate, (A) a schedule of all Accounts (B) a schedule of Eligible Accounts

18         setting forth the calculation of the Eligible Accounts on which such Advance is to be based

19         and a calculation of the Advance requested in connection therewith, (C) a schedule of all

20         Inventory, and (D) a schedule of Eligible Inventory setting forth the calculation of Eligible

21         Inventory on which such Advance is to be based and the calculation of the Advance

22         requested in connection therewith …"

23        27.    These Borrowing Certificates are binding representations and warranties

24 concerning the facts set forth in each certificate, including that the reported accounts receivable

25 are genuine obligations to the Borrower and that the listed inventory and equipment are in the

26 Borrower's possession and control.

27        28.    This requirement, and the representations in the Borrowing Certificates, stand at the

28 core of the Agreement and the Borrower's contractual obligations.  Simply put, GemCap loans on

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   the basis of the Borrowing Certificates, and where an inaccurate Borrowing Certificate is

2   submitted it runs the risk of advancing funds that a borrower is not entitled to receive, creating an

3   over-advance.  And where an over-advance occurs, Paragraph 1(c)(iv) of the Schedule requires

4   that it be repaid immediately.

5        29.     Beyond that, the Schedule requires that remittances from Account Debtors and all

6   other proceeds of Accounts and other Collateral "shall be directed to Lender and deposited in an

7   account at a financial institution selected by Lender (the 'Collection Account') . . . . Borrower

8   shall cause all Collections with respect to all Accounts to be sent directly to Lender's address . . . .

9   Any collections or other Collateral proceeds received by Borrower from any source whatsoever

10  shall be held in trust for the benefit of Lender and immediately remitted to Lender in kind."

11  Schedule, Exh. "C", ¶ 1(c)(vi).

12  *The Guarantees*

13       30.     Concurrent with the Loan Documents, the Guarantors (Shane and Mindy, as well as

14  Shane's grandparents, Ronald and Joyce Pertl, individually, and as Trustees of the Ronald F. Pertl

15  and Joyce M. Pertl Living Trust) each executed written Continuing Guarantees.  All the

16  Guarantors reaffirmed their Guarantees in writing, on August 28, 2018, following the execution of

17  the Amendment to Forbearance Agreement and Amendment No. 7 to the Loan and Security

18  Agreement, which is discussed further below.  At that time, Shane and Mindy executed Secured

19  Continuing Guarantees (*i.e.*, Guarantees which were now secured by real and other property), and

20  on or about November 28, 2018, Ronald, Joyce, and the Pertl Trust executed Amended and

21  Restated Secured Continuing Guarantees (also secured by real and other property).  True and

22  correct copies of the various Continuing Guarantees and the Secured Continuing Guarantees

23  executed by Shane, Mindy, Ronald, Joyce, and the Pertl Trust (with the Guarantors' Social

24  Security Numbers redacted to protect their privacy) are attached hereto collectively as **Exhibit**

25  **"D"** and incorporated by reference herein.

26       31.     The function of the Continuing Guarantees and the Secured Guarantees is to

27  obligate and make the Guarantors personally liable for the Borrower's debt obligations under the

28

Loan Documents.  Paragraph 1 of the Continuing Guarantees  and the Secured Guarantees unequivocally states:

> For valuable consideration, Guarantor hereby unconditionally guarantees and promises to promptly pay to Lender, at the address indicated above or at such other address as Lender may direct, in lawful money of the United States, all Indebtedness of Borrower to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter.  The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities and other costs and expenses relating to or arising out of the Indebtedness.  In giving this Guarantee, Guarantor hereby acknowledges that this Guarantee is a guaranty of payment (and not of collection), and that the liability of Guarantor hereunder is present, absolute, unconditional, continuing, primary, direct and independent of the obligations of Borrower to Lender.  Lender shall not be required to pursue any other remedies including, without limitation, its remedies against Borrower under any Loan Documents evidencing Indebtedness of Borrower, before pursuing Lender's rights and remedies against Guarantor under this Guarantee.

***The Borrower Breaches the Loan Agreement and Diverts Proceeds and Collateral***

32.      Beginning in or around December of 2017, the Borrower, in financial straits, implored GemCap to provide a temporary over-advance of $250,000.00, which GemCap, despite having no obligation to do so, provided pursuant to the terms of the Third Amendment to the Loan and Security Agreement.  But that agreement was induced by the Borrower's representations that it would repay the over-advance no later than January 15, 2018, and would otherwise comply with the terms of the Loan Documents.  On the basis of those representations and inducements, GemCap agreed to enter into the Third Amendment to the Loan Documents reflecting these terms – the amendment acknowledged in writing that the Borrower was in an over-advance position and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

PLAINTIFF GEMCAP LENDING I, LLC'S FIRST AMENDED COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  that the over-advance would be repaid by January 15, 2018.  *See* Exh. "A", Amendment 3 to Loan

2  and Security Agreement.

3        33.     But, as of March 16, 2018, the Borrower had already failed to make certain interest

4  payments when due, and further, the Borrower's loans continued to be in excess of the maximum

5  credit amount.  Further, on February 20, 2018, AgCountry Farm Credit Services, PCA, on behalf

6  of First Dakota National Bank, filed a petition against the Borrower in the District Court of

7  Russell County, Kansas, seeking judgment against the Borrower on a defaulted finance lease.

8  Notwithstanding these events which indisputably constituted a material breach of the Loan

9  Documents, and despite the Borrower's written admission that it had already defaulted under the

10  Loan Documents by failing to pay principal and interest payments to GemCap as well as failing to

11  direct all proceeds to GemCap, GemCap was nevertheless willing to continue assisting its

12  Borrower through troubled times.  On March 16, 2018, GemCap agreed to temporarily forbear

13  from exercising its rights and remedies arising from the Borrower's breaches under the Loan

14  Documents, conditioned and subject to the terms of a Forbearance Agreement.  *See* Exh. "A",

15  Amendment 4 to Loan and Security Agreement.

16        34.     Unfortunately, the Borrower's financial situation continued to decline.  In the

17  summer of 2018, the Borrower again sought GemCap's assistance and asked it to extend the

18  previously agreed-to forbearance period.  As acknowledged and admitted in writing on August 28,

19  2018, and as set forth in a list prepared and reviewed by the Borrower's legal counsel, Jon and

20  Van Osdol, the Borrower had defaulted under the Loan Documents by, among other things, failing

21  to: (i) pay monthly principal and interest payments on the loan; (ii) direct all proceeds to GemCap;

22  (iii) make the payments in the amounts and on the dates specified in prior amendments to the Loan

23  Documents, including the previous Forbearance Agreement; (iv) make timely payments to a

24  property and casualty insurance broker, resulting in notices of potential insurance lapses; (v) pay

25  off amounts owing to the State of Kansas Department of Labor relating to payroll; and (vi) make

26  payments to First Dakota National Bank related to a financing lease, which resulted in the lawsuit

27  being filed against the Borrower in the District Court of Russell County, Kansas.  *See* Exh. "A",

28

4025153.1

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  Amendment to Forbearance Agreement and Amendment No. 7 to Loan and Security Agreement

2  ("Amended Forbearance Agreement").

3       35.     Despite these serious and material breaches of the Loan Documents, which would

4  have immediately allowed GemCap to exercise its rights and remedies thereunder, the Borrower

5  and the Guarantors requested that GemCap continue to forbear from exercising its rights and

6  remedies and enter into the August 28, 2018 Amended Forbearance Agreement.  In consideration

7  for GemCap's willingness to accommodate the Borrower by entering into the Amended

8  Forbearance Agreement, the Borrower agreed, in Section 9 therein, to pay to GemCap all past due

9  amounts under the Loan Documents, in full, by September 30, 2018. The Borrower also agreed

10  that any inaccuracy of any representation or warranty in any of the other Loan Documents would

11  constitute a "Forbearance Default," which would allow GemCap to exercise all of its rights and

12  remedies under the Loan Documents without further notice to the Borrower or any Guarantor.

13       36.     Unfortunately, even after the execution of the Amended Forbearance Agreement,

14  the Borrower continued shirking its obligations under the Loan Documents.  Specifically, in

15  addition to all the Events of Default the Borrower had already admitted to, as outlined above, the

16  Borrower, among other things, also: (i) failed to make payments in the amounts and on the dates

17  specified in Section 9 of the Amended Forbearance Agreement; (ii) caused the loss and removal of

18  millions of dollars in inventory collateral which resulted from the Borrower's sale of cattle, for

19  which the Borrower has provided GemCap with none of the proceeds; (iii) failed to make past due

20  payments to third-party Conterra Agricultural Capital, LLC, which resulted in Borrower's default

21  under certain Conterra Agricultural Capital, LLC loan documentation and, therefore, a cross-

22  default under the Loan Documents, and (iv) failed to remain in good standing in the State of

23  Kansas.

24       37.     Specifically, in Section 3 of the Amended Forbearance Agreement, the Borrower

25  agreed to deliver a plan to GemCap, by October 1, 2018, to liquidate certain inventory and to

26  provide GemCap with view-only access to the Borrower's financial reporting and financial

27  systems.  Further, shortly after the Amended Forbearance Agreement was executed, and pursuant

28  to its terms, Mr. James Cullen of Steeplechase Advisors LLC was retained to act as the

Borrower's Chief Restructuring Officer ("CRO"), and to take over management duties of the Borrower's finances, as well as control over the Borrower's collections and disbursements.

38.     Once the CRO had been retained, the Borrower provided a cash-flow forecast to the CRO and to GemCap, and represented to them that cattle sales from the Borrower to a third party, Cargill, which were supposed to occur over the next 13-week period would generate enough cash flow to fund growth of the feedlot operation and reduce the over-advance of the GemCap credit line.  The CRO directed the Borrower to inform it of all pending cattle sales that were to take place in accordance with this forecast, including the paperwork relating to any pending cattle sales, and requested the ability to be present and on-site during the sale to witness the loading of cattle, so that it could validate the sales, update the Borrower's inventory records, and create an account receivable from the purchaser, Cargill.  Despite this, the Borrower claimed to have sold $538,653.03 worth of cattle to Cargill on or about October 24, 2018, but refused to produce any paperwork or documentation whatsoever to allow the CRO or GemCap to independently verify the amount and weight of the cattle sold, or even the fact that the sale actually took place.  Instead, the Borrower simply forwarded an informal text message to the CRO, which purported to be from a representative of Cargill named "Lisa White", suggesting that the cattle sale had gone through and that a check for $538,653.03 had been issued.  Shane also purported to call "Lisa White" directly, and allowed the CRO to speak with her.  "Lisa White" represented to the CRO that the Cargill sale was authentic.

39.     As it turns out, the text message from "Lisa White" was completely falsified, and the phone call with her was likewise fraudulent.  As Shane admitted under oath on November 21, 2018, he had fabricated the entire Cargill story, using a cell phone application to create the nonexistent text message from "Lisa White" at Cargill.  In addition, Shane also admitted under oath that, over time, the Borrower had sold nearly $3.5 million dollars' worth of cattle, all of which constituted GemCap's collateral, without having paid any proceeds from those sales to GemCap.  Moreover, those cattle were never removed from the Borrowing Base Certificates (most of which, 55 of a total 58, Shane's grandmother, Joyce, had signed), and that the Borrower had submitted to GemCap.  Additionally, the Borrowing Base Certificates that the Borrower submitted

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   to GemCap overstated the total amount of hay owned by the Borrower (also GemCap's collateral)

2   by about five to seven thousand tons.  While Joyce signed off on the majority of these Borrowing

3   Base Certificates, Chris Tucker, the Borrower's Chief Financial Officer, prepared them, and

4   arrived at the numbers reflected therein with input from Shane.  Chris, as an officer of the

5   Borrower, was also actively involved in reporting and presenting the false Borrowing Base

6   Certificates to GemCap.  Shane admitted under oath that, at all pertinent times, he had firsthand

7   knowledge of these falsehoods and that he understood that GemCap was relying on the accuracy

8   of the Borrowing Base Certificates.  A true and correct copy of Shane's November 21, 2018

9   signed, sworn, and notarized testimony is attached hereto as **Exhibit "E"** and is incorporated

10  herein as though set forth in full.

11         40.    Before the truth about the Cargill sale came to light through Shane's November 21,

12  2018 statement, the CRO had initially been doubtful and suspicious of the "Cargill sale", which,

13  as it turns out, was manufactured all along.  But in collaboration with Shane, the Borrower's

14  attorney, Jon, worked to assuages the CRO's concerns, by confirming the details of the sale to him

15  as if it had actually occurred.  And in an apparent effort to explain away the lack of any

16  documentation regarding the sale, Jon specifically told the CRO that Cargill, the largest privately-

17  held company in the world by annual revenue, did not use weight (or scale) tickets – which are

18  commonly used in livestock sale transactions – or any other form of documentation in their

19  dealings and that Cargill typically took a notably long time to issue payment.

20         41.    Also around this time, the CRO was in the process of drafting an information

21  memorandum, which was also a condition of the forbearance agreement between GemCap and the

22  Borrower, for the purpose of attempting to acquire refinancing for the Borrower.  Working closely

23  with Shane, Chris, and Jon, the CRO prepared the information memorandum setting forth the Pertl

24  Cos.' assets.  Before providing the memorandum to GemCap, however, the CRO sent a copy to

25  Shane, Chris and Jon, and Jon confirmed, in writing, that the information contained therein was

26  accurate and correct.  Notably, however, the version of the information memorandum that Jon had

27  approved reflected that the non-existent Cargill sale had actually occurred.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

42.    In short, the Borrower, through the actions of Shane, Chris, Jon, and his law firm, Van Osdol, defrauded GemCap by knowingly i) denying the CRO access to financial records and other various aspects of the Borrower's business; ii) selling or otherwise transferring to third parties certain collateral belonging to GemCap; iii) diverting proceeds from the sale of said collateral; iv) failing to remove the sold cattle from the Borrowing Base Certificates submitted to GemCap; v) with the help of Jon, fabricating a "sale" of collateral to Cargill that was untrue, all without the knowledge or permission of GemCap; and vi) submitting to GemCap an information memorandum for the Borrower containing falsified and inaccurate financial information.  Further, GemCap is informed and believes, and based thereupon alleges, that Shane has deposited the proceeds he improperly received from selling GemCap's collateral into either or both of two bank accounts at Bank Midwest in Kansas City, Missouri – Account Nos. 1903002913 and 1903893463, without the knowledge or consent of GemCap.  The CRO only discovered and informed GemCap of these bank accounts shortly before the filing of this First Amended Complaint.

### *The Notice of Default and Demands Upon the Guarantors*

43.    As a result of the foregoing, and after suspecting the Borrower's surreptitious diversion of GemCap's collateral and the proceeds therefrom, as well as the falsified Borrowing Base Certificates, GemCap, on November 14, 2018, issued a Notice of Default upon the Borrower and, on November 19, 2018, sent corresponding Demands upon the Guarantors, accelerating the total indebtedness and making demand upon the Guarantors to make payment in the amount due and owing to GemCap, which as of November 19, was $14,114,388.55, plus costs and expenses, including attorneys' fees.  True and correct copies of the Demands upon the Guarantors, each of which attaches the Notice of Default upon the Borrower, are attached collectively hereto as **Exhibit "F"** and are incorporated herein as though set forth in full.

44.    The demands required payment to be made by no later than 5:00 p.m. E.S.T. on Wednesday, November 21, 2018.  However, as of the filing of this suit, neither the Borrower nor the Guarantors have issued payment to GemCap.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

### *Jon and Van Osdol's Control Over the Borrower and its Fraudulent Dealings*

45.     Throughout all pertinent times referenced herein above, Jon and his law firm, Van Osdol, served as the Borrower's legal counsel.  And while Shane, as manager, and Chris, as the Borrower's Chief Financial Officer, were charged with being the companies' primary decision makers, Shane seldom, if ever, committed to any action that would bind the Borrower without first consulting with Jon.  For all intents and purposes, and as evidenced by his conduct, Jon acted as an officer of the Borrower, being constantly engaged in communications with the Borrower's other officers over the telephone, and oftentimes participating in conference calls for various company meetings.  Indeed, Jon sometimes made business decisions, including directing payments, on behalf of the Borrower on phone calls without the participation of Shane or Chris.

46.     Illustrative of Jon's inextricable relationship with the Borrower, Ms. Haley Gottschalk, the Borrower's Operations Manager, whose job responsibilities included ensuring that the Borrower paid its debts and met its accounts payable obligations, testified under oath that Jon routinely engaged in direct conversations with her concerning virtually all aspects of the business, and furthermore, instructed and directed her on who the Borrower should be paying and how much.  A true and correct copy of the December 20, 2018 Declaration of Haley Gottschalk, containing the sworn testimony referenced above, is attached hereto as **Exhibit "G"** and is incorporated herein as though set forth in full.

47.     Per Court Order dated November 21, 2018, signed by the Honorable Carlos Murguia in the United States District Court for the District of Kansas, Mr. Cullen, who previously served as the Borrower's CRO, was ultimately appointed as the Receiver over all rights and interest of the Borrower.  In that role, Mr. Cullen took over Ms. Gottschalk's responsibilities concerning the Borrower's debts and payables.  Yet even so, as Mr. Cullen has testified under oath, Jon continued to routinely provide Mr. Cullen with instructions and directions regarding the Borrower's payments, similar to the way he had with Ms. Gottschalk.  A true and correct copy of the January 7, 2019 Declaration of James Cullen, containing the sworn testimony referenced above, is attached hereto as **Exhibit "H"** and is incorporated herein as though set forth in full.

48.     Indeed, in the interest of formalizing Jon's apparent role as an officer in-fact of the Borrower, Shane and Jon often spoke of their intention to have Jon replace Chris as the Borrower's Chief Financial Officer.  But Jon had already begun to stand in for Chris with respect to the latter's job duties.  For instance, earlier in 2018, Jon (as opposed to Chris) took the lead in attempting to negotiate with Commerce Bank to secure new bank accounts for the Borrower with a Deposit Account Control Agreement.

49.     All this is to say that Van Osdol, through Jon, acted as an officer of the Borrower, in fact.  As mentioned above, Jon was closely involved in the Pertl Cos.' business dealings, and was sufficiently invested in the day-to-day operations of the Borrower, including active participation in telephone calls and business decisions concerning the companies, to be an officer for all intents and purposes.  And his service as an officer bled into the Borrower's and the Guarantor's fraudulent dealings with GemCap.  For instance, in addition to Jon's involvement regarding the fabricated Cargill sale, mentioned above, on one particular phone call which occurred in late October of 2018, Shane and Chris asked Jon to review a cash flow projection the two had drafted that was to be a schedule in a revised forbearance agreement that the Borrower was negotiating with GemCap at the time.  After reviewing the draft schedule, Jon instructed Shane and Chris to remove all references to projected cattle and hay sales because these would immediately place the Borrower in default under the forbearance.

***Martin and BancCentral are Recruited to Further Defraud GemCap and Interfere with its Rights in and to its Collateral***

50.     To further deprive GemCap of its rights under the Loan Documents and frustrate and interfere with GemCap's interests in its collateral, the other Defendants recruited the assistance of BancCentral, and its Vice-President, Martin, in particular.  Before and up to the time of GemCap's dealings with the Borrower, BancCentral was the Borrower's lender with a security interest in much, if not most, of the Borrower's assets.  That said, in or around the summer of 2017, BancCentral agreed, in writing, to release its liens on the Borrower's (specifically PR and PRF's) cattle, machinery, and any other chattel property in exchange for a payoff of approximately $2,048,076.80 (amounts PR and PRF funded with advances from GemCap), covering all but

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   BancCentral's real estate loans with PR and PRF.  GemCap agreed to fund that payoff on

2   BancCentral's express and unambiguous representation that BancCentral's then existing liens

3   would be extinguished in their entirety (except for first lien mortgages on certain real properties)

4   and GemCap would maintain a first priority lien concerning all the Borrower's assets, now or

5   hereafter acquired, and including livestock, farm products and equipment.  And indeed, GemCap

6   advanced funds to the Borrower on the strength of BancCentral's and Martin's representations.

7   Ultimately, the Borrower made the payoff to BancCentral and BancCentral consequently

8   terminated its liens (except for liens on certain real properties).  A true and correct copy of

9   Martin's August 3, 2017 letter confirming that BancCentral would release all liens on cattle,

10  machinery and any other chattel property in exchange for the above-referenced payoff is attached

11  hereto as **Exhibit "I"** and is incorporated herein as though set forth in full.  A true and correct

12  copy of the Kansas Secretary of State UCC Filing System's acknowledgment forms showing the

13  creation and termination of BancCentral's prior liens on the assets constituting GemCap's

14  collateral is attached hereto as **Exhibit "J"**.

15      51.    Subsequently, GemCap entered into the Loan Documents with the Borrower which

16  are the subject of this lawsuit, secured by GemCap's collateral and documented via the appropriate

17  UCC filings.

18      52.    Despite that, however, BancCentral filed a lien on the property constituting

19  GemCap's collateral, including all livestock and farm products, based on a *subsequent*

20  $620,706.54 loan BancCentral made to PR on or around June or July of 2018.  Beyond that,

21  BancCenteral likewise asserted a short term note totaling approximately $391,079.86 secured by

22  the Borrower's equipment.  Neither of these BancCentral loans, nor the purported collateral

23  supporting them, were disclosed to GemCap.  Notwithstanding the above, BancCentral has

24  claimed a senior interest in GemCap's collateral.  But BancCenteral nevertheless refuses, despite

25  GemCap's requests, to provide GemCap and Mr. Cullen (the Receiver) with any documentation

26  supporting BancCentral's extraordinary claim.

27      53.    Additionally, when Mr. Cullen took over control of the Borrower as Receiver, he

28  opened new bank accounts for the Borrower's constituent entities, but had left approximately

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

$20,000.00 in PRF's BancCentral account for the sole purpose of allowing certain payroll and other checks to clear, and the Receiver specifically informed Martin that these funds were protected by the Receivership.  Despite this, BancCentral is charging an Non-Sufficient Funds ("NSF") fee for each transaction out of that account.  And BancCentral also appears to be bouncing non-payroll checks from this same PRF account, the result being, of course, that the Receiver – and ultimately GemCap – will have to pay these amounts twice since the Receiver is obligated to pay the Borrower's debts.

54.     Were that not enough, on or about December 13, 2018, BancCentral swept all the remaining cash from the PRF bank accounts and, for no apparent or legitimate reason, posted a negative balance of approximately $1,000,000.00 on the accounts of PR and PRF (for a total deficit of $2,000,000.00).  In other words, BancCentral has manufactured a synthetic encumbrance on the Borrower's assets, while having full knowledge of the Receiver's current attempts to auction the property of the Receivership estate.

55.     And moreover, despite knowing that the Borrower's cattle constitute GemCap's collateral and the property of the Receivership, BancCentral has willingly withheld information, in its possession, from the Receiver and GemCap concerning the location of that cattle.  Specifically, Martin advised the Receiver that he was aware of the location of 400 head of cattle – *i.e.*, GemCap's senior secured collateral – and yet refused to identify their location, in an act of obvious sabotage of GemCap's rights.

## FIRST CAUSE OF ACTION

### Civil RICO Violations

### (Against All Defendants)

56.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 55 as though fully set forth herein.

57.     The Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961 et seq.) provides that various acts involving the conduct of an enterprise through a pattern of racketeering activity are prohibited.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

58.     The Defendants here, in contravention of RICO, conspired with one another to establish, maintain, and participate in a systematic enterprise to secure loan financing through fraudulent misrepresentations and illegal artifice, all with the purpose of enriching themselves at the expense of their victims, most notably GemCap.

59.     In sum, the Defendants – led principally by Shane, Chris and Jon – concocted and launched an elaborate scheme to defraud GemCap.  While they directly made misrepresentations to GemCap to induce it to lend more money to the Borrower (including through preparing and submitting Borrowing Base Certificates to GemCap which both Shane and Chris knew were false), and later, agree to forbearance, they conspired with Van Osdol and Jon, who, for all intents and purposes, was a decision making officer of the Borrower, to further the deception.  And when they ultimately came to the realization that GemCap would not simply stop pursuing its rights to its collateral, they enlisted BancCentral to serve as a mechanism to further their efforts to frustrate GemCap's rights and interfere with GemCap's first priority security interests.

60.     In all, the Defendants have misappropriated and absconded with upwards of tens of millions of dollars in furtherance of this conspiracy – amounts that have essentially disappeared – and have defrauded GemCap in the process.

61.     GemCap is informed and believes, and on that basis alleges, that the Defendants have engaged in both mail and wire fraud in conspiring to defraud GemCap in the manner alleged above.  Both mail and wire fraud are predicate acts under RICO, and serve to support GemCap's claim for relief under the statute.

62.     The Defendants have, despite GemCap's demand, failed and refused to fulfill their obligations to GemCap and have prevented GemCap from exercising its rights under the Loan Documents to secure and liquidate the collateral.  This ongoing misconduct is intended to frustrate GemCap's rights under the Loan Documents and prevent GemCap from realizing any proceeds from the sale of the pledged collateral.

63.     As a direct and proximate result of Defendants' RICO violations, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

64.     Under RICO, GemCap is also entitled to recover threefold the damages it sustains and its costs of suit, including attorneys' fees.

<div align="center"><u>**SECOND CAUSE OF ACTION**</u></div>

<div align="center">**Breach of Written Contract (Secured Continuing Guarantee)**</div>

<div align="center">**(Against William Shane Pertl)**</div>

65.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 64 as though fully set forth herein.

66.     As set forth above, Shane entered into a Continuing Guarantee and a subsequent Secured Continuing Guarantee, by which he personally guaranteed Borrower's debt obligations under the Loan Documents.  Section 21 of the Secured Continuing Guarantee grants GemCap "a first priority continuing security interest in and lien upon all now owned and hereafter acquired property and assets of [Shane]."  Section 23 of the Secured Continuing Guarantee goes on to provide that "the term 'property' is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property."

67.     GemCap has performed all obligations, conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of its contractual obligations.

68.     However, Borrower defaulted on its obligations under the Loan Documents, which caused significant losses to GemCap.  The act of Borrower's default under the Loan Documents triggered Shane's obligations under the Secured Continuing Guarantee he executed.

69.     Despite demand, Shane has breached the Secured Continuing Guarantee by failing to fulfill his obligations thereunder, as he has not made any payment to GemCap.

70.     As a direct and proximate result of Shane's breach of the Secured Continuing Guarantee he executed, GemCap has incurred not less than $14,931,953.08 in damages as of January 7, 2019, exclusive of attorneys' fees and costs, and will continue to incur damages in an amount to be proven at trial, in addition to incidental and consequential damages and attorneys' fees and costs.

<div align="center">21</div>

<div style="writing-mode: vertical-lr;">FREEMAN, FREEMAN & SMILEY, LLP<br>1888 CENTURY PARK EAST, SUITE 1900<br>LOS ANGELES, CALIFORNIA 90067<br>(310) 255-6100</div>

71.     Paragraph 9 of the Secured Continuing Guarantee allows GemCap "the right to obtain a temporary protective order and writ of attachment against Guarantor with respect to any sums due under this Secured Guarantee."

### THIRD CAUSE OF ACTION

**Breach of Written Contract (Secured Continuing Guarantee)**

**(Against Mindy J. Montgomery)**

72.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 71 as though fully set forth herein.

73.     As set forth above, Mindy entered into a Continuing Guarantee and a subsequent Secured Continuing Guarantee, by which she personally guaranteed Borrower's debt obligations under the Loan Documents.  Section 21 of the Secured Continuing Guarantee grants GemCap "a first priority continuing security interest in and lien upon all now owned and hereafter acquired property and assets of [Mindy]."  Section 23 of the Secured Continuing Guarantee goes on to provide that "the term 'property' is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property."

74.     GemCap has performed all obligations, conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of its contractual obligations.

75.     However, Borrower defaulted on its obligations under the Loan Documents, which caused significant losses to GemCap.  The act of Borrower's default under the Loan Documents triggered Mindy's obligations under the Secured Continuing Guarantee she executed.

76.     Despite demand, Mindy has breached the Continuing Guarantee by failing to fulfill her obligations thereunder, as she has not made any payment to GemCap.

77.     As a direct and proximate result of Mindy's breach of the Secured Continuing Guarantee she executed, GemCap has incurred not less than $14,931,953.08 in damages as of January 7, 2019, exclusive of attorneys' fees and costs, and will continue to incur damages in an

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1  amount to be proven at trial, in addition to incidental and consequential damages and attorneys'

2  fees and costs.

3        78.     Paragraph 9 of the Secured Continuing Guarantee allows GemCap "the right to

4  obtain a temporary protective order and writ of attachment against Guarantor with respect to any

5  sums due under this Secured Guarantee."

6  <div align="center">**FOURTH CAUSE OF ACTION**</div>

7  <div align="center">**Fraud**</div>

8  <div align="center">**(Against William Shane Pertl, Jonathon W. Davis, Van Osdol, P.C., Christopher Tucker and**</div>

9  <div align="center">**DOES 1-25, Inclusive)**</div>

10        79.     GemCap realleges and incorporates the allegations set forth in paragraphs 1

11  through 78 as though fully set forth herein.

12        80.     Throughout the course of the loan period, the Borrower, through Shane and Chris,

13  submitted Borrowing Base Certificates (prepared by Chris, signed by Shane's grandmother, Joyce,

14  and approved by Shane) to GemCap, in each of which Shane, Chris and Joyce represented, among

15  other things, the value of the Borrower's eligible inventory against which it could make draw

16  requests.  There were 58 Borrowing Base Certificates in all, 55 of which were signed by Joyce.

17  As an example, a true and correct copy of the final Borrowing Base Certificate that Joyce executed

18  on or about November 15, 2018 is attached hereto as **Exhibit "K"**, and incorporated by reference

19  herein.

20        81.     Chris's and Shane's representations and warranties concerning the value of the

21  Borrower's total and eligible inventory base were false.  The true facts were that Chris and Shane

22  secretly conspired – with Jon and Van Osdol – to defraud GemCap by falsely reporting the

23  Borrower's inventory base in order to induce GemCap to lend the Borrower funds that it otherwise

24  would not have been eligible for.  Chris, as the Borrower's Chief Financial Officer, was actively

25  involved in preparing, reporting and presenting the Borrowing Base Certificates to GemCap, with

26  full knowledge of the inaccuracies contained therein.

27        82.     To illustrate, Shane admitted under oath that he fabricated the above-referenced

28  purported sale of cattle to Cargill.  He also admitted under oath that, over time, the Borrower had

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   sold nearly 3.5 million dollars' worth of cattle, all of which constituted GemCap's collateral,

2   without having paid any proceeds from those sales to GemCap.  Moreover, those cattle were never

3   removed from the Borrowing Base Certificates that Joyce had signed, and that the Borrower,

4   through Chris, had submitted to GemCap.  Additionally, the Borrowing Base Certificates that the

5   Borrower submitted to GemCap overstated the total amount of hay owned by the Borrower (also

6   GemCap's collateral) by about five to seven thousand tons.  Shane admitted under oath that, at all

7   pertinent times, he had firsthand knowledge of these falsehoods and that he understood that

8   GemCap was relying on the accuracy of the Borrowing Base Certificates.

9          83.     The CRO had initially been doubtful and suspicious of the "Cargill sale", which, as

10  it turns out, was manufactured all along.  But in collaboration with Shane, the Borrower's

11  attorney, Jon, worked to assuages the CRO's concerns, by confirming the details of the sale to him

12  as if it had actually occurred.  And in an apparent effort to explain away the lack of any

13  documentation regarding the sale, Jon specifically told the CRO that Cargill, the largest privately-

14  held company in the world by annual revenue, did not use weight (or scale) tickets – which are

15  commonly used in livestock sale transactions – or any other form of documentation in their

16  dealings and that Cargill typically took a notably long time to issue payment.

17         84.     Also around this time, the CRO was in the process of drafting an information

18  memorandum, which was a condition of a forbearance agreement between GemCap and the

19  Borrower, for the purpose of attempting to acquire refinancing for the Borrower.  Working closely

20  with Shane, Chris, and Jon, the CRO prepared the information memorandum setting forth the Pertl

21  Cos.' assets.  Before providing the memorandum to GemCap, however, the CRO sent a copy to

22  Shane, Chris and Jon, and Jon confirmed, in writing, that the information contained therein was

23  accurate and correct.  Notably, however, the version of the information memorandum that Jon had

24  approved reflected that the non-existent Cargill sale had actually occurred.

25         85.     In short, the Borrower, through the actions of Shane, Chris, Jon, and his law firm,

26  Van Osdol, defrauded GemCap by knowingly i) denying the CRO access to financial records and

27  other various aspects of the Borrower's business; ii) selling or otherwise transferring to third

28  parties certain collateral belonging to GemCap; iii) diverting proceeds from the sale of said

1  collateral; iv) failing to remove the sold cattle from the Borrowing Base Certificates submitted to

2  GemCap; v) with the help of Jon, fabricating a "sale" of collateral to Cargill that was untrue, all

3  without the knowledge or permission of GemCap; and vi) approving the submission to GemCap

4  an information memorandum for the Borrower containing falsified and inaccurate financial

5  information.  Further, GemCap is informed and believes, and based thereupon alleges, that Shane

6  has deposited the proceeds he improperly received from selling GemCap's collateral into either or

7  both of two bank accounts at Bank Midwest in Kansas City, Missouri – Account Nos. 1903002913

8  and 1903893463, without the knowledge or consent of GemCap.  GemCap only discovered these

9  bank accounts shortly before the filing of this First Amended Complaint.

10        86.     Indeed, GemCap would not have entered into the Loan Documents with the Borrower

11  and continued to extend credit to the Borrower had it known the truth.  Shane and Chris – with the

12  assistance of Van Osdol and Jon (who, as evidenced by his conduct, acted as an officer of the

13  Borrower) – in fact furthered the fraud by knowingly and intentionally submitting Borrowing Base

14  Certificates to GemCap that misrepresented the status of the Borrower's collateral.  GemCap

15  extended further credit to the Borrower in reliance on those representations.

16        87.     Further, in October of 2018, Jon improperly instructed Shane and Chris to remove

17  all references to projected cattle and hay sales from a cash flow projection that was to be

18  submitted to GemCap because these would immediately place the Borrower in default under a

19  revised forbearance agreement the parties were negotiating.

20        88.     GemCap's reliance on the false representations by Shane, Chris, Jon and Van Osdol

21  proximately caused GemCap's damages.  As a legal and proximate result of Defendants' fraudulent

22  conduct, and each of them, GemCap has incurred damages and will continue to incur damages in an

23  amount to be proven at trial.

24        89.     In performing the acts alleged herein, Shane, Chris, Jon and Van Osdol, and each of

25  them, have acted fraudulently, despicably, and in willful and conscious disregard of GemCap's rights,

26  thereby justifying an award of punitive and exemplary damages against them, jointly and severally.

27  / / /

28  / / /

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FIFTH CAUSE OF ACTION**

**Negligence**

**(Against William Shane Pertl, Jonathon W. Davis, Christopher Tucker and**

**DOES 1-25, Inclusive)**

90.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 89 as though fully set forth herein.

91.     Shane, as the Borrower's manager, and Chris, as the Borrower's Chief Financial Officer, were charged with being the companies' primary decision makers.  Jon, through his conduct, also acted as one of the Borrower's officers and primary decisions makers.

92.     As the Borrower's acting officers, Shane, Chris and Jon interfaced with GemCap on matters associated with the Loan Documents, including the submission of Borrowing Base Certificates and other materials and negotiations pertinent to the loan facility.  Indeed, Chris was actively involved in preparing, reporting and presenting the Borrowing Base Certificates to GemCap that misrepresented the status of the Borrower's collateral.

93.     As the Borrower's acting officers, Shane, Chris and Jon owed a duty to GemCap to use due care in managing the Borrower's operations so that it fulfilled its obligations to GemCap under the Loan Documents.

94.     Shane, Chris and Jon breached that duty by:

          a.   Approving and submitting Borrowing Base Certificates, an information memorandum and cash flow projections to GemCap that materially misrepresented the status of the Borrower's financial status and GemCap's collateral;

          b.   Failing to preserve GemCap's collateral and the proceeds therefrom;

          c.   Refusing GemCap access to the Borrower's records and collateral;

          d.   Otherwise failing to see that the Borrower fulfilled its obligations under the Loan Documents.

95.     As a legal and proximate result of Shane's, Chris's, and Jon's breaches, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**SIXTH CAUSE OF ACTION**

**Professional Negligence**

**(Against Jonathon W. Davis, Van Osdol, P.C., and DOES 1-25, Inclusive)**

96.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 95 as though fully set forth herein.

97.     Jon and his law firm, Van Osdol, issued opinions regarding the Borrower's financial status to GemCap at the inception and throughout the course of GemCap's loan facility with the Borrower, as well as during negotiations to modify its terms, all of which were intended to influence GemCap to lend money to their client, the Borrower.  As detailed above, these opinions were comprised of numerous material misrepresentations.  These misrepresentations induced GemCap to, among other things, advance to the Borrower approximately $2,048,076.80 as a payoff to BancCentral in exchange for the release of BancCentral's liens on the collateral that is the subject of this Action, as explained above.

98.     Additionally, Jon, who was serving as counsel to the Borrower, and acting as the Borrower's officer in-fact, i) furthered the Borrower's deception regarding the fabricated "Cargill sale", ii) approved, in writing, an inaccurate information memorandum that was submitted to GemCap, and iii) improperly instructed his client to omit material financial information on a cash flow projection that was to be submitted to GemCap.  Thus, Jon and Van Osdol were instrumental in misrepresenting the status of the Borrower's collateral to GemCap, and thereby reasonably induced GemCap to advance funds under the terms of the loan facility.

99.     Under California law, such opinions must be issued with due care, or the attorneys who do not act carefully will have breached a duty owed to those they attempted or expected to influence on behalf of their clients.

100.    Jon and Van Osdol breached the duties owed to GemCap by making these false and misleading representations for the monetary benefit of the Borrower.

101.    As a legal and proximate result of Jon and Van Osdol's breaches, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

## SEVENTH CAUSE OF ACTION

2

### Fraud in the Inducement

3

### (Against BancCentral National Association, Martin McNeil, and DOES 1-25, Inclusive)

4      102.    GemCap realleges and incorporates the allegations set forth in paragraphs 1

5   through 101 as though fully set forth herein.

6      103.    Before and up to the time of GemCap's dealings with the Borrower, BancCentral

7   was the Borrower's lender with a security interest in much, if not most, of the Borrower's assets.

8   That said, in or around the summer of 2017, BancCentral agreed, in writing, to release its liens on

9   the Borrower's (specifically PR and PRF's) cattle, machinery, and any other chattel property in

10  exchange for a payoff of approximately $2,048,076.80 (amounts PR and PRF funded with

11  advances from GemCap), covering all but BancCentral's real estate loans with PR and PRF.

12  GemCap agreed to fund that payoff on BancCentral's express and unambiguous representation

13  that BancCentral's then existing liens would be extinguished in their entirety (except for first lien

14  mortgages on certain real properties) and GemCap would maintain a first priority lien concerning

15  all the Borrower's assets, now or hereafter acquired, and including livestock, farm products and

16  equipment.  And indeed, GemCap advanced funds to the Borrower on the strength of

17  BancCentral's and Martin's representations.  Ultimately, the Borrower made the payoff to

18  BancCentral and BancCentral consequently terminated its liens (except for liens on certain real

19  properties).

20      104.    Subsequently, GemCap entered into the Loan Documents with the Borrower which

21  are the subject of this lawsuit, secured by GemCap's collateral and documented via the appropriate

22  UCC filings.

23      105.    Despite that, however, BancCentral filed a lien on the property constituting

24  GemCap's collateral, including all livestock and farm products, based on a *subsequent*

25  $620,706.54 loan BancCentral made to PR on or around June or July of 2018.  Beyond that,

26  BancCenteral likewise asserted a short term note totaling approximately $391,079.86 secured by

27  the Borrower's equipment.  Neither of these BancCentral loans, nor the purported collateral

28  supporting them, were disclosed to GemCap.  Notwithstanding the above, BancCentral has

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    claimed a senior interest in GemCap's collateral. But BancCenteral nevertheless refuses, despite

2    GemCap's requests, to provide GemCap and Mr. Cullen (the Receiver) with any documentation

3    supporting BancCentral's extraordinary claim.

4        106.    GemCap is informed and believes and thereupon alleges that the written and verbal

5    representations made by Martin and BancCentral, as described above, were fraudulent

6    misrepresentations designed and intended to induce GemCap to fund the $2,048,076.80 payoff to

7    BancCentral and proceed to enter into the Loan Documents with the Borrower.

8        107.    GemCap justifiably relied on the written and verbal representations made by

9    BancCentral and Martin in agreeing to fund the payoff and enter into the loan facility with the

10   Borrower. Had GemCap known the truth, including that BancCentral and Martin had no intention

11   to abide by its agreement with GemCap and that BancCentral would subsequently reinstate its

12   liens on the subject collateral, GemCap would not have agreed to fund the payoff and provide the

13   loan to the Borrower.

14       108.    GemCap's reliance on the false representations by BancCentral and Martin

15   proximately caused GemCap's damages. As a legal and proximate result of BancCentral's and

16   Martin's fraudulent conduct, GemCap has incurred damages and will continue to incur damages in an

17   amount to be proven at trial.

18       109.    In performing the acts alleged herein, BancCentral and Martin have acted

19   fraudulently, despicably, and in willful and conscious disregard of GemCap's rights, thereby

20   justifying an award of punitive and exemplary damages against them, jointly and severally.

21                              **EIGHTH CAUSE OF ACTION**

22                  **Intentional Interference with Contractual Relations**

23      **(Against BancCentral National Association, Martin McNeil and DOES 1-25, Inclusive)**

24       110.    GemCap realleges and incorporates the allegations set forth in paragraphs 1

25   through 109 as though fully set forth herein.

26       111.    At all pertinent times, BancCentral and Martin were well aware of the loan facility

27   and the Loan Documents entered into between GemCap and the Borrower, secured by GemCap's

28   collateral and documented via the appropriate UCC filings.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

112.    Despite that, however, BancCentral filed a lien on the property constituting GemCap's collateral, including all livestock and farm products, based on a *subsequent* $620,706.54 loan BancCentral made to PR on or around June or July of 2018.  Beyond that, BancCenteral likewise asserted a short term note totaling approximately $391,079.86 secured by the Borrower's equipment.  Neither of these BancCentral loans, nor the purported collateral supporting them, were disclosed to GemCap.  Notwithstanding the above, BancCentral has claimed a senior interest in GemCap's collateral.  But BancCenteral nevertheless refuses, despite GemCap's requests, to provide GemCap and Mr. Cullen (the Receiver) with any documentation supporting BancCentral's extraordinary claim.

113.    Were that not enough, on or about December 13, 2018, BancCentral swept all the remaining cash from the PRF's BancCentral bank accounts and, for no apparent or legitimate reason, posted a negative balance of approximately $1,000,000.00 on the accounts of PR and PRF (for a total deficit of $2,000,000.00).  In other words, BancCentral has manufactured a synthetic encumbrance on the Borrower's assets, while having full knowledge of the Receiver's current attempts to auction the property of the Receivership estate.

114.    And moreover, despite knowing that the Borrower's cattle constitute GemCap's collateral and the property of the Receivership, BancCentral has willingly withheld information, in its possession, from the Receiver and GemCap concerning the location of that cattle.  Specifically, Martin advised the Receiver that he was aware of the location of 400 head of cattle – *i.e.*, GemCap's senior secured collateral – and yet refused to identify their location, in an act of obvious sabotage of GemCap's rights.

115.    As set forth hereinabove, BancCentral and Martin had knowledge of the Loan Documents and the intent to interfere with it, and they took specific action to interfere with GemCap's loan facility with the Borrower and GemCap's collateral, and to induce the Borrower to breach the Loan Documents, to further their own special interests.

116.    As a legal and proximate result of BancCentral's and Martin's interference with GemCap's contract with the Borrower, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

117.   In performing the acts alleged herein, BancCentral and Martin have acted fraudulently, despicably, and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against them, jointly and severally.

## NINTH CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (Against BancCentral National Association, Martin McNeil and DOES 1-25, Inclusive)

118.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 117 as though fully set forth herein.

119.   At all pertinent times, BancCentral and Martin were well aware of the loan facility and the Loan Documents entered into between GemCap and the Borrower, secured by GemCap's collateral and documented via the appropriate UCC filings.

120.   Despite that, however, BancCentral filed a lien on the property constituting GemCap's collateral, including all livestock and farm products, based on a *subsequent* $620,706.54 loan BancCentral made to PR on or around June or July of 2018.  Beyond that, BancCenteral likewise asserted a short term note totaling approximately $391,079.86 secured by the Borrower's equipment.  Neither of these BancCentral loans, nor the purported collateral supporting them, were disclosed to GemCap.  Notwithstanding the above, BancCentral has claimed a senior interest in GemCap's collateral.  But BancCenteral nevertheless refuses, despite GemCap's requests, to provide GemCap and Mr. Cullen (the Receiver) with any documentation supporting BancCentral's extraordinary claim.

121.   Were that not enough, on or about December 13, 2018, BancCentral swept all the remaining cash from the PRF's BancCentral bank accounts and, for no apparent or legitimate reason, posted a negative balance of approximately $1,000,000.00 on the accounts of PR and PRF (for a total deficit of $2,000,000.00).  In other words, BancCentral has manufactured a synthetic encumbrance on the Borrower's assets, while having full knowledge of the Receiver's current attempts to auction the property of the Receivership estate.

122.   By engaging in the foregoing wrongful conduct, BancCentral and Martin intended to disrupt and interfere with GemCap's ability to recover funds rightfully belonging to it from a

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   potential auction of the Receivership estate.  BancCentral and Martin knew that this disruption and

2   frustration of GemCap's rights to prospective economic recovery was certain or substantially certain

3   to occur.

4       123.    As a legal and proximate result of BancCentral's and Martin's interference with

5   GemCap's rights to economic recovery through a relationship with a potential purchaser of the

6   Receivership property at auction, GemCap has incurred damages and will continue to incur damages

7   in an amount to be proven at trial.

8       124.    In performing the acts alleged herein, BancCentral and Martin have acted

9   fraudulently, despicably, and in willful and conscious disregard of GemCap's rights, thereby

10  justifying an award of punitive and exemplary damages against them, jointly and severally.

11                      **TENTH CAUSE OF ACTION**

12          **Negligent Interference with Prospective Economic Advantage**

13  **(Against BancCentral National Association, Martin McNeil and DOES 1-25, Inclusive)**

14      125.    GemCap realleges and incorporates the allegations set forth in paragraphs 1

15  through 124 as though fully set forth herein.

16      126.    At all pertinent times, BancCentral and Martin knew or should have known of the

17  loan facility and the Loan Documents entered into between GemCap and the Borrower, secured by

18  GemCap's collateral and documented via the appropriate UCC filings.

19      127.    Despite that, however, BancCentral filed a lien on the property constituting

20  GemCap's collateral, including all livestock and farm products, based on a *subsequent*

21  $620,706.54 loan BancCentral made to PR on or around June or July of 2018.  Beyond that,

22  BancCenteral likewise asserted a short term note totaling approximately $391,079.86 secured by

23  the Borrower's equipment.  Neither of these BancCentral loans, nor the purported collateral

24  supporting them, were disclosed to GemCap.  Notwithstanding the above, BancCentral has

25  claimed a senior interest in GemCap's collateral.  But BancCenteral nevertheless refuses, despite

26  GemCap's requests, to provide GemCap and Mr. Cullen (the Receiver) with any documentation

27  supporting BancCentral's extraordinary claim.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

128.     Were that not enough, on or about December 13, 2018, BancCentral swept all the remaining cash from the PRF's BancCentral bank accounts and, for no apparent or legitimate reason, posted a negative balance of approximately $1,000,000.00 on the accounts of PR and PRF (for a total deficit of $2,000,000.00).  In other words, BancCentral has manufactured a synthetic encumbrance on the Borrower's assets, while having full knowledge of the Receiver's current attempts to auction the property of the Receivership estate.

129.     By engaging in the foregoing wrongful conduct, BancCentral and Martin negligently interfered and disrupted GemCap's ability to recover funds rightfully belonging to it from a potential auction of the Receivership estate.  Specifically, by purporting to place a lien on the same collateral on which GemCap had previously claimed a first priority security interest, and by improperly imposing a deficit on the Borrower's bank accounts, BancCentral and Martin breached their duty not to interfere with GemCap's rights in and under the Loan Documents and to the collateral.

130.     As a legal and proximate result of BancCentral's and Martin's interference with GemCap's rights to economic recovery through a relationship with a potential purchaser of the Receivership property at auction, GemCap has incurred damages and will continue to incur damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Conversion

**(Against All Defendants Except Jonathon W. Davis, Van Osdol, and Christopher Tucker)**

131.     GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 130 as though fully set forth herein.

132.     Under the terms and conditions of the Loan Documents, GemCap has a right to possess the Borrower's collateral and the proceeds therefrom.

133.     Defendants have wrongfully exercised control over the collateral and proceeds and converted same by transferring and liquidating the collateral for their own personal gain.

134.     GemCap has demanded immediate access to the collateral and proceeds, but the Defendants have failed and refused those demands and Defendants continue to assert sole and exclusive possession and control over the collateral and proceeds that belong to GemCap.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

135.   As a legal and proximate result of Defendants' conversion, GemCap has suffered damages in an amount unknown at this time.  GemCap will establish its exact damages according to proof at the time of trial.

136.   Because the collateral and proceeds converted by Defendants may have grown far greater than the legal rate of interest recognizes and allowing Defendants to pocket the difference would reward them for their wrongdoing, GemCap is entitled to a constructive trust on the collateral and proceeds converted by defendants and any product or profit derived therefrom.

137.   In performing the acts alleged herein, Defendants, and each of them, have acted fraudulently, despicably, and in willful and conscious disregard of GemCap's rights, thereby justifying an award of punitive and exemplary damages against Defendants.

## TWELFTH CAUSE OF ACTION

### Unfair Business Practices

### (Against All Defendants)

138.   GemCap realleges and incorporates the allegations set forth in paragraphs 1 through 137 as though fully set forth herein.

139.   California Business and Professions Code section 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

140.   Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professions Code section 17200.  As alleged above, these unfair business practices and acts include, but are not limited to: (1) Defendants' misrepresentations to GemCap; (2) Defendants' misappropriation and misuse of loan funds and collateral; (3) the Guarantors' fraudulent breaches of the Secured Guarantees; (4) BancCentral's and Martin's efforts to induce GemCap to pay off the Borrower's BancCentral liens, only to subsequently purport to reinstate those liens; and (5) BancCentral's and Martin's creation of an artificial encumbrance on the Borrower's assets, while having full knowledge of the Receiver's current attempts to auction the property of the Receivership estate.

141.    As a direct, proximate, and foreseeable result of the wrongful conduct of the Defendants, and each of them, GemCap has been damaged in an amount to be proven at trial. GemCap is entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may be obtained by Defendants as a result of such unfair business acts and practices.

142.    California Business and Professions Code section 17203 provides in relevant part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as maybe necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

143.    Pursuant to California Business and Professions Code section 17203, GemCap seeks an order of this Court for a temporary restraining order, preliminary injunction and permanent injunction: (1) attaching any and all of the Defendants' assets in the amount of $14,931,953.08; (2) freezing all accounts in the name of the Guarantors, the Borrower and any of its constituent entities, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (3) freezing all BancCentral accounts used in connection with the fraudulent scheme, and enjoining and prohibiting Defendants from withdrawing, transferring, or otherwise dissipating any of the funds in those accounts; (4) enjoining and prohibiting the transfer of any funds, collateral or other assets by and between any of the Defendants; (5) enjoining and prohibiting all of the Defendants from taking any steps to frustrate, impair or prevent GemCap from attaching or seizing any of the pledged security under the Loan Documents and its related documents; (6) enjoining and prohibiting all of the Defendants from taking any steps that could or will impair GemCap's rights under the Loan Documents and related documents, including without limitation its right to the pledged security; and (7) enjoining and prohibiting all of the Defendants from preventing GemCap from exercising its rights under the Loan Documents to inspect the loan collateral and/or from inspecting the books and records of the Borrower.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## **PRAYER FOR RELIEF**

WHEREFORE, GemCap prays for judgment as follows:

1.     For damages according to proof;

2.     For a constructive trust;

3.     For restitution and disgorgement;

4.     For a right to attach order, writ of possession and/or attachment;

5.     For a temporary restraining order, preliminary injunction and permanent injunction;

6.     For a temporary protective order;

7.     For attorneys' fees and costs;

8.     For prejudgment and postjudgment interest as allowed by law;

9.     For costs of suit incurred herein;

10.    For punitive and exemplary damages; and

11.    For such other and further relief as the Court may deem just and proper.


DATED: January 8, 2019                      FREEMAN, FREEMAN & SMILEY, LLP


                                    By:
                                          TODD M. LANDER
                                          ARASH BERAL
                                          MATTHEW A. YOUNG
                                          Attorneys for Plaintiff
                                          GEMCAP LENDING I, LLC

# EXHIBIT A

LOAN AND SECURITY AGREEMENT

by and between

GEMCAP LENDING I, LLC

as Lender

and

PERTL RANCH, LLC, PERTL RANCH FEEDERS LLC, and OUTLAW FARMS &
TRUCKING LLC

jointly and severally,

as Borrower

Dated:  August 11, 2017

{00331756 DOC 4}

## LOAN AND SECURITY AGREEMENT

**LOAN AND SECURITY AGREEMENT**, dated as of August 11, 2017, by and between (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), and (ii) GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**").

### RECITALS:

**WHEREAS**, Borrower desires to enter into a term and revolving loan credit facility with Lender; and

**WHEREAS**, Lender is willing to establish such credit facility on the terms and conditions hereinafter set forth:

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

### SECTION 1. DEFINITIONS AND RULES OF INTERPRETATION AND CONSTRUCTION

**Specific Terms Defined**. Capitalized terms used herein and not otherwise defined have the following meanings:

1.1    "**Account Debtor**" or "**account debtor**" means "account debtor" as defined in Article 9 of the UCC, and any other Persons obligated in respect of Accounts.

1.2    "**Accounts**" or "**accounts**" means "accounts" as defined in the UCC, and, in addition, any and all obligations of any kind at any time due and/or owing to Borrower, whether now existing or hereafter arising, and all rights of Borrower to receive payment or any other consideration including, without limitation, pursuant to invoices, contract rights, leases, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments, and all other debts, obligations and liabilities in whatever form owing to Borrower from any Person, and all of Borrower's rights to receive payments for goods sold (whether delivered, undelivered, in transit or returned) or assets leased or services rendered (whether or not earned by performance), which may be represented thereby, or with respect thereto, and all property pledged as collateral security for any of the foregoing, and all rights as an unpaid vendor (including stoppage in transit, replevin or reclamation), and all additional amounts due from any Account Debtor, whether or not invoiced, together with all Proceeds and products of any and all of the foregoing.

1.3    "**ACH**" has the meaning set forth in Section 2.5 hereof.

{00131756 DOC 4}

1.4     "**Additional Appraisals**" shall have the meaning set forth in Section 13.9 hereof.

1.5     "**Advance**" has the meaning as set forth in Section 1(c)(ii) of the Loan Agreement Schedule.

1.6     "**Affiliate**" means, with respect to any Person, (a) any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person, including any Subsidiary, or (b) any other Person who is a director, manager, officer or who may function in a similar role (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person means the power (direct or indirect) to direct or cause the direction of the management or the policies of such Person, whether through the ownership of any voting securities, by contract or otherwise.

1.7     "**Agreement**" means this Loan and Security Agreement (including the Loan Agreement Schedule, all Exhibits annexed hereto and the Borrower's Disclosure Schedule) as originally executed or, if amended, modified, supplemented, renewed or extended from time to time, as so amended, modified, supplemented, renewed or extended.

1.8     "**Appraisal**" means the appraisal of the Equipment made by the Appraiser.

1.9     "**Appraiser**" means Hyperams, LLC.

1.10    "**Appraised Forced Liquidation Value**" shall have the meaning given to such term in the Appraisal or in the Additional Appraisals, as applicable.

1.11    "**Assignment of Leases**" means the Assignment of Leases whereby Borrower assigns its rights in the leases of Borrower's Premises to Lender as originally executed or, if amended, modified, supplemented, renewed, extended or replaced from time to time, as so amended, modified, supplemented, renewed, extended or replaced.

1.12    "**Availability**" means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) Six Million Five Hundred Thousand Dollars ($6,500,000).

1.13    "**Balance Sheet**" means the balance sheet of Borrower dated as of the Balance Sheet Date.

1.14    "**Balance Sheet Date**" means July 15, 2017.

1.15    "**Bankruptcy Code**" means the United States Bankruptcy Code, Title 11, United States Code, as the same may be amended and modified from time to time.

1.16    "**Borrower**" has the meaning set forth in the introductory paragraph hereof.

1.17    "**Borrower's Disclosure Schedule**" means the disclosure schedule prepared by Borrower that is being delivered to Lender concurrently herewith or, if amended, modified, supplemented, renewed, extended or replaced from time to time, as so amended, modified, supplemented, renewed, extended or replaced.

1.18    "**Borrower's Premises**" means the real property leased and owned by the Borrower as set forth on Exhibit 1.18 attached hereto.

1.19    "**Borrowing Base**" shall be calculated at any time as the sum of (A) the product obtained by multiplying the outstanding amount of all Eligible Accounts, net of all Taxes, discounts, allowances and credits given or claimed, by up to eighty percent (80%), plus (B) the product obtained by multiplying the Cost/Market Price of then-existing Eligible Inventory consisting of Finished Goods Inventory by up to seventy-five percent (75%), plus (C) the product obtained by multiplying the Cost/Market Price of then-existing Eligible Inventory consisting of Work-in-Process Inventory by up to sixty-five percent (65%), plus (D) the product obtained by multiplying the Cost/Market Price of then-existing Eligible Inventory consisting of Market Livestock by up to seventy percent (70%), plus (E) the product obtained by multiplying the Cost/Market Price of then-existing Eligible Inventory consisting of Breeding Livestock by up to fifty percent (50%), provided, that notwithstanding the foregoing, the ratio between Eligible Accounts and Eligible Inventory for purposes of determining the maximum amount to be advanced on Eligible Accounts and Eligible Inventory shall be determined by Lender in its sole discretion.

1.20    "**Borrowing Certificate**" has the meaning as set forth in Section 1(c)(v) of the Loan Agreement Schedule.

1.21    "**Breeding Livestock**" means Inventory, Goods and/or Farm Products consisting of cattle that is or has been used for breeding.

1.22    "**Business**" means Farming Operations and feedlot operations.

1.23    "**Business Day**" means any day other than a Saturday, Sunday or any other day on which banks located in the State of California are authorized or required to close under applicable banking laws.

1.24    "**Cost/Market Price**" means with respect to Finished Goods Inventory, Work-in-Process Inventory, Market Livestock, and Breeding Livestock, the lower of the cost or market price as determined by Lender in its sole and absolute discretion.

1.25    "**Chattel Paper**" has the meaning ascribed to such term in the UCC.

1.26    "**Closing Date**" means the date of this Agreement.

1.27    "**Collateral**" has the meaning as set forth in Section 5.1 hereof.

1.28    "**Collection Account**" has the meaning set forth in Section 1(c)(vi) of the Loan Agreement Schedule.

1.29    "**Collection Days**" means a period equal to the greater of (i) two (2) Business Days after the deposit of Collections into the Collection Account, or (ii) such longer period as may be required by the financial institution with whom the Collection Account is maintained, in either event for which interest may be charged on the aggregate amount of such deposits at the Interest Rate or, if applicable, the Default Interest Rate.

**1.30**   "**Collections**" means with respect to any Account, all cash collections on such Account.

**1.31**   "**Commercial Tort Claims**" has the meaning ascribed to such term in the UCC.

**1.32**   "**Default Interest Rate**" has the meaning set forth in Section 3(b) of the Loan Agreement Schedule.

**1.33**   "**Deposit Accounts**" has the meaning ascribed to such term in the UCC.

**1.34**   "**Document**" or "document" has the meaning ascribed to such term in the UCC.

**1.35**   "**Electronic Chattel Paper**" has the meaning ascribed to such term in the UCC.

**1.36**   "**Eligible Accounts**" means Accounts created by Borrower which satisfy all of the following criteria:

(1)   such Accounts are created from, or arise in connection with, the sale of Eligible Inventory in the ordinary course of Borrower's Business;

(2)   such Accounts are good and valid Accounts representing undisputed bona fide Indebtedness incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto with respect to an unconditional sale and delivery upon the stated terms of Eligible Inventory sold by the Borrower, and collectible in accordance with their terms; such Eligible Inventory has been shipped to the Account Debtor; Borrower has possession of and has delivered to Lender, shipping and delivery receipts evidencing shipment of such Eligible Inventory; and the Eligible Inventory sold by Borrower giving rise to the Account shall have been accepted by the Account Debtor as evidenced by acceptance documentation duly executed by the Account Debtor and delivered to Lender, in form and substance satisfactory to Lender;

(3)   the amounts of the Accounts reported to Lender are the actual amounts absolutely owing to Borrower and do not arise from sales on consignment, guaranteed sales or other terms under which payment by the Account Debtors may be conditional or contingent;

(4)   the Account Debtor's chief executive office or principal place of business is located in the United States;

(5)   such Accounts do not arise from progress billings, retainages or bill and hold sales;

(6)   there are no contra relationships, setoffs, counterclaims or disputes existing with respect thereto;

(7)   the Inventory giving rise thereto are not subject to any Liens except for the Liens of Lender;

(8)   such Accounts are free and clear of all Liens except for the Liens of Lender;

(9)     such Accounts are not Accounts with respect to which the Account Debtor or any officer or employee thereof is an officer, employee or agent of or is affiliated with Borrower, directly or indirectly, whether by virtue of family membership, ownership, control, management or otherwise;

(10)     such Accounts are not Accounts with respect to which the Account Debtor is a Governmental Authority;

(11)     Borrower has delivered to Lender or Lender's representative such documents as Lender may have requested in connection with such Accounts and Lender shall have received a verification of such Accounts, satisfactory to it, if sent to the Account Debtor or any other obligor or any bailee;

(12)     there are no facts existing or threatened which might result in any material adverse change in the Account Debtor's financial condition;

(13)     such Accounts are not owed by an Account Debtor with respect to which more than 25% of such Account Debtor's Accounts have remained unpaid for more than sixty (60) days after the invoice date thereof;

(14)     such Accounts have not remained unpaid for more than ninety (90) days after the invoice date thereof;

(15)     such Accounts continue to be in full conformity with the representations and warranties made by Borrower to Lender with respect thereto;

(16)     Lender is, and continues to be, reasonably satisfied with the credit standing of the Account Debtor in relation to the amount of credit extended;

(17)     such Accounts are not evidenced by chattel paper or an instrument of any kind with respect to or in payment of the Account unless such instrument is duly endorsed to and in possession of Lender or represents a check in payment of an account;

(18)     such Accounts are net of any returns, discounts, claims, credits and allowances;

(19)     Borrower is able to bring suit and enforce its remedies against the Account Debtor through judicial process;

(20)     such Accounts do not represent interest payments, late or finance charges owing to Borrower;

(21)     such Accounts have credit insurance in such amounts and in form and substance acceptable to Lender in its sole and absolute discretion;

(22)     Accounts that satisfy the criteria set forth in the foregoing items (1) – (21), which are owed by any other single Account Debtor or its Affiliates so long as such

Accounts, in the aggregate, constitute no more than twenty percent (20%) of all Eligible Accounts; and

(23)   notwithstanding the provisions of items (1) – (22), Accounts which are otherwise satisfactory to Lender in its sole and absolute discretion.

1.37   "**Eligible Inventory**" means Inventory consisting of solely of Finished Goods Inventory, Work-in-Process Inventory, Breeding Livestock, and Market Livestock owned by Borrower, with the existence and possession thereof evidenced by documentation provided by Borrower in form and substance satisfactory to Lender and the Cost/Market Price determined by Lender in its sole and absolute discretion, excluding any Inventory having any of the following characteristics:

(1)   Inventory that is either work-in-process, raw materials or raw goods, other than Work-in-Process Inventory;

(2)   Inventory packaging materials, office supplies or cleaning supplies;

(3)   In-transit Inventory;

(4)   Inventory as to which Lender has not received a waiver in form and substance acceptable to Lender from the applicable landlord, warehouseman, filler, processor or packer in respect thereof;

(5)   Inventory not subject to a duly perfected first priority security interest in Lender's favor;

(6)   Inventory that is subject to any Lien in favor of any Person other than Lender that is not subordinate to Lender's first priority security interest on terms satisfactory to Lender in its sole and absolute discretion;

(7)   Inventory on consignment from any Person, on consignment to any Person or subject to any bailment;

(8)   Inventory that is (i) damaged, defective, or tainted, (ii) slow-moving as determined in Lender's sole and absolute discretion, (iii) obsolete or not currently saleable in the normal course of the Borrower's operations, or (iv) subject to shrinkage;

(9)   Inventory that the Borrower has returned, has attempted to return, is in the process of returning or intends to return to the vendor thereof;

(10)   Inventory manufactured or produced by the Borrower pursuant to a license unless the applicable licensor has agreed in writing to permit the Lender to exercise its rights and remedies against such Inventory;

(11)   Inventory not covered by a casualty insurance policy acceptable to Lender in its sole and absolute discretion and under which Lender has been named as a loss payee and additional insured;

{00321756-DOC 4}

6

(12)   Inventory with contra-account liability;

(13)   Inventory that is located at any warehouse or other premises other than (a) Borrower's Premises, or (b) any other premises expressly approved by Lender in writing; and

(14)   Inventory otherwise deemed ineligible by Lender in its sole and absolute discretion.

**1.38**   "**Environment**" means all air, surface water, groundwater or land, including, without limitation, land surface or subsurface, including, without limitation, all fish, wildlife, biota and all other natural resources.

**1.39**   "**Environmental Law**" or "**Environmental Laws**" means all federal, state and local laws, statutes, ordinances and regulations now or hereafter in effect, and in each case as amended or supplemented from time to time, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

**1.40**   "**Environmental Liabilities and Costs**" means, as to any Person, all liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit, order or agreement with any Governmental Authority or other Person, and which arise from any environmental, health or safety conditions, or a Release or conditions that are reasonably likely to result in a Release, and result from the past, present or future operations of such Person or any of its Affiliates.

**1.41**   "**Environmental Lien**" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

**1.42**   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

**1.43**   "**Equipment**" means "equipment", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and shall include, without limitation, the machinery and equipment set forth on Section 5.4(j) to the Borrower's Disclosure Schedule, and all other equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and Borrower's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories, attachments and parts thereof or thereto, and all substitutions and replacements therefor.

{0933756 DOC 4}

1.44   "**Equipment Certificate**" has the meaning set forth in Section 7(b)(iv) of the Loan Agreement Schedule.

1.45   "**Equity Interests**" means, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, membership interests, units, participations or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC (or any successor thereto) under the Securities Exchange Act of 1934, as amended).

1.46   "**Event of Default**" means the occurrence or existence of any event or condition described in Section 11 of this Agreement.

1.47   "**Existing Mortgagees**" means collectively, Conterra Agricultural Capital, LLC and BancCentral National Association.

1.48   "**Farm Products**" has the meaning ascribed to such term in the UCC, now owned or hereafter acquired by Borrower, wherever located, including, without limitation, crops grown, growing or to be grown and livestock born or unborn.

1.49   "**Financial Statements**" has the meaning set forth in Section 8.9 hereof.

1.50   "**Financing Statements**" means the Uniform Commercial Code UCC Financing Statements and Uniform Commercial Code UCC Financing Statement Amendments to be filed with applicable Governmental Authorities of each State or Commonwealth or political subdivisions thereof pursuant to which Lender shall perfect its security interest in the Collateral.

1.51   "**Finished Goods Inventory**" means Inventory, Goods and/or Farm Products consisting of hay and grain crops that have been harvested, bundled, bailed and are stored on Borrower's Premises that are owned by Borrower, and for the avoidance of doubt, excludes Work-in-Process Inventory.

1.52   "**Fiscal Year**" means that twelve (12) month period commencing on January 1 and ending on December 31.

1.53   "**Fixtures**" has the meaning ascribed to such term in the UCC.

1.54   "**GAAP**" means generally accepted accounting principles in effect in the United States of America at the time of any determination, and which are applied on a consistent basis. All accounting terms used in this Agreement which are not expressly defined in this Agreement shall have the meanings given to those terms by GAAP, unless the context of this Agreement otherwise requires.

1.55   "**General Intangibles**" has the meaning ascribed to such term in the UCC.

1.56   "**Goods**" has the meaning ascribed to such term in the UCC.

1.57   "**Governmental Authority**" or "**Governmental Authorities**" means any federal, state, county or municipal governmental agency, court, tribunal, department, instrumentality, board,

commission. officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

1.58    "Guarantees" means the Continuing Guarantee and the Secured Continuing Guarantee. as applicable. of each Guarantor as originally executed or, if amended, modified, supplemented, renewed, extended or replaced from time to time, as so amended, modified, supplemented, renewed, extended or replaced.

1.59    "Guarantor" means each of (i) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, (ii) WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, (iii) RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and (iv) MINDY J. MONTGOMERY, an unmarried individual.

1.60    "Hazardous Substances" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes." "toxic substances," or any other formulation intended to define. list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity. reproductive toxicity, or "EP toxicity," (b) oil, petroleum, or petroleum derived substances. natural gas, natural gas liquids, synthetic gas, drilling fluids. produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

1.61    "Indebtedness" means, with respect to any Person, all of the obligations of such Person which, in accordance with GAAP, should be classified upon such Person's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including without limitation, with respect to Borrower, in any event and whether or not so classified, including the following:

                (a)    all debt and similar monetary obligations of a Person, whether direct or indirect;

                (b)    all obligations of a Person arising or incurred under or in respect of any guaranties (whether direct or indirect) of such Person with respect to the indebtedness of any other Person; and

                (c)    all obligations of a Person arising or incurred under or in respect of any Lien upon or in any property owned by Borrower that secures indebtedness of another Person, even though such Person has not assumed or become liable for the payment of such indebtedness.

1.62    "Instruments" has the meaning ascribed to such term in the UCC.

1.63    "Intellectual Property" means all of the following intellectual property used in the conduct of the Borrower's Business: (a) inventions, processes, techniques, discoveries, developments and related improvements. whether or not patentable; (b) United States patents, patent applications, divisionals, continuations. reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, of any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) unregistered, United States registered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or

business symbol and any foreign or international equivalent of any of the foregoing; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Borrower; (f) copyrights; (g) work for hire; (h) customer and mailing lists; (i) any and all rights of the Borrower to the name "Pertl Ranch", "Pertl Feeders", "Outlaw Farms & Trucking", or any derivations thereof; (j) Borrower's entire customer list and database and all assets used or useful by Borrower in the conduct of its Business over the internet or in any electronic medium; (k) all websites, IP addresses, URLs or domain names owned by Borrower; (l) the patents, trademarks, websites, IP addresses, URLs, domain names and such other items set forth on Section 8.21 to the Borrower's Disclosure Schedule; and (m) all past and future infringement and all goodwill associated with the items described in (a) through and including (l).

1.64    "**Interest Rate**" means the Term Loan Interest Rate, Revolving Loan Interest Rate, or any combination of the preceding, as the context requires.

1.65    "**Inventory**" has the meaning ascribed to such term in the UCC, now owned or hereafter acquired by Borrower, wherever located, and, in any event, shall include, without limitation, Farm Products, Goods, all raw materials, work-in-process, finished and semi-finished Inventory including, without limitation, all materials, parts, components and supplies relating to the manufacture or assembly thereof, packaging and shipping supplies relating thereto, and all other inventory, merchandise, goods and other personal property now or hereafter owned by Borrower, which are held for sale, exchange or lease or are furnished or are to be furnished under a contract of service or an exchange arrangement or which constitute raw materials, work-in-process or materials used or consumed or to be used or consumed in Borrower's Business, or the processing, packaging, delivery or shipping of the same, and all finished goods and the products of the foregoing, whatever form and wherever located; and all names or marks affixed to or to be affixed thereto for purposes of selling same by the seller, manufacturer, lessor or licensor thereof and all right, title and interest of Borrower therein and thereto.

1.66    "**Investment Property**" has the meaning ascribed to such term in the UCC.

1.67    "**Lender**" has the meaning set forth in the introductory paragraph hereof.

1.68    "**Letter-of-Credit Rights**" means "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not the beneficiary thereof has demanded or is entitled to demand payment or performance.

1.69    "**Lien**" or "**lien**" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, lien (statutory or other, including, without limitation, liens imposed by any Governmental Authority or otherwise), charge or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures.

1.70    "**Loans**" means the aggregate principal amount advanced to, made available to, or paid for the benefit of, Borrower as Revolving Loans and Term Loan as set forth in this Agreement and the other Loan Documents.

1.71    "**Loan Agreement Schedule**" means the Loan Agreement Schedule dated of even date herewith, signed by Borrower and delivered together with this Agreement, which Loan Agreement Schedule is incorporated herein by reference.

1.72    "**Loan Documents**" means this Agreement, the Loan Agreement Schedule, the Borrower's Disclosure Schedule, the Term Loan Note, the Revolving Loan Note, the Guarantees, the Assignment of Leases, the Mortgagee Waiver and Access Agreement, the Mortgages and any and all other agreements, notes, documents, mortgages, financing statements, guaranties, intercreditor agreements, subordination agreements, certificates and such other documents and instruments executed and/or delivered at any time by Borrower or any other Person to Lender pursuant to and in connection with the Loans and this Agreement, as the same may be amended, modified, supplemented, renewed or extended from time to time.

1.73    "**Manager**" means with respect to (i) PR, WILLIAM S. PERTL, a/k/a SHANE PERTL, (ii) PRF, WILLIAM S. PERTL, a/k/a SHANE PERTL and MINDY J. MONTGOMERY, and (iii) OFT, WILLIAM S. PERTL, a/k/a SHANE PERTL.

1.74    "**Market Livestock**" means Inventory, Goods and/or Farm Products consisting of cattle that is born which is intended to be sold at market or auction within two hundred seventy days (270) from the birthdate of such cattle, and for the avoidance of doubt, excludes Breeding Livestock.

1.75    "**Material Adverse Effect**" means a material adverse effect on (a) the Business, assets, liabilities, financial condition, results of operations or business prospects of Borrower, (b) the ability of Borrower or any Guarantor to perform its obligations under any Loan Document to which it is a party, (c) the value of the Collateral or the rights of Lender therein, (d) the validity or enforceability of any of the Loan Documents, (e) the rights and remedies of Lender under any of such Loan Documents, or (f) the timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith. All determinations of materiality shall be made by the Lender in its sole and absolute judgment.

1.76    "**Material Contract**" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could have a Material Adverse Effect.

1.77    "**Maturity Date**" means the earlier of (i) August 10, 2019, and (ii) the date Lender may exercise any of its remedies pursuant to the terms hereof.

1.78    "**Maximum Credit**" means the sum of (i) up to Six Million Five Hundred Thousand Dollars ($6,500,000) subject to Availability, any Reserves and the Revolving Loan Commitment, and (ii) up to One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000), subject to the Appraisal, the Additional Appraisals, as applicable, any Reserves and the Term Loan Commitment.

1.79    "**Missing, Damaged, Sold or Devalued Equipment**" has the meaning set forth in Section 7(d) of the Loan Agreement Schedule.

1.80    "**Mortgages**" means all of the mortgages described on Exhibit 1.80 attached hereto including, without limitation, the Mortgage and Security Agreements in favor of Lender

encumbering the Borrower's or Guarantor's, as applicable, owned real property including, without limitation, all improvements, Farm Products, Goods, mineral rights, water rights and fixtures.

    **1.81**   "**Mortgagee Waiver and Access Agreement**" means with respect to each of the Existing Mortgagees, the Mortgagee Waiver and Access Agreement as originally executed by each of the Existing Mortgagees or, if amended, modified, supplemented, renewed, extended or replaced from time to time, as so amended, modified, supplemented, renewed, extended or replaced.

    **1.82**   "**Notes**" means, collectively, the Term Loan Note and the Revolving Loan Note.

    **1.83**   "**Obligations**" means all obligations, liabilities, Loans and Indebtedness of every kind, nature and description owing by Borrower to Lender pursuant to the Loan Documents, including, without limitation, principal, interest, repurchase obligations, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising before, during or after the Term or after the commencement of any case with respect to Borrower under the Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts which would accrue and become due but for the commencement of such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

    **1.84**   "**Organizational Documents**" means, in the case of a corporation, its Articles of Incorporation, Certificate of Incorporation and By-Laws; in the case of a general partnership, its Articles of Partnership and any partnership agreement; in the case of a limited partnership, its Articles of Limited Partnership and any partnership agreement; in the case of a limited liability company, its Articles of Organization and Operating Agreement or Regulations, if any; in the case of a limited liability partnership, its Articles of Limited Liability Partnership; or alternatively, in each case, the legal equivalent thereof in the jurisdiction of its organization, together with all other formation or governing documents, schedules, exhibits, amendments, addendums, modifications, replacements, additions, or restatements of the foregoing, which are in effect.

    **1.85**   "**Overadvance**" has the meaning as set forth in <u>Section 1(c)(iv) of the Loan Agreement Schedule</u>.

    **1.86**   "**Payment Intangibles**" has the meaning ascribed to such term in the UCC.

    **1.87**   "**Permitted Actions**" means any or all of the following with respect to the Collateral: inspect; assemble; appraise; display, sever; remove; maintain; use or operate; prepare for sale or lease; process or repair; and/or lease, transfer and/or sell any or all of the Collateral by private sale or public disposition from any of the locations where any Collateral may be located.

    **1.88**   "**Permitted Encumbrances**" means the Liens (i) in favor of Lender, (ii) Liens in favor of Existing Mortgagees, and (iii) for Taxes not yet due and payable.

    **1.89**   "**Permitted Indebtedness**" means (i) the unsecured Indebtedness consisting of accounts payable or trade payables of the Borrower incurred in the ordinary course of Business and repayable in accordance with customary trade practices, and (ii) Indebtedness secured by Permitted Encumbrances (excluding Taxes).

{00331756.DOC / 4}

**1.90**   "**Person**" or "**person**" means, as applicable, any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any Governmental Authorities.

**1.91**   "**Proceeds**" has the meaning ascribed to such term in the UCC and shall also include, but not be limited to, (a) any and all proceeds of any and all insurance policies (including, without limitation, life insurance, casualty insurance, business interruption insurance and credit insurance), indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral or otherwise, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of Governmental Authority) and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

**1.92**   "**Promissory Note**" has the meaning ascribed to such term in the UCC.

**1.93**   "**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Substance into the Environment.

**1.94**   "**Reserves**" means, as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith reducing the amount of the Revolving Loan Commitment and reducing the Term Loan Commitment (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may adversely affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, Business or prospects of Borrower, (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (iv) Borrower's ability to perform its Obligations under the Loan Documents; or (b) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

**1.95**   "**Responsible Officer**" means with respect to (i) PR, (A) either one of JOYCE M. PERTL or RONALD F. PERTL, and (B) either one of WILLIAM S. PERTL, a/k/a SHANE PERTL, and MINDY JO MONTGOMERY, (ii) PRF, either one of WILLIAM S. PERTL, a/k/a SHANE PERTL or MINDY J. MONTGOMERY, and (iii) OFT, WILLIAM S. PERTL, a/k/a SHANE PERTL.

**1.96**   "**Revolving Loan Commitment**" means, at any given time, the difference between (i) Availability and (ii) the sum of the Reserves related to the Revolving Loans plus outstanding Revolving Loans plus any other Obligations relating to the Revolving Loans.

**1.97**   "**Revolving Loan Note**" means the "Secured Promissory Note (Revolving Loans)" as may be amended, restated, modified or supplemented from time to time.

**1.98**   "**Revolving Loan Prepayment Fee**" has the meaning set forth in <u>Section 4(b) of the Loan Agreement Schedule</u>.

1.99    "**Revolving Loan Interest Rate**" is as set forth in Section 3(a) of the Loan Agreement Schedule.

1.100    "**Revolving Loans**" has the meaning as set forth in Section 1(c)(i) of the Loan Agreement Schedule.

1.101    "**SEC**" means the United States Securities and Exchange Commission.

1.102    "**Securities**" has the meaning ascribed to such term in the UCC.

1.103    "**Software**" has the meaning ascribed to such term in the UCC.

1.104    "**Subsidiary**" means, as to any Person, a corporation, limited liability company or other entity with respect to which more than fifty (50%) percent of the outstanding Equity Interests of each class having voting power is at the time owned by such Person or by one or more Subsidiaries of such Person or by such Person.

1.105    "**Tangible Chattel Paper**" has the meaning ascribed to such term in the UCC.

1.106    "**Tax**" or "**Taxes**" has the meaning set forth in Section 8.12(d).

1.107    "**Tax Deduction**" has the meaning set forth in Section 8.12(c).

1.108    "**Term**" has the meaning set forth in Section 4.1.

1.109    "**Term Loan**" has the meaning set forth in Section 1(b)(i) of the Loan Agreement Schedule.

1.110    "**Term Loan Commitment**" means the lesser of (i) seventy percent (70%) of the Appraised Forced Liquidation Value of the Equipment set forth in the Appraisal and (ii) One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000).

1.111    "**Term Loan Interest Rate**" is as set forth in Section 3(a) of the Loan Agreement Schedule.

1.112    "**Term Loan Note**" means the "Secured Promissory Note (Term Loan)", as may be amended, restated, modified or supplemented from time to time.

1.113    "**Term Loan Prepayment Fee**" is as set forth in Section 4(a) of the Loan Agreement Schedule.

1.114    "**UCC**" means the Uniform Commercial Code as presently enacted in California (or any successor legislation thereto), and as the same may be amended from time to time; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy under the Loan Documents is governed by the Uniform Commercial Code as in effect in a jurisdiction other than California. "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of

the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

**1.115** "**Work-in-Process Inventory**" means Inventory, Goods and/or Farm Products consisting of hay and grain crops (i) that are planted in ground and remain in ground and have not been harvested, bundled or bailed, and (ii) that are harvested, bundled and bailed and remain on Borrower's Premises that are leased; provided that Work-in-Process Inventory shall not include any crop or portion thereof that is dead, is diseased or in any manner no longer can be projected to meet the projected yields as provided by the Borrower to Lender.

**1.116   Rules of Interpretation and Construction.**  In this Agreement unless the context otherwise requires:

(a)     All terms used herein which are defined in the UCC shall have the meanings given therein unless otherwise defined in this Agreement;

(b)     Sections mentioned by number only are the respective Sections of this Agreement as so numbered;

(c)     Words importing a particular gender shall mean and include the other gender and words importing the singular mean and include the plural and vice versa;

(d)     Words importing persons shall mean and include firms, associations, partnerships (including limited partnerships), societies, trusts, corporations, limited liability companies or other legal entities, including public or governmental bodies, as well as natural persons;

(e)     Each reference in this Agreement to a particular person shall be deemed to include a reference to such person's successors and permitted assigns;

(f)     Any headings preceding the texts of any Section of this Agreement, and any table of contents or marginal notes appended to copies hereof are intended, solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect;

(g)     If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any of the remaining provisions thereof;

(h)     The terms "herein", "hereunder", "hereby", "hereto", and any similar terms as used in this Agreement refer to this Agreement; the term "heretofore" means before the date of execution of this Agreement; and the term "hereafter" shall mean after the date of execution of this Agreement;

(i)     If any clause, provision or section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or section of this Agreement, then the clause, provision or section containing the more specific provisions shall control and govern with respect to such apparent conflict;

{00331756.DOC - 4}

15

(j)     Unless otherwise specified, (i) all accounting terms used herein or in any Loan Document shall be interpreted in accordance with GAAP, (ii) all accounting determinations and computations hereunder or thereunder shall be made in accordance with GAAP and (iii) all financial statements required to be delivered hereunder or thereunder shall be prepared in accordance with GAAP;

(k)     An Event of Default that occurs shall exist or continue or be continuing unless such Event of Default is waived by Lender in accordance with the terms of this Agreement;

(l)     The word "and" when used from time to time herein shall mean "or" or "and/or" if such meaning is expansive of the rights or interests of Lender in the given context;

(m)     All references herein and in the other Loan Documents to times of day shall refer to Los Angeles, California time, unless otherwise specified to the contrary; and

(n)     No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by reason of such party or his or its counsel having, or being deemed to have, structured or drafted such provision.

### SECTION 2. LOANS

**2.1**    **Loans.** The terms and provisions of Sections 1(b) and 1(c) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

**2.2**    **Maximum Credit.** The aggregate principal amount of the Loans shall not exceed the amount of the Maximum Credit.

**2.3**    **Use of Proceeds.** Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule.

**2.4**    **Repayment.** Borrower shall repay the Loans and other Obligations in accordance with this Agreement and the Notes.

**2.5**    **ACH.** In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("**ACH**") to all deposit accounts maintained by Borrower, wherever located. At the request of the Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) any ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waives any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has so communicated with and instructed the institution(s) set forth in Section 1(e) of the Loan Agreement Schedule.

## SECTION 3. INTEREST, FEES AND CHARGES

**3.1     Interest.** Interest on the Loans shall accrue as set forth in <u>Sections 3(a) and 3(b) of the Loan Agreement Schedule</u>.

**3.2     Fees.** Borrower shall pay Lender, or Lender's designee, the fees set forth in <u>Section 3(c) of the Loan Agreement Schedule</u>. Such fees, other than the audit fees referenced therein, shall be deemed fully earned on the date hereof, shall be paid from Loan proceeds, and shall not be subject to rebate or proration for any reason.

**3.3     Fees and Expenses.** Borrower shall pay, on Lender's demand, all costs, expenses, filing fees and Taxes payable in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, defense and enforcement of the Loan Documents, Lender's rights in the Collateral, and all other existing and future agreements or documents contemplated herein or related hereto, including any amendments, waivers, supplements or consents which may now or hereafter be made or entered into in respect hereof, or in any way involving claims or defenses asserted by Lender or claims or defenses against Lender asserted by Borrower or any third party directly or indirectly arising out of or related to the relationship between Borrower and Lender, including, but not limited to the following, whether incurred before, during or after the Term or after the commencement of any case with respect to Borrower under the Bankruptcy Code or any similar or successor statute: (a) all costs and expenses of filing or recording (including Financing Statements and mortgage filing fees); (b) all title insurance and other insurance premiums, appraisal fees, fees incurred in connection with any environmental report and audit, survey and search fees and charges; (c) all fees relating to the wire transfer of loan proceeds and other funds and fees for returned checks; and (d) all costs, fees and disbursements of counsel to Lender. If any fees, costs or charges payable to Lender hereunder are not paid when due, such amounts shall be added to the Obligations and accrue interest at the Default Interest Rate until paid.

**3.4     Savings Clause.** It is intended that the Interest Rate and the Default Interest Rate shall never exceed the maximum rate, if any, which may be legally charged in the State of California for commercial loans made to corporations (the "**Maximum Rate**"). If the provisions for interest contained in the Term Loan Note or Revolving Loan Note would result in a rate higher than the Maximum Rate, the interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to the Borrower.

## SECTION 4. TERM

**4.1     Term.** This Agreement shall continue until all Obligations shall have been indefeasibly paid in full (the "**Term**").

**4.2     Early Termination; Loan Prepayment Fees.**

(a)     Lender shall have the right to accelerate payment of the Obligations at any time upon or after the occurrence of an Event of Default.

(b)     Borrower may prepay the Loans as set forth in <u>Sections 4(a) or 4(b) of the Loan Agreement Schedule</u>.

{00331756 DOC 4}

17

(c)     Borrower shall prepay the Loans as set forth in Sections 4(c) and 4(d) of the Loan Agreement Schedule.

## SECTION 5.  COLLATERAL

5.1     **Security Interests in Borrower's Assets**.  As collateral security for the payment and performance of the Obligations, Borrower hereby grants and conveys to Lender a first priority continuing security interest in and Lien upon all now owned and hereafter acquired property and assets of Borrower and the Proceeds and products thereof including, without limitation, the property described in this Section 5.1 and all property of Borrower now or hereafter held or possessed by Lender (which property, assets and Proceeds, together with all other collateral security for the Obligations now or hereafter granted to or otherwise acquired by Lender, are referred to herein collectively as the "**Collateral**"):

(a)     Accounts;

(b)     Chattel Paper;

(c)     Commercial Tort Claims;

(d)     Deposit Accounts;

(e)     Documents;

(f)     Electronic Chattel Paper;

(g)     Equipment;

(h)     Farm Products;

(i)     Fixtures;

(j)     General Intangibles;

(k)     Goods;

(l)     Instruments;

(m)     Inventory;

(n)     Investment Property;

(o)     Letter-of-Credit Rights;

(p)     Payment Intangibles;

(q)     Promissory Notes;

(r)     Software;

(s)     Tangible Chattel Paper;

(t)     Securities (whether certificated or uncertificated);

(u)     warehouse receipts;

(v)     cash monies;

(w)    Tax and duty refunds;

(x)     Intellectual Property;

(y)     Key man life insurance on William S. Pertl a/k/a Shane Pertl; and

(z)     All present and future books and records relating to any of the above including, without limitation, all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to any of the foregoing maintained with or by any other Person);

(aa)    Additional Collateral set forth in Section 5(a) of the Loan Agreement Schedule; and

(bb)    Any and all products and Proceeds of the foregoing in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any or the foregoing.

**5.2    Financing Statements.** Borrower hereby authorizes Lender to prepare and file Financing Statements with respect to the Collateral in form acceptable to Lender and its counsel, and hereby ratifies any actions taken by Lender prior to or after the date hereof in respect of the preparation and filing of Financing Statements. Borrower shall, at all times, do, make, execute, deliver and record, register or file all Financing Statements and other instruments, acts, pledges, leasehold or other mortgages, amendments, modifications, assignments and transfers (or cause the same to be done), and will deliver to Lender such instruments and/or documentation evidencing items of Collateral, as may be requested by Lender to better secure or perfect Lender's security interest in the Collateral or any Lien with respect thereto. Borrower acknowledges that it is not authorized to file any termination statement with respect to any Financing Statement in favor of Lender without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender. In addition, Borrower hereby authorizes Lender to record the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral.

**5.3    License Grant.** The terms of Section 5(b) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

5.4     **Representations, Warranties and Covenants Concerning the Collateral**. Borrower covenants, represents and warrants (each of which such covenants, representations and warranties shall survive execution and delivery of this Agreement and shall be deemed repeated upon the making of each request for a Revolving Loan and made as of the time of each and every Revolving Loan hereunder) as follows:

(a)     (i) Borrower owns all of the Collateral free and clear of all Liens (including any claim of infringement) except those in Lender's favor and Permitted Encumbrances and (ii) none of the Collateral is subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

(b)     It shall not encumber, mortgage, pledge, assign or grant any Lien upon any Collateral or any other assets to anyone other than the Lender and except for Permitted Encumbrances.

(c)     The Liens granted pursuant to this Agreement, upon the filing of Financing Statements in respect of Borrower in favor of the Lender in the applicable filing office of the state of organization of Borrower, the recording of the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral which is created under such laws, constitute valid perfected first priority security interests in all of the Collateral in favor of the Lender, as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof.

(d)     No security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to the Liens of Lender and Permitted Encumbrances.

(e)     It shall not dispose of any of the Collateral whether by sale, lease or otherwise except for (i) the sale of Inventory in the ordinary course of business and (ii) the disposition or transfer in the ordinary course of business of worn out or obsolete Equipment if consented to in advance in writing by Lender, in Lender's sole and absolute discretion, and then only to the extent that the proceeds of any such disposition are used to acquire replacement Equipment which is subject to the Lender's security interest or are used to repay the Obligations, as determined by Lender in its sole and absolute discretion.

(f)     It shall defend the right, title and interest of the Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant the Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to the Lender, (ii) the prompt (but in no event later than two (2) Business Days following the Lender's request therefor) delivery to the Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, alonges or other instruments of transfer executed in blank), (iii) notification to third parties of the Lender's interest in Collateral at the Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve Borrower's and/or the Lender's interests in the Collateral.

{00311736.DOC. 4}

(g)      It shall promptly, and in any event within two (2) Business Days after the same is acquired by it, notify the Lender of any Commercial Tort Claim acquired by it and shall execute and deliver to the Lender such documents as Lender shall request to perfect, preserve or protect the Liens, rights and remedies of the Lender with respect to any such Commercial Tort Claim.

(h)      It shall perform in a reasonable time all other steps requested by the Lender to create and maintain in the Lender's favor a valid perfected first Lien in all Collateral.

(i)      It shall notify the Lender promptly, and in any event within two (2) Business Days after obtaining knowledge thereof (i) of any material delay in its performance of any of its obligations to any Account Debtor; (ii) of any assertion by any Account Debtor of any material claims, offsets or counterclaims; (iii) of any allowances, credits and/or monies granted by it to any Account Debtor; (iv) of all material adverse information relating to the financial condition of an Account Debtor; (v) of any material return of Inventory; and (vi) of any loss, damage or destruction of any of the Collateral .

(j)      Section 5.4(j) of the Borrower's Disclosure Schedule contains a true and complete list of certain specific machinery and equipment owned by Borrower as of the Closing Date and the location of such certain specific machinery and equipment. Borrower shall not permit any Equipment to become a fixture to real estate or accessions to other personal property. Borrower shall keep and maintain its Equipment in good operating condition, except for ordinary wear and tear, and shall make all necessary repairs and replacements thereof so that the value and operating efficiency shall at all times be maintained and preserved.

(k)      Section 5.4(k) of the Borrower's Disclosure Schedule lists all banks and other financial institutions at which it maintains deposits and/or other accounts, and such Schedule correctly identifies the name, address and telephone number of each such depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower shall not establish any depository or other bank account with any financial institution (other than the accounts set forth on Section 5.4(k) of the Borrower's Disclosure Schedule) without providing Lender with written notification thereof and providing similar information related thereto.

(l)      On the date hereof, its exact legal name (as indicated in the public record of its jurisdiction of organization), jurisdiction of organization, organizational identification number, if any, from the jurisdiction of organization, and the location of its chief executive office and all other offices or locations out of which it conducts business or operations, are specified on Section 5.4(l) of the Borrower's Disclosure Schedule. It has furnished to the Lender its Organizational Documents and long-form good standing certificate as of a date which is within thirty (30) days of the date hereof. It is organized solely under the law of the jurisdiction so specified and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction. Except as otherwise indicated on Section 5.4(l) of the Borrower's Disclosure Schedule, the jurisdiction of its organization of formation is required to maintain a public record showing it to have been organized or formed. Except as specified on Section 5.4(l) of the Borrower's Disclosure Schedule, it has not changed its name, jurisdiction of organization, chief executive office or place of business or its corporate or company structure in any way (e.g., by merger, consolidation, change in form or otherwise) within the last five years and has not within the last five years become bound (whether as a result of merger or otherwise) as a grantor under a security agreement entered into by another Person, which has not heretofore been terminated.

{00331756 DOC, 4}

(m)     Borrower shall maintain and keep all of its books and records concerning the Collateral at its executive offices listed in Section 5.4(l) of the Borrower's Disclosure Schedule.

(n)     It will not, except upon delivery to the Lender of all additional Financing Statements and other documents and legal opinions requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein: (i) change its jurisdiction of organization or the location of its chief executive office from that referred to in Section 5.4(l) of the Borrower's Disclosure Schedule; or (ii) change its name, identity or organizational structure.

(o)     None of the Collateral is subject to any prohibition against encumbering, pledging, hypothecating or assigning the same or requires notice or consent to Borrower's doing of the same.

(p)     (i) All Accounts represent complete bona fide transactions which require no further act under any circumstances on its part to make such Accounts payable by the Account Debtors, (ii) no Account is subject to any present, future contingent offsets or counterclaims, and (iii) no Account represents bill and hold sales, consignment sales, guaranteed sales, sale or return or other similar understandings or obligations of any Affiliate or Subsidiary of the applicable Borrower. It has not made, nor will it make, any agreement with any Account Debtor for any extension of time for the payment of any Account, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by it in the ordinary course of its Business consistent with historical practice and as previously disclosed to the Lender in writing.

(q)     The additional representations, warranties and covenants set forth in Section 5(c) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

## SECTION 6.  CONDITIONS TO MAKING INITIAL LOANS

The obligation of Lender to make the initial Loans shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the following conditions precedent:

6.1     **Loan Documents.**  Each of the Loan Documents shall have been duly and properly authorized, executed and delivered by Borrower and the other parties thereto and shall be in full force and effect as of the date hereof.

6.2     **Representations and Warranties.**  Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement and in other Loan Documents shall be true and correct in all respects as of the date hereof, provided that any such representation or warranty that is qualified by materiality shall be true and correct in all material respects as of the date hereof.

6.3     **Certified Copies of Formation Documents.**  Lender shall have received from Borrower, certified by the Responsible Officer to be true and complete on and as of a date which is not more than ten (10) Business Days prior to the date hereof, a copy of each of the Organizational Documents of Borrower in effect on such date of certification.

6.4     **Proof of Action.**  Lender shall have received from Borrower a copy, certified by the Responsible Officer to be true and complete on and as of the date hereof, of the records of all corporate

{00331756.DOC 4}

22

or limited liability company action taken by Borrower to authorize (a) its execution and delivery of each of the Loan Documents to which it is or is to become a party as contemplated or required by this Agreement, (b) its performance of all of its agreements and obligations under each of such documents, and (c) the incurring of the Obligations contemplated by this Agreement.

**6.5**   **[Reserved]**

**6.6**   **Insurance**. Lender shall have received evidence of insurance, additional insured and loss payee endorsements required hereunder and under the other Loan Documents, in form and substance satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as additional insured and loss payee.

**6.7**   **Validity of Collateral Representation**. Lender shall have received a statement by the appropriate officers of Borrower which shall represent and certify the validity of the Collateral.

**6.8**   **ACH Agreement**. Lender shall have received from Borrower an agreement executed by Borrower which irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system to all deposit accounts maintained by Borrower, wherever located.

**6.9**   **IRS Form 8821**. Lender shall have received from Borrower an executed Form 8821 to be submitted to the Internal Revenue Service which shall grant Lender access to Borrower's Tax information.

**6.10**   **IRS Form W-9**. Lender shall have received from Borrower an executed Form W-9 to be submitted to the Internal Revenue Service which shall allow Lender to verify Borrower's tax identification number(s).

**6.11**   **Pay Proceeds Letter**. Borrower shall have delivered to Lender a pay proceeds letter with respect to the disbursement of the proceeds of the initial Loans in form and substance satisfactory to Lender, which letter shall provide for, among other things, the payment or reimbursement of all costs and expenses incurred by Lender in connection with this Agreement and the other Loan Documents, including, without limitation, Lender's due diligence expenses and legal fees.

**6.12**   **No Event of Default**. No event shall have occurred on or prior to the date of each initial Loan by Lender hereunder and be continuing on the date of each such initial Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document; and, Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

**6.13**   **Additional Deliveries**. Borrower shall have delivered to Lender such other documents and instruments reasonably requested by Lender, including, without limitation, the documents set forth on Section 6 of the Loan Agreement Schedule.

## SECTION 7.  CONDITIONS TO MAKING ALL LOANS

If it is contemplated in this Agreement that more than one advance will be made by Lender under Section 2.1 hereof, the obligations of Lender to make all Loans hereunder shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the conditions set forth in Section 6 and, in addition, all of the following conditions precedent:

**7.1    Applications and Compliance.**  The application for such Loans shall have been made by Borrower to Lender in accordance with the applicable provisions of this Agreement and in compliance with all provisions of this Agreement.

**7.2    Representations and Warranties.**  Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement or in other Loan Documents shall have been true and correct in all material respects when made (provided that any such representation or warranty that is qualified as to materiality shall be true and correct in all respects), shall, for all purposes of this Agreement, be deemed to be repeated on and as of the date of each Loan by Lender hereunder and shall be true and correct in all respects on and as of each such date, except to the extent that any of such representations and warranties relate, by the express terms thereof, solely to a date prior to the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer of Borrower with respect to the foregoing in form and substance satisfactory to Lender.

**7.3    Performance, etc.**  Borrower shall have duly and properly performed, complied with and observed each of its covenants, agreements and obligations contained in this Agreement and in any other Loan Documents on the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.  No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender, knowing and intending that Lender shall rely thereon in making the Loans contemplated hereby (each of which representations and warranties shall be continuing unless expressly made in relation only to a specific date), that:

**8.1    Existence.**

(a)    Borrower (i) is a corporation or limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) is in good standing in all other jurisdictions in which it is required to be qualified to do business as a foreign corporation or limited liability company, (iii) has all requisite corporate or limited liability company power and authority and full legal right to own or to hold under lease its properties and to carry on the business as presently engaged and (iv) has been issued all required federal, state and local licenses, certificates or permits necessary, required or appropriate to the operation of its Business.

(b)       Borrower has corporate or limited liability company power and authority and has full legal rights to enter into each of the Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under each of such documents.

**8.2      No Violation, etc.** The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, the performance by Borrower of all of its agreements and obligations under each of such documents, and the incurring by Borrower of all of the Obligations contemplated by this Agreement, have been duly authorized by all necessary corporate or limited liability company actions on the part of Borrower and, if required, its shareholders, and do not and will not (a) contravene any provision of Borrower's Organizational Documents or this Agreement (each as from time to time in effect), (b) conflict with, or result in a breach of the terms, conditions, or provisions of, or constitute a default under, or result in the creation of any Lien upon any of the property of Borrower under, any agreement, mortgage or other instrument to which Borrower is or may become a party, (c) violate or contravene any provision of any law, regulation, order, ruling or interpretation thereunder or any decree, order or judgment or any court or governmental or regulatory authority, bureau, agency or official (all as from time to time in effect and applicable to such entity), (d) other than waivers required from Borrower's landlords, require any waivers, consents or approvals by any  third party, including any creditors or trustees for creditors of Borrower, or (e) require any approval, consent, order, authorization, or license by, or giving notice to, or taking any other action with respect to, any Governmental Authority.

**8.3      Binding Effect of Documents, etc.** Borrower has duly executed and delivered each of the Loan Documents to which Borrower is a party, and each of the Loan Documents is valid, binding and in full force and effect. The agreements and obligations of Borrower as contained in each of the Loan Documents constitute, or upon execution and delivery thereof will constitute, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject, as to the enforcement of remedies only, to limitations imposed by federal and state laws regarding bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights and remedies generally, and by general principles of law and equity.

**8.4      No Events of Default.**

(a)       No Event of Default has occurred and is continuing and no event has occurred and is continuing and no condition exists that would, with notice or the lapse of time, or both, constitute an Event of Default.

(b)       Borrower is not in default under any Material Contract to which Borrower is a party or by which Borrower or any property of Borrower is bound.

(c)       Borrower's execution, delivery and performance of and compliance with this Agreement and the other Loan Documents  will not, with or without the passage of time or giving of notice, result in any violation of law, or be in conflict with or constitute a default under any term or provision, or result in the creation of any Lien upon any of Borrower's  properties or assets or the suspension, revocation, impairment, forfeiture or nonrenewal, of any permit, license, authorization or approval applicable to Borrower, or any of its businesses or operations or any of its assets or properties.

**8.5    No Governmental Consent Necessary**.  No consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any Governmental Authority is required with respect to the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party.

**8.6    No Proceedings**.  Except as set forth on <u>Section 8.6 of the Borrower's Disclosure Schedule</u>, there are no actions, suits, or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower in any court or before any Governmental Authority.

**8.7    No Violations of Laws; Licenses and Permits**.  Borrower has conducted, and is conducting, its Business, so as to comply in all material respects with all applicable federal, state, county and municipal statutes and regulations.  Neither Borrower nor any officer, director, manager, member or shareholder of Borrower is charged with, or so far as is known by Borrower, is under investigation with respect to, any violation of any such statutes, regulations or orders, which could have a Material Adverse Effect.  Borrower has been issued all required federal, state and local licenses, certificates or permits required for the operation of its business.

**8.8    Use of Proceeds of the Loans**.  Proceeds from the Loans shall be used only for those purposes set forth in this Agreement.  No part of the proceeds of the Loans shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of any statute or regulation.  In particular, without limitation of the foregoing, no part of the proceeds from the Loans is intended to be used to acquire any publicly held stock of any kind.

**8.9    Financial Statements; Indebtedness**.

(a)    The balance sheet of Borrower as of July 15, 2017, and the related statement of operations, stockholders' equity and cash flows (together with the related notes) for the Fiscal Year ended December 31, 2016, and the balance sheet of Borrower and the related statement of operations, stockholders' or members' equity and cash flows (together with the related notes) for the 6-month period ended June 30, 2017 (collectively, the "**Financial Statements**") fairly present, as of the date thereof, the financial position of Borrower, and the results of its operations, cash flows and stockholders' equity in all material aspects.

(b)    Except as shown on the most recent Financial Statements, (i) Borrower has no Indebtedness as of the date hereof which would adversely affect the financial condition of Borrower or the Collateral, and (ii) Borrower has no liabilities, contingent or otherwise, except those which, individually or in the aggregate, are not material to the financial condition or operating results of Borrower.

**8.10    Changes in Financial Condition**.  Since the Balance Sheet Date, there has been no material adverse change and no material adverse development in the Business, properties, operations, condition (financial or otherwise), results of operations or prospects of Borrower.  Since the Balance Sheet Date, Borrower has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, outside of the ordinary course of business, (iii) had capital expenditures outside of the ordinary course of business, (iv) engaged in any transaction with any Affiliate or (v) engaged in any other transaction outside of the ordinary course of business.

{00331756.DOC; 4}

**8.11 Equipment**. Borrower shall keep and maintain its Equipment in good operating condition, and shall make all necessary repairs and replacements thereof so that the value and operating efficiency shall at all times be maintained and preserved.

**8.12 Taxes and Assessments.**

(a) Borrower has paid and discharged when due all Taxes, assessments and other governmental charges which may lawfully be levied or assessed upon its income and profits, or upon all or any portion of any property belonging to it, whether real, personal or mixed, to the extent that such Taxes, assessment and other charges have become due. Borrower has filed all Tax returns, federal, state and local, and all related information, required to be filed by it.

(b) Borrower shall make all payments to be made by it hereunder without any Tax Deduction. If a Tax Deduction is required, the amount of the payment due from Borrower to Lender shall be increased and grossed up to an amount equal to the payment which would have been due if no Tax Deduction had been required. If a Tax Deduction is required, Borrower shall promptly make any payment required in connection with that Tax Deduction.

(c) "**Tax Deduction**" means a deduction or withholding for or on account of a Tax from a payment received by Lender under a Loan Document.

(d) "**Tax**" or "**Taxes**" means any tax, levy, impost, duty or other charge or withholding of a similar nature, including any income, franchise, stamp, documentary, excise or property tax, charge or levy (in each case, including any related penalty or interest).

**8.13 ERISA.** Borrower is in compliance in all material respects with the applicable provisions of ERISA and all regulations issued thereunder by the United States Treasury Department, the Department of Labor and the Pension Benefit Guaranty Corporation.

**8.14 Environmental Matters.**

(a) Borrower has duly complied with, and its facilities, assets, property, leaseholds and Equipment are in compliance in all respects with, the provisions of all Environmental Laws.

(b) Borrower has been issued all required federal, state and local licenses, certificates or permits required under Environmental Laws for the operation of its Business.

**8.15 United States Anti-Terrorism Laws; Holding Company Status.**

(a) In this Section 8.15:

"**Anti-Terrorism Law**" means each of: (i) Executive Order No. 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the "**Executive Order**"); (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (iii) the Money Laundering Control Act of 1986, Public Law 99-570; and (iv) any similar law enacted in the United States of America subsequent to December 31, 2004.

"**holding company**" has the meaning given to it in the United States Public Utility Holding Company Act of 1935, and any successor legislation and rules and regulations promulgated thereunder.

"**investment company**" has the meaning given to it in the United States Investment Company Act of 1940.

"**public utility**" has the meaning given to it in the United States Federal Power Act of 1920.

"**Restricted Party**" means any person listed: (i) in the Annex to the Executive Order; (ii) on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or (iii) in any successor list to either of the foregoing.

(b)     Borrower is not (i) a holding company or subject to regulation under the United States Public Utility Holding Company Act of 1935; (ii) a public utility or subject to regulation under the United States Federal Power Act of 1920; (iii) required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or (iv) subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee Indebtedness.

(c)     To the best of Borrower's knowledge, Borrower (i) is not, and is not controlled by, a Restricted Party; (ii) has not received funds or other property from a Restricted Party; and (iii) is not in breach of and is not the subject of any action or investigation under any Anti-Terrorism Law.

(d)     Borrower has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

**8.16    Customers and Vendors.**   There are no disputes with any customers, suppliers, manufacturers, vendors and independent contractors of Borrower in excess of $5,000 in the aggregate with any such party.

**8.17    Representations, Warranties and Covenants Concerning the Collateral.**   The representations, warranties and covenants of Borrower set forth in Section 5.4 hereof are incorporated in this Section 8.17 by reference.

**8.18    Books and Records.**   Borrower maintains its chief executive office and its books and records related to the Collateral at its address set forth in Section 5.4(l) of the Borrower's Disclosure Schedule.

**8.19    Ownership and Control.**   All of the issued and outstanding Equity Interests of Borrower are owned beneficially and of record according to the percentages set forth in Section 8.19 of the Borrower's Disclosure Schedule.

**8.20** **Changes.** Since the Balance Sheet Date, except as disclosed in Section 8.20 of the Borrower's Disclosure Schedule, with respect to Borrower, there has not been:

(a) any change in its Business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects, which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect;

(b) any resignation or termination of any of its officers, key employees or groups of employees;

(c) any change, except in the ordinary course of business, in its contingent obligations by way of guaranty, endorsement, indemnity, warranty or otherwise;

(d) any damage, destruction or loss, whether or not covered by insurance, which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(e) any waiver by it of a valuable right or of a material debt owed to it;

(f) any direct or indirect loans made by it to any of its stockholders, managers, employees, officers or directors, other than advances made in the ordinary course of business;

(g) any material change in any compensation arrangement or agreement with any employee, manager, officer, director or equity holder;

(h) any declaration or payment of any dividend or other distribution of its assets;

(i) any labor organization activity related to it;

(j) any debt, obligation or liability incurred, assumed or guaranteed by it, except those for immaterial amounts and for current liabilities incurred in the ordinary course of business;

(k) any sale, assignment, transfer, abandonment or other disposition of any Collateral other than Inventory in the ordinary course of business;

(l) any change in any Material Contract to which it is a party or by which it is bound which, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(m) any other event or condition of any character that, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(n) any arrangement or commitment by it to do any of the acts described in subsection (a) through (m) of this Section 8.20.

8.21    Intellectual Property.

(a)    (1) Borrower holds all Intellectual Property that it owns free and clear of all Liens and restrictions on use or transfer, whether or not recorded, and has sole title to and ownership of or has the full, exclusive (subject to the rights of its licensees) right to use in its field of business such Intellectual Property; and Borrower holds all Intellectual Property that it uses but does not own under valid licenses or sub-licenses from others; (2) the use of the Intellectual Property by Borrower does not violate or infringe on the rights of any other Person; (3) Borrower has not received any notice of any conflict between the asserted rights of others and Borrower with respect to any Intellectual Property; (4) Borrower has used its commercially reasonable best efforts to protect its rights in and to all Intellectual Property; (5) Borrower is in compliance with all material terms and conditions of its agreements relating to the Intellectual Property; (6) Borrower is not, and since the Balance Sheet Date has not been, a defendant in any action, suit, investigation or proceeding relating to infringement or misappropriation by Borrower of any Intellectual Property nor has Borrower been notified of any alleged claim of infringement or misappropriation by Borrower of any Intellectual Property; (7) to the knowledge of Borrower, none of the products or services Borrower is researching, developing, proposes to research and develop, make, have made, use, or sell, infringes or misappropriates any Intellectual Property right of any third party; and (8) to Borrower's knowledge, none of the material processes and formulae, research and development results and other know-how relating to Borrower's Business, the value of which to Borrower is contingent upon maintenance of the confidentiality thereof, has been disclosed to any Person other than Persons bound by written confidentiality agreements.

(b)    Section 8.21 of the Borrower's Disclosure Schedule sets forth a true and complete list of (i) all Intellectual Property owned or claimed by Borrower, together with any and all registration or application numbers for any Intellectual Property filed or issued by any Intellectual Property registry (and in the case of any and all domain names registered by or on behalf of Borrower, the name of the registrar(s) thereof) and (ii) all Intellectual Property licenses which are material to the Borrower's Business.

8.22    Employees.    Borrower has no collective bargaining agreements with any of its employees.    There is no labor union organizing activity pending or, to Borrower's knowledge, threatened with respect to Borrower. Except as set forth in Section 8.22 of the Borrower's Disclosure Schedule, Borrower is not a party to or bound by any currently effective deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement.    To Borrower's knowledge, no employee of Borrower, nor any consultant with whom Borrower has contracted, is in violation of any material term of any employment contract or any other contract relating to the right of any such individual to be employed by, or to contract with, Borrower or to receive any benefits; and, to Borrower's knowledge, the continued employment by Borrower of its present employees, and the performance of Borrower's contracts with its independent contractors, will not result in any such violation. Except for employees who have a current effective employment agreement with Borrower, as set forth in Section 8.22 of the Borrower's Disclosure Schedule, no employee of Borrower has been granted the right to continued employment by Borrower or to any material compensation following termination of employment with Borrower. Borrower is not aware that any officer, director, manager, partner, key employee or group of employees intends to terminate his, her or their employment with Borrower, nor does Borrower have a present intention to terminate any of the same.

{00331756 DOC; 4}

30

**8.23    Tax Status.** Borrower (i) has made or filed all federal and state income and all other Tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all Taxes and other governmental assessments and charges that are shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and for which it has set aside on its books a provision in the amount of such Taxes being contested in good faith and (iii) has set aside on its books provisions reasonably adequate for the payment of all Taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid Taxes payable by Borrower claimed to be due by the taxing authority of any jurisdiction, and the officers of the Borrower know of no basis for any such claim.

**8.24    Representations and Warranties: True, Accurate and Complete.** None of the representations, certificates, reports, warranties or statements now or hereafter made or delivered to Lender pursuant hereto or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances in which they are made, not misleading.

**8.25    Fees; Brokers; Finders.** There are no fees, commissions or other compensation due to any third party acting on behalf of or at the direction of Borrower in connection with the Loan Documents, except as set forth on Section 8.25 of the Borrower's Disclosure Schedule. All negotiations relative to the Loan Documents, and the transactions contemplated thereby, have been carried on by the Borrower with the Lender without the intervention of any other person or entity acting on behalf of the Borrower, and in such manner as not to give rise to any claim against the Borrower or the Lender for any finder's fee, brokerage commission or like payment due to any third party acting on behalf of or at the direction of Borrower, and if any such fee, commission or payment is payable, it shall be the sole responsibility of the Borrower and the Borrower shall pay, and indemnify the Lender for, the same.

## SECTION 9.  AFFIRMATIVE COVENANTS

Until the indefeasible payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

**9.1 Notify Lender.** Borrower shall promptly, and in any event within two (2) Business Days of any determining of the following, inform Lender (a) if any one or more of the representations and warranties made by Borrower in this Agreement or in any document related hereto shall no longer be entirely true, accurate and complete in any respect; (b) of any Equipment which is not in good order and repair, and in running and marketable condition, or of any Equipment that is removed or is missing from the Borrower's Premises; (c) of all material adverse information relating to the financial condition of Borrower; (d) of any material return of goods; (e) of any loss, damage or destruction of any of the Collateral; (f) the occurrence of an Event of Default or a Material Adverse Effect; and (g) of any other events or occurrences set forth in Section 7(a) of the Loan Agreement Schedule.

**9.2    Change in Ownership, Directors, Managers or Officers.** Borrower shall promptly notify Lender of any changes in Borrower's managers, directors and/or officers and in the ownership of Borrower.

**9.3    Pay Taxes and Liabilities; Comply with Agreement**. Borrower shall promptly pay, when due, or otherwise discharge, all Indebtedness, sums and liabilities of any kind now or hereafter owing by Borrower to its employees as wages or salaries or to Lender and Governmental Authorities however created, incurred, evidenced, acquired, arising or payable, including, without limitation, income Taxes, excise Taxes, sales and use Taxes, license fees, and all other Taxes with respect to any of the Collateral, or any wages or salaries paid by Borrower or otherwise, unless the validity of which are being contested in good faith by Borrower by appropriate proceedings, provided that Borrower shall have maintained reasonably adequate reserves and accrued the estimated liability on Borrower's balance sheet for the payment of same.

**9.4    Observe Covenants, etc**. Borrower shall observe, perform and comply with the covenants, terms and conditions of this Agreement and the other Loan Documents.

**9.5    Maintain Corporate Existence and Qualifications**. Borrower shall maintain and preserve in full force and effect, its corporate existence and rights, franchises, licenses and qualifications necessary to continue its Business, and comply with all applicable statutes, rules and regulations pertaining to the operation, conduct and maintenance of its existence and Business including, without limitation, all federal, state and local laws relating to benefit plans, environmental safety, or health matters, and hazardous or liquid waste or chemicals or other liquids (including use, sale, transport and disposal thereof).

**9.6    Financial Reports and Other Information**. Borrower shall deliver or cause to be delivered to Lender:

(a)    **Reports.** The financial reports and other information set forth in Section 7(b) of the Loan Agreement Schedule, on the dates set forth therein. The Borrower shall further comply with all its covenants set forth therein.

(b)    **Notice of Litigation, Judgments, Environmental, Health or Safety Complaints.**

(i)    Within two (2) Business Days after commencement or receipt by Borrower, written notice to Lender of all litigation and of all proceedings involving the Borrower or any of its assets, together with a copy of all pleadings and demands;

(ii)    Within two (2) Business Days thereafter, written notice to Lender of the entry of any judgment or the institution of any lawsuit or of other legal or equitable proceedings or the assertion of any cross claim or counterclaim seeking monetary damages from Borrower; and

(iii)    Within two (2) Business Days thereafter, notice or copies if written of all claims, complaints, orders, citations or notices, whether formal or informal, written or oral, from a governmental body or private person or entity, relating to air emissions, water discharge, noise emission, solid or liquid waste disposal, hazardous waste or materials, or any other environmental, health or safety matter, which adversely affect Borrower. Such notices shall include, among other information, the name of the party who filed the claim, the potential amount of the claim, and the nature of the claim.

(c)    **Other Information**. Upon demand,

          (i)      Certificates of insurance for all policies of insurance to be maintained by Borrower pursuant hereto;

          (ii)     All information received by Borrower affecting the financial status or condition of any Account Debtor or the payment of any Account, including but not limited to, invoices, original orders, shipping and delivery receipts; and

          (iii)    An estoppel certificate executed by the Responsible Officer of Borrower indicating that there then exists no Event of Default and no event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

    (d)    **Additional Information.**  From time to time, such other information as Lender may reasonably request, including financial projections and cash flow analysis.

   **9.7**    **Comply with Laws.**  Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, compliance with which is necessary to maintain its corporate existence or the conduct of its Business or non-compliance with which would adversely affect in any respect its ability to perform its obligations or any security given to secure its obligations.

   **9.8**    **Insurance Required.**

    (a)    Borrower shall cause to be maintained, in full force and effect on all Collateral, insurance in such amounts against such risks as is reasonably satisfactory to Lender, including, but without limitation, business interruption, liability, fire, theft, burglary, pilferage, vandalism, malicious mischief, loss in transit, and hazard insurance and, if as of the date hereof, any of the leased real property of Borrower is in an area that has been identified by the Secretary of Housing and Urban Development as having special flood or mudslide hazards, and on which the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, then Borrower shall maintain flood insurance.  Said policy or policies shall:

          (i)      Be in a form and with insurers which are satisfactory to Lender;

          (ii)     Be for such risks, and for such insured values as Lender or its assigns may reasonably require in order to replace the property in the event of actual or constructive total loss;

          (iii)    Designate Lender as additional insured and loss payee as Lender's interest may from time to time appear;

          (iv)    Contain a "breach of warranty clause" whereby the insurer agrees that a breach of the insuring conditions or any negligence by Borrower or any other person shall not invalidate the insurance as to Lender and its assignee;

          (v)     Provide that they may not be canceled or altered without thirty (30) days prior written notice to Lender; and

(vi)     Upon demand, be delivered to Lender.

(b)     Borrower shall obtain such additional insurance as Lender may reasonably require.

(c)     Borrower shall, in the event of loss or damage of any Collateral, forthwith notify Lender and file proofs of loss with the appropriate insurer.  Borrower hereby authorizes Lender to endorse any checks or drafts constituting insurance proceeds.

(d)     Borrower shall forthwith upon receipt of insurance proceeds endorse and deliver the same to Lender

(e)     In no event shall Lender be required either to (i) ascertain the existence of or examine any insurance policy or (ii) advise Borrower in the event such insurance coverage shall not comply with the requirements of this Agreement.

9.9     **Condition of Collateral; No Liens**.  Borrower shall (i) maintain all Collateral in good condition and repair at all times, (ii) preserve the Collateral against any loss, damage, or destruction of any nature, (iii) keep the Collateral free and clear of any Liens, except for the Liens of Lender and Permitted Encumbrances set forth on Section 9.9 of the Borrower's Disclosure Schedule, and shall not permit Collateral to become a fixture to real estate or accessions to other personal property.

9.10     **Payment of Proceeds**.   Borrower shall forthwith upon receipt of all Proceeds of Collateral, pay such Proceeds (insurance or otherwise) up to the amount of the then-outstanding Obligations over to Lender for application against the Obligations in such order and manner as Lender may elect.

9.11     **Records**.   Borrower shall at all times keep accurate and complete records of its operations, of the Collateral and the status of each Account, which records shall be maintained at its executive offices as set forth on Section 5.4(l) of the Borrower's Disclosure Schedule.

9.12     **Pay Obligations**.  Borrower shall promptly and timely pay all Obligations when due in accordance with the Loan Documents.

9.13     **Delivery of Documents**.  If any Proceeds of Accounts shall include, or any of the Accounts shall be evidenced by, notes, trade acceptances or instruments or documents, or if any Inventory is covered by documents of title or chattel paper, whether or not negotiable, then Borrower waives protest regardless of the form of the endorsement.  If Borrower fails to endorse any instrument or document, Lender is authorized to endorse it on Borrower's behalf.

9.14     **United States Contracts**.   Section 7(c) of the Loan Agreement Schedule is hereby incorporated by reference and made a part hereof.

9.15     **Further Assurances**.  Borrower shall at any time or from time to time upon request of Lender take such steps and execute and deliver such Financing Statements and other documents all in the form of substance satisfactory to Lender relating to the creation, validity or perfection of the security interests provided for herein, under the UCC or which are reasonably necessary to effectuate the purposes and provisions of this Agreement.  Borrower shall defend the right, title and interest of Lender

{00531756.DOC 4}

in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to Lender, (ii) the prompt (but in no event later than two (2) Business Days following Lender's request therefor) delivery to Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification of Lender's interest in Collateral at Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve Borrower's and/or Lender's respective and several interests in the Collateral.

9.16    **Indemnification**.  Borrower shall indemnify, protect, defend and hold Lender, and Lender's members, managers, directors, officers, employees, agents, attorneys, and representatives (each, an "**Indemnified Party**") harmless from and against any and all claims, demands, suits, judgments, losses, damages, liabilities, expenses, costs and fees (including reasonable attorneys' fees) and liabilities of any kind or nature relating to, resulting from, arising out of or in connection with the Loan Documents and the transactions contemplated by the Loan Documents. If a claim or action shall be brought against an Indemnified Party based upon any of the above, the Indemnified Party shall select counsel to defend such claim or action. Borrower shall be responsible for payment of all costs and expenses of such counsel selected by the Indemnified Party and all costs and expenses incurred by the Indemnified Party. The Indemnified Party and counsel selected by the Indemnified Party shall defend, compromise, settle or purse such claim or action at Borrower's expense. The provisions of this Section shall survive the termination of this Agreement and the final repayment of the Obligations.

9.17    **Additional Covenants.**  The terms and provisions of <u>Section 8 of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

9.18    **Name Changes; Location Changes**.

(a)    Borrower shall promptly notify Lender of any changes in the name of Borrower or if Borrower is known by or conducting business under any names other than those set forth in this Agreement.

(b)    Borrower shall deliver not less than thirty (30) days prior written notice to Lender if Borrower intends to conduct any of its Business or operations at or out of offices or locations other than those set forth in <u>Section 5.4(l) of the Borrower's Disclosure Schedule</u>, or if it changes the location of its chief executive office or the address at which it maintains its books and records.

9.19    **Acquisition of Real Property**.  If after the Closing Date, Borrower acquires or purchases any real property using any part of the Availability for the acquisition or purchase of such real property, Borrower shall covey to Lender a first mortgage lien on such real property purchased at the time of closing in such acquisition or purchase.

## SECTION 10. NEGATIVE COVENANTS

Until payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

**10.1**   [Reserved]

**10.2    Disposition of Assets or Collateral.** Borrower will not sell, lease, transfer, convey, or otherwise dispose of any or all of its assets or Collateral, other than the sale of Inventory in the ordinary course of business or the sale of Equipment in accordance with Lender's prior written consent under Section 5.4(e) hereof.

**10.3    Other Liens.** Borrower will not incur, create or permit to exist any Lien on any of its property or assets, whether now owned or hereafter acquired, except for (a) those Liens in favor of Lender created by this Agreement and the other Loan Documents; and (b) the Permitted Encumbrances.

**10.4    Other Liabilities.** Borrower will not incur, create, assume, or permit to exist, any Indebtedness or liability on account of either borrowed money or the deferred purchase price of property, except (i) Obligations to Lender, (ii) debt expressly subordinated to Borrower's Obligations to Lender pursuant to a subordination agreement in form and substance satisfactory to Lender or (iii) Permitted Indebtedness set forth on Section 10.4 of the Borrower's Disclosure Schedule.

**10.5**   [Reserved]]

**10.6    Loans.** Borrower will not make any loans to any Person, other than advances to employees of Borrower in the ordinary course of business, with outstanding advances to any employee not to exceed $1,000 at any time.

**10.7    Guaranties.** Borrower will not assume, guaranty, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

**10.8    Transfers of Notes or Accounts.** Borrower will not sell, assign, transfer, discount or otherwise dispose of any Accounts or any promissory note payable to Borrower, with or without recourse.

**10.9    Dividends.** Borrower will not declare or pay any cash dividend, make any distribution on, redeem, retire or otherwise acquire directly or indirectly, any of its Equity Interests without the prior written consent of Lender.

**10.10   Payments to Affiliates.** Except as set forth in Section 10.10 of the Borrower's Disclosure Schedule, or as otherwise approved by Lender in writing in advance, Borrower shall not make any payments of cash or other property to any Affiliate.

**10.11   Modification of Documents.** Borrower will not change, alter or modify, or permit any change, alteration or modification of its Organizational Documents in any manner that might adversely

affect Lender's rights hereunder as a secured lender or its Collateral without Lender's prior written consent.

**10.12   Change Business or Name.**  Borrower will not engage in any business other than the Business, or change its names as it appears in the official filings of its state of organization.

**10.13   Settlements.**  Other than in the ordinary course of its Business, Borrower will not compromise, settle or adjust any claims in any amount relating to any of the Collateral, without the prior written consent of Lender.

## SECTION 11.  EVENTS OF DEFAULT

The occurrence of any of the following shall constitute an event of default (hereinafter referred to as an "**Event of Default**"):

**11.1   Failure to Pay.**  The failure by Borrower to pay, when due, (a) any payment of principal, interest, fees or other charges due and owing to Lender pursuant to any obligations of Borrower to Lender including, without limitation, those Obligations arising pursuant to this Agreement or any Loan Document, or under any other agreement for the payment of monies then due and payable to Lender, or (b) any Taxes due to any Governmental Authority.

**11.2   Failure of Insurance.**  Failure of one or more of the insurance policies required hereunder to remain in full force and effect; failure on the part of Borrower to pay or cause to be paid all premiums when due on the insurance policies pursuant to this Agreement; failure on the part of Borrower to take such other action as may be requested by Lender in order to keep said policies of insurance in full force and effect until all Obligations have been indefeasibly paid in full; and failure on the part of Borrower to execute any and all documentation required by the insurance companies issuing said policies to effectuate said assignments.

**11.3   Failure to Perform.**  Borrower's failure to perform or observe any covenant, term or condition of this Agreement or in any other Loan Document.

**11.4   Cross Default.**  Borrower's breach of or default under any agreement or contract with (i) any of the Existing Mortgagees, or (ii) any of the landlords of the Borrower's Premises, or (iii) any other third party which default with respect to any other third party would result in a liability to Borrower in excess of $5,000.

**11.5   False Representation or Warranty.**  Borrower shall have made any statement, representation or warranty in this Agreement or in any other Loan Document to which Borrower is a party or in a certificate executed by Borrower incident to this Agreement, which is at any time found to have been false in any material respect at the time such representation or warranty was made.

**11.6   Liquidation, Voluntary Bankruptcy, Dissolution, Assignment to Creditors.**  Any resolution shall be passed or any action (including a meeting of creditors) shall be taken by Borrower for the termination, winding up, liquidation or dissolution of Borrower, or Borrower shall make an assignment for the benefit of creditors, or Borrower shall file a petition in voluntary liquidation or bankruptcy, or Borrower shall file a petition or answer or consent seeking, or consenting to, the reorganization of Borrower or the readjustment of any of the Indebtedness of Borrower under any

applicable insolvency or bankruptcy laws now or hereafter existing (including the Bankruptcy Code), or Borrower shall consent to the appointment of any receiver, administrator, liquidator, custodian or trustee of all or any part of the property or assets of Borrower or any corporate or company action shall be taken by Borrower for the purposes of effecting any of the foregoing.

**11.7    Involuntary Petition Against Borrower**. Any petition or application for any relief is filed against Borrower under applicable insolvency or bankruptcy laws now or hereafter existing (including the Bankruptcy Code) or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity), and is not dismissed or stayed within thirty (30) days of the filing thereof.

**11.8    Judgments; Levies**. Judgments or attachments aggregating in excess of $10,000 at any given time are obtained against Borrower which remain unstayed for a period of ten (10) days or are enforced.

**11.9    Change in Condition**. There occurs any event or a change in the condition or affairs, financial or otherwise, of Borrower which, in the reasonable opinion of Lender, impairs Lender's security or the ability of Borrower to discharge its obligations hereunder or any other Loan Document or which impairs the rights of Lender in the Collateral.

**11.10    Environmental Claims**. Lender determines that any Environmental Liabilities and Costs or Environmental Lien with respect to Borrower will have a potentially adverse effect on the financial condition of Borrower or on the Collateral.

**11.11    Failure to Notify**. If at any time Borrower fails to provide Lender immediately with notice or copies, if written, of all complaints, orders, citations or notices with respect to environmental, health or safety complaints.

**11.12    Failure to Deliver Documentation**. Borrower shall fail to obtain and deliver to Lender any other documentation required to be signed or obtained as part of this Agreement, or shall have failed to take any reasonable action requested by Lender to perfect, protect, preserve and maintain the security interests and Lien on the Collateral provided for herein.

**11.13    Material Adverse Effect**. A Material Adverse Effect shall have occurred.

**11.14    Dissolution; Maintenance of Existence**. Borrower is dissolved, or Borrower fails to maintain its corporate existence in good standing, or the usual business of Borrower ceases or is suspended in any respect.

**11.15    Indictment**. The indictment of Borrower or any director or Responsible Officer of Borrower under any criminal statute, or commencement of criminal or civil proceedings against Borrower, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any portion of the property of Borrower.

**11.16    Tax Liens**. The filing of a Lien for any unpaid Taxes filed by any Governmental Authority against Borrower or any of its assets.

{00331756.DOC; 4}

**11.17   Challenge to Validity of Loan Documents**.  Borrower attempts to terminate or challenge the validity of, or its liability under, this Agreement or any other Loan Document, or any proceeding shall be brought to challenge the validity, binding effect of any Loan Document, or any Loan Document ceases to be a valid, binding and enforceable obligation of Borrower.

**11.18   Claims Against Lender.**  Any claim asserted by Borrower seeking to challenge the Loan Documents, Lender's Liens in the Collateral or otherwise commencing any cause of action against the Lender.

**11.19   Other Events of Default**.  Any events and/or occurrences set forth on Section 9 of the Loan Agreement Schedule.

## SECTION 12. REMEDIES

**12.1    Acceleration; Other Remedies**.  Upon the occurrence and during the continuation of an Event of Default:

(a)     Lender shall have all rights and remedies provided in this Agreement, any of the other Loan Documents, the UCC or other applicable law, all of which rights and remedies may be exercised without notice to Borrower, all such notices being hereby waived, except such notice as is expressly provided for hereunder or is not waivable under applicable law.  All rights and remedies of Lender are cumulative and not exclusive and are enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions and in any order Lender may determine. Without limiting the foregoing, Lender may (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (iii) require Borrower, at Borrower's expense, to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (vi) extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations, and (vii) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including, without limitation, entering into contracts with respect thereto, by public or private sales at any exchange, broker's board, any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of Borrower, which right or equity of redemption is hereby expressly waived and released by Borrower.  If any of the Collateral or other security for the Obligations is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender.  If notice of disposition of Collateral is required by law, ten (10) days prior notice by Lender to Borrower designating the time and place of any public sale, or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrower waives any other notice.  In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of

prejudgment remedy. Borrower waives the posting of any bond which might otherwise be required. In addition to the foregoing and without limitation to any other provision hereof, Borrower hereby grants Lender its assignee or any of its representatives and also grants to any purchasers of any Collateral at any public or private sale conducted by Lender, the right and license, for a period of up to one hundred eighty (180) days commencing on the date of the conclusion of such public or private sale conducted by Lender, to use all of the Borrower's names, trade names, business names and trademarks, to enter upon and use the premises where the Collateral is located and to do with the Collateral so purchased, any or all of the Permitted Actions at no cost to Lender and at no cost to any purchaser of any Collateral at a public or private sale conducted by Lender or by any purchaser of any Collateral. Borrower acknowledges and agrees that the foregoing rights of Lender and any purchasers of Collateral pursuant to a public or private sale conducted by Lender shall survive the Term.

(b)      Lender may apply the Proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition of the Collateral to payment of any of the Obligations, in whole or in part (including attorneys' fees and legal expenses incurred by Lender with respect thereto or otherwise chargeable to Borrower) and in such order as Lender may elect, whether or not then due. Borrower shall remain liable to Lender for the payment on demand of any deficiency together with interest at the Default Interest Rate and all costs and expenses of collection or enforcement, including reasonable attorneys' fees and legal expenses.

(c)      Lender may, at its option, cure any default by Borrower under any agreement with a third party or pay or bond on appeal any judgment entered against Borrower, discharge Taxes and Liens at any time levied on or existing with respect to the Collateral, and pay any amount, incur any expense or perform any act which, in Lender's sole and absolute judgment, is necessary or appropriate to preserve, protect, insure, maintain, or realize upon the Collateral. Such amounts paid by Lender shall be repayable by Borrower on demand and added to the Obligations, with interest payable thereon at the Default Interest Rate. Lender shall be under no obligation to effect such cure, payment, bonding or discharge, and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower.

(d)      Lender and Lender's agents shall have the right to utilize any of Borrower's customer lists, registered names, trade names or trademarks to publicly advertise, sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral and Borrower will be deemed to have waived and voided any confidentiality agreements by and between Borrower and Lender.

**12.2     Set-off.** Lender shall have the right, immediately and without notice of other action, to set-off against any of Borrower's liabilities to Lender any money or other liability owed by Lender or any Affiliate of Lender (and such Affiliate of Lender is hereby authorized to effect such set-off) in any capacity to Borrower, whether or not due, and Lender or such Affiliate shall be deemed to have exercised such right of set-off and to have made a charge against any such money or other liability immediately upon the occurrence of such Event of Default even though the actual book entries may be made at a time subsequent thereto. The right of set-off granted hereunder shall be effective irrespective of whether Lender shall have made demand under or in connection with the Loans. None of the rights of Lender described in this Section are intended to diminish or limit in any way Lender's or Affiliates of Lender's common-law set-off rights.

{00331756.DOC; 4}

40

**12.3    Costs and Expenses.** Borrower shall be liable for all costs, charges and expenses, including attorneys' fees and disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of Lender's remedies with respect thereto, each of which shall be repayable by Borrower on demand with interest at the Default Interest Rate, and added to the Obligations.

**12.4    No Marshalling.** Lender shall be under no obligation whatsoever to proceed first against any of the Collateral or other property which is security for the Obligations before proceeding against any other of the Collateral. It is expressly understood and agreed that all of the Collateral or other property which is security for the Obligations stands as equal security for all Obligations, and that Lender shall have the right to proceed against any or all of the Collateral or other property which is security for the Obligations in any order, or simultaneously, as in its sole and absolute discretion it shall determine. It is further understood and agreed that Lender shall have the right to sell any or all of the Collateral or other property which is security for the Obligations in any order or simultaneously, as Lender shall determine in its sole and absolute discretion.

**12.5    No Implied Waivers; Rights Cumulative.** No delay on the part of Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document or provided by statute or at law or in equity or otherwise shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege or be construed as a waiver of any Event of Default or as an acquiescence therein. No right, remedy, power or privilege conferred on or reserved to Lender hereunder or under any other Loan Document or otherwise is intended to be exclusive of any other right, remedy, power or privilege. Each and every right, remedy, power or privilege conferred on or reserved to Lender under this Agreement or under any of the other Loan Documents or otherwise shall be cumulative and in addition to each and every other right, remedy, power or privilege so conferred on or reserved to Lender and may be exercised by Lender at such time or times and in such order and manner as Lender shall (in its sole and absolute discretion) deem expedient.

### SECTION 13.  OTHER RIGHTS OF LENDER

**13.1    Collections.** Borrower hereby authorizes Lender to, and Lender shall make such arrangements as it shall deem necessary or appropriate to, collect the Accounts and any other monetary obligations included in, or Proceeds of, the Collateral at any time whether or not an Event of Default has occurred. Borrower shall, at Borrower's expense and in the manner requested by Lender from time to time, direct that remittances and all other Proceeds of Accounts and other Collateral, and all other amounts payable or paid to Borrower for any reason or for any purpose be (a) remitted in kind to Lender, (b) sent to a post office box designated by and/or in the name of Lender, or in the name of Borrower, but as to which access is limited to Lender and/or (c) deposited into a bank account maintained in the name of Lender and/or a blocked bank account under arrangements with the depository bank under which all funds deposited to such blocked bank account are required to be transferred solely to Lender. In connection therewith, Borrower shall execute such post office box and/or blocked bank account agreements as Lender shall specify.

**13.2    Repayment of Obligations; Application.** All Obligations shall be payable at Lender's office set forth in the Loan Agreement Schedule or at a bank or such other place as Lender may expressly designate from time to time for purposes of this Section. Lender shall apply all payments received from Borrower and all Proceeds of Collateral received by Lender and all other amounts

received by Lender to the Loans whether or not then due or to any other Obligations then due, in whatever order or manner Lender shall determine.  Lender shall apply all Proceeds of Accounts or other Collateral received by Lender and all other payments received by Lender in respect of the Obligations to the Loans whether or not then due or to any other Obligations then due, in whatever order or manner Lender shall determine.

13.3    **Lender Appointed Attorney-in-Fact.**

(a)    Borrower hereby irrevocably constitutes and appoints Lender, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in its place and stead and in its name or otherwise, from time to time in Lender's discretion, at Borrower's sole cost and expense, to take any and all appropriate action and to execute and deliver any and all documents and instruments which Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limiting the generality of the foregoing: (i) at any time any of the Obligations are outstanding, (A) to transmit to Account Debtors, other obligors or any bailees notice of the interest of Lender in the Collateral or request from Account Debtors or such other obligors or bailees at any time, in the name of Borrower or Lender or any designee of Lender, information concerning the Collateral and any amounts owing with respect thereto, (B) to execute in the name of Borrower and file against Borrower in favor of Lender Financing Statements or amendments with respect to the Collateral, or record a copy or an excerpt hereof in the United States Copyright Office or the United States Patent and Trademark Office and to take all other steps as are necessary in the reasonable opinion of Lender under applicable law to perfect the security interests granted herein, and (C) to pay or discharge Taxes, Liens, security interests or other encumbrances levied or placed on or threatened against the Collateral; and (ii) after and during the continuation of an Event of Default, (A) to receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the Proceeds thereof, (B) to notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (C) to change the address for delivery of mail to Borrower and to receive and open mail addressed to Borrower, (D) take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral, (E) to obtain and adjust insurance required pursuant to this Agreement and to pay all or any part of the premiums therefor and the costs thereof, (F) to assemble, market and/or sell any Inventory or other Collateral, (G) to take any and all action and to execute and deliver any and all documents and instruments which Lender may deem reasonably necessary or advisable to (a) accomplish the purposes of perfecting, continuing and preserving, a continuing first priority security interest in any of the Collateral in favor of Lender, and (b) effect a transfer of any of the Collateral to Lender or to Lender's designees, and (H) to extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations.

(b)    Borrower hereby ratifies, to the extent permitted by law, all that Lender shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this Agreement. The powers of attorney granted pursuant to this Agreement are each a power coupled with an interest and shall be irrevocable until the Obligations are paid indefeasibly in full.

{00331756 DOC 4}

42

**13.4    Release of Lender.**  Borrower hereby releases and exculpates Lender, its officers, partners, members, directors, employees, agents, representatives and designees, from any liability arising from any acts or occurrence under this Agreement or in furtherance thereof, whether as attorney-in-fact or otherwise, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct as determined by a final and non-appealable order from a court of competent jurisdiction.  In no event will Lender have any liability to Borrower for lost profits or other special or consequential damages.

**13.5    Uniform Commercial Code.**  At all times prior and subsequent to an Event of Default hereinafter, Lender shall be entitled to all the rights and remedies of a secured party under the UCC with respect to all Collateral.

**13.6    Preservation of Collateral.**  At all times prior and subsequent to an Event of Default hereinafter, Lender may (but without any obligation to do so) take any and all action which in its sole and absolute discretion is necessary and proper to preserve its interest in the Collateral, including without limitation the payment of debts of Borrower which might, in Lender's sole and absolute discretion, impair the Collateral or Lender's security interest therein, and the sums so expended by Lender shall be secured by the Collateral, shall be added to the amount of the Obligations due Lender and shall be payable on demand with interest at the rate applicable to the Loans set forth in Section 3.1 hereof from the date expended by Lender until repaid by Borrower.  After written notice by Lender to Borrower and automatically, without notice, after an Event of Default, Borrower shall not, without the prior written consent of Lender in each instance, (a) grant any extension of time of payment of any Accounts, (b) compromise or settle any Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

**13.7    Lender's Right to Cure.**  In the event Borrower shall fail to perform any of its Obligations hereunder or under any other Loan Document, then Lender, in addition to all of its rights and remedies hereunder, may perform the same, but shall not be obligated to do so, at the cost and expense of Borrower. Such costs and expenses shall be added to the amount of the Obligations due Lender, and Borrower shall promptly reimburse Lender for such amounts together with interest at the Default Interest Rate from the date such sums are expended until repaid by Borrower.

**13.8    Inspection of Collateral.**  From time to time as requested by Lender, Lender or its designee shall have access, (a) prior to an Event of Default, at the sole expense of Borrower, during reasonable business hours to all of the premises where Collateral is located for the purpose of inspecting the Collateral and to all of Borrower's Collateral, and all books and records of Borrower, and Borrower shall permit Lender or Lender's designees to make copies of such books and records or extracts therefrom as Lender may request, and (b) on or after an Event of Default, at the sole expense of Borrower, at any time, to all of the premises where Collateral is located for the purposes of inspecting, disposing and realizing upon the Collateral, and all Borrower's books and records, and Borrower shall permit Lender or its designee to make such copies of such books and records or extracts therefrom as Lender may request.  Without expense to Lender, Lender may use such of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the realization on the Collateral as Lender, in its sole and absolute discretion, deems appropriate.  Borrower hereby irrevocably authorizes all accountants and third parties to disclose

and deliver to Lender at Borrower's expense all financial information, books and records, work papers, management reports and other information in its possession regarding Borrower.

13.9   **Additional Appraisals**. Lender shall have the right to obtain, on an annual basis or more often if Lender deems necessary in its sole and absolute discretion, an appraisal of the Equipment from an appraiser selected by Lender in its sole and absolute discretion (each, the "**Additional Appraisals**") at the sole cost and expense of Borrower. If the Additional Appraisals for Equipment sets forth Equipment that is Missing, Damaged, Sold or Devalued Equipment, Borrower shall with respect to such Missing, Damaged, Sold or Devalued Equipment, immediately pay Lender the amounts as described in Section 4(c) of the Loan Agreement Schedule.

## SECTION 14. PROVISIONS OF GENERAL APPLICATION

14.1   **Waivers**. Borrower waives demand, presentment, notice of dishonor or protest and notice of protest of any instrument of Borrower or others which may be included in the Collateral.

14.2   **Survival**. All covenants, agreements, representations and warranties made by Borrower herein or in any other Loan Document or in any certificate, report or instrument contemplated hereby shall survive any independent investigation made by Lender and the execution and delivery of this Agreement, and such certificates, reports or instruments and shall continue so long as any Obligations are outstanding and unsatisfied, applicable statutes of limitations to the contrary notwithstanding.

14.3   **Notices**. All notices, requests and demands to or upon the respective parties hereto shall be in writing and either (a) delivered by registered or certified mail, return receipt requested, (b) delivered by hand, or (c) delivered by national overnight courier service with next Business Day delivery, and shall be deemed to have been duly given or made (i) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) one (1) Business Day after deposit with a national overnight courier with all charges prepaid, or (iii) when hand-delivered. All notices, requests and demands are to be given or made to the respective parties at the addresses set forth on Section 11 of the Loan Agreement Schedule (or to such other addresses as either party may designate by notice in accordance with the provisions of Section 11 of the Loan Agreement Schedule).

14.4   **Amendments; Waiver of Defaults**. The terms of this Agreement shall not be amended, waived, altered, modified, supplemented or terminated in any manner whatsoever except by a written instrument signed by Lender and Borrower. Any default or Event of Default by Borrower may only be waived by a written instrument specifically describing such default or Event of Default and signed by the Lender.

14.5   **Binding on Successors**.

(a)   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Borrower may not assign any of its rights or obligations under this Agreement or the other Loan Documents to any Person without the prior written consent of Lender.

(b)   Lender may assign any or all of the Obligations together with any or all of the security therefor to any Person and any such assignee shall succeed to all of Lender's rights with respect

thereto. Lender shall notify Borrower of any such assignment. Upon such assignment, Lender shall have no further obligations under the Loan Documents. Lender may from time to time sell or otherwise grant participations in any of the Obligations and the holder of any such participation shall, subject to the terms of any agreement between Lender and such holder, be entitled to the same benefits as Lender with respect to any security for the Obligations in which such holder is a participant.

**14.6    Invalidity.** Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**14.7    Publicity.** Borrower hereby authorizes Lender to make appropriate announcements of the financial arrangement entered into by and between Borrower and Lender, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate, or as required by applicable law.

**14.8    Section or Paragraph Headings.** Section and paragraph headings are for convenience only and shall not be construed as part of this Agreement.

**14.9    APPLICABLE LAW. THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF CALIFORNIA, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF CALIFORNIA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC, WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9301 THROUGH 9307 OF THE UCC) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF CALIFORNIA SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED**

BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

14.10  **ALTERNATIVE DISPUTE RESOLUTION.**  This Section 14.10 concerns the resolution of any and all controversies or claims between or among Borrower and Lender, whether arising in contract or tort or by statute, that arise out of or relate to (i) this Agreement (including any renewals, extensions or modifications), or (ii) any of the other Loan Documents (collectively, a "Claim").

(a)  As used herein, "JAMS" means JAMS or any successor thereto, as well as another like mediation/arbitration entity approved by each party to the Claim in its sole and absolute discretion. The Lender and the Borrower agree that all such arbitrations shall be conducted in Los Angeles, California or such other location as the parties shall agree.

(b)  Except as both Borrower and Lender otherwise agree in writing, each Claim will be resolved as follows: Borrower and Lender will designate a referee (or a panel of referees) selected under the auspices of JAMS in the same manner as arbitrators are selected in proceedings administered under the applicable rules and procedures of JAMS for the arbitration of disputes. If the parties are unable to agree upon a referee within ten (10) calendar days after one party serves a written notice of intent for judicial reference upon the other party, then the referee will be selected by the court in accordance with California Code of Civil Procedure Section 640(b). The designated referee(s) will be appointed by a court as provided in California Code of Civil Procedure Section 638 and the following related Sections. The referee (or the presiding referee of the panel) will be a retired California state court judge or an attorney licensed to practice law in the State of California with at least ten (10) years' experience practicing commercial law. The referee shall render a written statement of decision and shall conduct the proceedings in accordance with the California Code of Civil Procedure, the Rules of Court and California Evidence Code, except as otherwise specifically agreed by the parties and approved by the referee. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain a prompt and expeditious resolution of the dispute or controversy in accordance with the terms of this Section 14.10. In this regard, the parties agree that the parties and the referee shall use reasonable efforts to ensure that (a) discovery be conducted for a period no longer than six (6) months from the date the referee is appointed, excluding motions regarding discovery, (b) a trial date be set within nine (9) months of the date the referee is appointed, (c) each side shall be allowed up to five (5) individual depositions total, and (d) the one (1) day duration limit applicable to individual depositions shall apply to depositions of each person designated as a "person most knowledgeable" of an entity, provided, that the referee may modify the foregoing agreements upon a showing of need by either party. In accordance with Section 644 of the California Code of Civil Procedure, the decision of the referee upon the whole issue must stand as the decision of the court, and upon the filing of the statement of decision with the clerk of the court, or with the judge if there is no clerk, judgment may be entered thereon in the same manner as if the action had been tried by the court. Any decision of the referee and/or judgment or other order entered thereon shall be appealable to the

same extent and in the same manner that such decision, judgment, or order would be appealable if rendered by a judge of the Superior Court in which venue is proper hereunder.

(c)     Nothing in this Section 14.10 shall be applied to limit the right of Lender to (i) exercise self-help remedies, such as but not limited to, setoff, (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral, (iii) exercise any judicial or power of sale rights, (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies, or (v) to pursue rights against a party in a third-party proceeding in any action brought against Lender or Borrower (including actions in bankruptcy court). If a Claim includes multiple claims, some of which are found not subject to this Section 14.10, the parties shall stay the proceedings of the Claim or part or parts thereof not subject to this Section 14.10 until all other Claims or parts thereof are resolved in accordance with this Section 14.10. If there are Claims by or against multiple parties, some of which are not subject to this Section 14.10, the parties shall sever the Claims subject to this Section 14.10 and resolve them in accordance with this Section 14.10.

(d)     The filing of a court action is not intended to constitute a waiver of the right of Borrower or Lender, including the suing party, thereafter to require submission of the Claim to a referee.

(e)     By agreeing to this Section 14.10, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any Claim as provided in each of the Loan Documents. Furthermore, without intending in any way to limit the agreement for reference set forth in this Section 14.10, to the extent any Claim is not submitted for reference, the parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of such Claim as provided in the Loan Documents, to the fullest extent allowed by law.

(f)     In the event of any inconsistency between the terms and provisions of this Section 14.10, on the one hand, and those of the "Applicable Law" or "Consent to Jurisdiction" provisions of this Agreement or those of the "governing law" in any other Loan Document on the other hand, the terms and provisions of this Section 14.10 shall prevail. No provision in the Loan Documents regarding submission to jurisdiction and/or venue in any court is intended or shall be construed to be in derogation of the provisions in any Loan Document for judicial reference of any Claim.

(g)     During the pendency of any Claim which is submitted to judicial reference in accordance with this Section 14.10, each of the parties to such Claim shall bear equal shares of the fees charged and costs incurred by the referee in performing the services described in this Section 14.10. The compensation of the referee shall not exceed the prevailing rate for like services. The prevailing party shall be entitled to reasonable court costs and legal fees, including customary attorney fees, expert witness fees, paralegal fees, the fees of the referee and other reasonable costs and disbursements charged to the party by its counsel, in such amount as is determined by the referee.

THIS SECTION 14.10 CONSTITUTES A "REFERENCE AGREEMENT" BETWEEN OR AMONG THE PARTIES WITHIN THE MEANING OF AND FOR PURPOSES OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638.

{00331756 DOC; 4}

14.11   CONSENT TO JURISDICTION. BORROWER HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS AGREEMENT.   NOTWITHSTANDING THE FOREGOING, BORROWER CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE LENDER'S RIGHTS IN AND TO THE COLLATERAL AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

14.12   Waiver of Consequential Damages, Etc. To the fullest extent permitted by law, Borrower agrees not to assert, and hereby waives, in any legal action or other proceeding, any claim against Lender or any Affiliate of Lender, on any theory of liability, for special, indirect, consequential, special, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loan or the use of the proceeds thereof.

14.13   Entire Agreement. This Agreement, the other Loan Documents, any supplements or amendments hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith contains the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

14.14   Counterparts. This Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

14.15   Joint and Several Obligations. If more than one Person is a Borrower hereunder, the provisions of Section 12 of the Loan Agreement Schedule shall apply.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK AND SIGNATURES ON NEXT PAGE]

**IN WITNESS WHEREOF**, this Loan and Security Agreement has been duly executed as of the day and year first above written.

BORROWER:

PERTL RANCH, LLC

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

PERTL RANCH FEEDERS LLC

By: _____
Name: _____
Title: _____

OUTLAW FARMS & TRUCKING LLC

By: _____
Name: _____
Title: _____

LENDER:

GEMCAP LENDING I, LLC

By: _____
Richard Elis, Co-President

[SIGNATURE PAGE - LOAN AND SECURITY AGREEMENT]

{00331756.DOC. 4}

**EXHIBIT 1.18**

[BORROWER'S PREMISES]

See attached

## BORROWER'S PREMISES

Owned Property

### Property 1

*Parcel 1:*
The North Half (N/2) less the South Half of the Northwest Quarter of the Northwest Quarter (S/2 NW/4 NW/4) of Section Twenty-three (23), Township Twelve (12) South, Range Eleven (11) West of the 6th P.M., Russell County, Kansas.

*Parcel 2:*
The Northwest Quarter (NW/4) of Section Twenty-eight (28) and the Northeast Quarter of the Southwest Quarter (NE/4 SW/4) of Section Twenty-eight (28) and the Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of Section Twenty-eight (28), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas;

and

The East Half of the Northeast Quarter (E/2 NE/4) of Section Twenty-nine (29), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas, EXCEPT a tract of land in the Northwest Quarter (NW/4) of Section Twenty-eight (28) and the Northeast Quarter (NE/4) of Section Twenty-nine (29), all in Township Eight (8) South, Range Ten (10) West of the 6th P.M., in Mitchell County. Kansas, more particularly described as follows:

> Beginning at the Northwest corner of Section Twenty-eight (28), Township Eight (8) South, Range Ten (10) West, thence easterly along the North line of said Section Twenty-eight (28) 240.00 feet; thence southerly on a deflection angle to the right of 89°34'10", 1566.27 feet; thence northwesterly on a deflection angle to the right of 114°47'51", 284.03 feet to a point on the East line of the Northeast Quarter (NE/4) of Section Twenty-nine (29), Township Eight (8) South, Range Ten (10) West; thence continuing northwesterly along previous course, 296.95 feet; thence northerly on a deflection angle to the right of 68°58'30", 1328.67 feet to a point on the North line of said Northeast Quarter (NE/4); thence easterly along said North line on a deflection angle to the right of 86°37'25", 200.00 feet to the Point of Beginning.

*Parcel 3:*
The Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of Section Thirty-three (33) and the South Half of the Northeast Quarter (S/2 NE/4) of Section Thirty-three (33), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas.

*Parcel 4:*
The Southwest Quarter of the Northwest Quarter (SW/4 NW/4) of Section Thirty-four (34), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas.

Exhibit 1.18

## Property 2

The Southeast Quarter (SE/4) of Section Six (6), Township Eleven (11) South, Range Ten (10) West of the 6th P.M., Lincoln County, Kansas;

That part of the Southwest Quarter (SW/4) of Section Thirty-six (36), Township Fourteen (14) South, Range Eleven (11) West of the 6th P.M., in Russell County, Kansas, lying North of Lincoln Road;

The South Half of the Northwest Quarter (S/2 NW/4) of Section Thirty-six (36), Township Fourteen (14) South, Range Eleven (11) West of the 6th P.M., in Russell County, Kansas;

The Northeast Quarter (NE/4) of Section Sixteen (16), Township Thirteen (13), Range Ten (10) West of the 6th P.M., Lincoln County, Kansas;

## Property 3

The Northeast Quarter (NE/4) of Section Twenty (20), Township Eleven (11) South, Range Eighteen (18) West of the 6th P.M., Ellis County, Kansas;

The North Half (N/2) of Section Twenty-one (21), Township Eleven (11) South, Range Eighteen (18) West of the 6th P.M., Ellis County, Kansas.

## Property 4

*Parcel 1:*
The West Half (W/2) of Section Twelve (12), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

*Parcel 2:*
The West Half (W/2) and the Southeast Quarter (SE/4) of Section Eleven (11), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

The Northeast Quarter (NE/4) of Section Eleven (11), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

## Property 5

107 S. Main Street, Lucas, Kansas 67648

Exhibit 1.18

Leased Property

| | Owner of Record | Legal | Percentage | Total Acres | Crop Acres | Grass Acres | County |
|---|---|---|---|---|---|---|---|
| Rent | Cynthia Malir | 9/15/2010 | 100 | 114.32 | 102 | 12.32 | Mitchell |
| Rent | Cynthia Malir | 10/12/2011 | 100 | 220.47 | 213.09 | 7.38 | Russell |
| Rent | U.S. Corp of Engineers | 36-12-11 | 100 | 53.8 | 0 | 53.8 | Russell |
| Rent | Ron/Joyce Pertl | 23-12-11 | 100-Home | 320 | 82.31 | 237.69 | Russell |
| Rent | Ron/Joyce Pertl | 22-15-11 | 100 | 160 | 0 | 160 | Russell |
| Rent | Ron/Joyce Pertl | 23-15-11 | 33 R&J 67 Shane | 80 | 64.24 | 15.76 | Russell |
| Own | Shane/Ron/Joyce | 28-8-10 | 50 Shane 50 R&J | 257.93 | 146.2 | 111.73 | Mitchell |
| Own | Shane/Ron/Joyce | 33-8-10 | 50 R&J 50 Shane | 121.14 | 50.72 | 70.42 | Mitchell |
| Own | Shane/Ron/Joyce | 34-8-10 | | 38.05 | 28.3 | 9.75 | Mitchell |
| Own | Ron/Joyce Pertl | 28-95-10 | 100 | 397 | 291 | 106 | Mitchell |
| Rent | Ron/Joyce Pertl | 34-95-10 | 33 | 91 | 64 | 27 | Mitchell |
| Own | Ron/Joyce Pertl | 36-8-10 | 33 | 314 | 301 | 13 | Mitchell |
| Rent | Cynthia Malir | | 100 | 119 | 0 | 119 | Barton |
| Rent | Cynthia Malir | | 100 | 42.6 | 0 | 42.6 | Ellsworth |
| Rent | Cynthia Malir | | 100 | 204 | 0 | 204 | Barton |
| Rent | Goodbye | 31-6-10 | 33 | 157 | 157 | 0 | Mitchell |
| Rent | Goodbye | 32-6-10 | 33 | 157 | 157 | 0 | Mitchell |
| Rent | Goodbye | 29-6-10 | 33 | 159 | 159 | 0 | Mitchell |
| Rent | Goodbye | 29-6-10 | 33 | 237 | 237 | 0 | Mitchell |
| Rent | May | 28-6-10 | 33 | 79.8 | 74 | 5.8 | Mitchell |
| Rent | May | 29-6-10 | 33 | 85 | 83 | 2 | Mitchell |
| Rent | Kanzer | 27-6-10 | 33 | 201 | 201 | 0 | Mitchell |
| Rent | Houghton | 4/6/2010 | 100 | 390.84 | 381 | 9.84 | Mitchell |
| Rent | Houghton | 5/6/2010 | 100 | 477 | 443.4 | 33.6 | Mitchell |
| Rent | Houghton | 33-6-10 | 100 | 81 | 72.9 | 8.1 | Mitchell |

Exhibit 1-18

| | | | | 4,557.95 | 3,308.16 | 1,249.79 | |
|---|---|---|---|---|---|---|---|
| | **Sub TotaL** | | | | | | |
| Own | Ron/Joyce & Shane | 33-95-10 | 83.3/16.7 | 309.5 | 309.5 | 0 | Mitchell |
| Rent | Gasper | 6-95-10 | 33 | 156.7 | 156.7 | 0 | Mitchell |
| Rent | Gasper | 7-95-10 | 33 | 119 | 119 | 0 | Mitchell |
| Rent | Gasper | 18-95-10 | 33 | 321.07 | 321.07 | 0 | Mitchell |
| | | | | | | | |
| | **Sub Total** | | | 906.27 | 906.27 | 0 | |
| | | | | | | | |
| | Bob Syms | | Shares | 130 | 128 | 2 | Ellis |
| | Bob Syms | | Trade | 116 | 9 | 107 | Ellis |
| | Bob Syms | | Shares | 320 | 320 | 0 | Ellis |
| | Gary Oller | | Shares | 51 | 9 | 42 | Ellsworth |
| | Gary Oller | | Cash | 217 | 217 | 0 | Ellsworth |
| | Gary Oller | | Cash | 179 | 179 | 0 | Ellsworth |
| | Gary Oller | | Shares | 61 | 61 | 0 | Ellsworth |
| | Frank Prince | | Shares | 481 | 0 | 481 | Ellsworth |
| | Frank Prince | | Shares | 319 | 0 | 319 | Ellsworth |
| | Frank Prince | | Shares | 1192 | 0 | 1192 | Ellsworth |
| | Frank Prince | | Shares | 191 | 0 | 191 | Russell |
| | Frank Prince | | Shares | 44 | 0 | 44 | Russell |
| | Rodney Cook | | Trade | 3400 | 29 | 3371 | Russell |
| | Rodney Cook | | Trade | 905 | 791 | 114 | Russell |
| | Nadine Lee | | Trade | 156 | 119 | 37 | Lincoln |
| | Nick Dortzweiler | | Trade/Cash | 425 | 388 | 37 | Ellis |
| | Nick Dortzweiler | | Trade/Cash | 233 | 190 | 43 | Ellis |
| | US Govt | | Share/Buy | 762 | 0 | 762 | |
| | US Govt | | Share/Buy | 391 | 0 | 391 | |
| | US Govt | | Share/Buy | 914 | 0 | 914 | |

Exhibit 1 18

| State of Kansas | | Share/Buy | 650 | 0 | 650 | |
|---|---|---|---|---|---|---|
| State of Kansas | | Share/Buy | 670 | 0 | 670 | |
| Pertl Ranch | | | 160 | 103 | 57 | Russell |
| Pertl Ranch | | | 240 | 236 | 4 | Ellsworth |
| Pertl Ranch | | | 60 | 56.2 | 3.8 | Russell |
| | | | | | | |
| **Sub Total** | | | **12,267.00** | **2,835.20** | **9,431.80** | |
| | | | | | | |
| **Grand Total** | | | **17,731.22** | **7,049.63** | **10,681.59** | |

Exhibit 1.18

## EXHIBIT 1.80

### [MORTGAGES]

**Property 1**

**Name of Mortgagors:**  Ronald F. Pertl and Joyce M. Pertl, Trustees of the Ronald F. Pertl and Joyce M. Pertl Living Trust under agreement dated September 19, 2006;

Ronald F. Pertl and Joyce M. Pertl, husband and wife; and

Shane Pertl, a single person.

**Name of Mortgage Document:**  Mortgage and Security Agreement dated August 11, 2017

**Description of Property:**

*Parcel 1:*
The North Half (N/2) less the South Half of the Northwest Quarter of the Northwest Quarter (S/2 NW/4 NW/4) of Section Twenty-three (23), Township Twelve (12) South, Range Eleven (11) West of the 6th P.M., Russell County, Kansas.

*Parcel 2:*
The Northwest Quarter (NW/4) of Section Twenty-eight (28) and the Northeast Quarter of the Southwest Quarter (NE/4 SW/4) of Section Twenty-eight (28) and the Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of Section Twenty-eight (28), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas;

and

The East Half of the Northeast Quarter (E/2 NE/4) of Section Twenty-nine (29), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas, EXCEPT a tract of land in the Northwest Quarter (NW/4) of Section Twenty-eight (28) and the Northeast Quarter (NE/4) of Section Twenty-nine (29), all in Township Eight (8) South, Range Ten (10) West of the 6th P.M., in Mitchell County, Kansas, more particularly described as follows:

Beginning at the Northwest corner of Section Twenty-eight (28), Township Eight (8) South, Range Ten (10) West, thence easterly along the North line of said Section Twenty-eight (28) 240.00 feet; thence southerly on a deflection angle to the right of 89°34'10", 1566.27 feet; thence northwesterly on a deflection angle to the right of 114°47'51", 284.03 feet to a point on the East line of the Northeast Quarter (NE/4) of Section Twenty-nine (29), Township Eight (8) South, Range Ten (10) West; thence continuing northwesterly along previous course,

{00331756.DOC, 4}

296.95 feet; thence northerly on a deflection angle to the right of 6858'30". 1328.67 feet to a point on the North line of said Northeast Quarter (NE/4); thence easterly along said North line on a deflection angle to the right of 8637'25". 200.00 feet to the Point of Beginning.

*Parcel 3:*
The Northwest Quarter of the Southeast Quarter (NW/4 SE/4) of Section Thirty-three (33) and the South Half of the Northeast Quarter (S/2 NE/4) of Section Thirty-three (33), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas.

*Parcel 4:*
The Southwest Quarter of the Northwest Quarter (SW/4 NW/4) of Section Thirty-four (34), Township Eight (8) South, Range Ten (10) West of the 6th P.M., Mitchell County, Kansas.

### Property 2

| | |
|---|---|
| **Name of Mortgagors:** | **Pertl Ranch, LLC, a Kansas limited liability company** |
| **Name of Mortgage Document:** | **Mortgage and Security Agreement dated August 11, 2017** |

**Description of Property:**

The Southeast Quarter (SE/4) of Section Six (6), Township Eleven (11) South, Range Ten (10) West of the 6th P.M., Lincoln County, Kansas;

That part of the Southwest Quarter (SW/4) of Section Thirty-six (36), Township Fourteen (14) South, Range Eleven (11) West of the 6th P.M., in Russell County, Kansas. lying North of Lincoln Road;

The South Half of the Northwest Quarter (S/2 NW/4) of Section Thirty-six (36), Township Fourteen (14) South, Range Eleven (11) West of the 6th P.M., in Russell County, Kansas;

The Northeast Quarter (NE/4) of Section Sixteen (16), Township Thirteen (13), Range Ten (10) West of the 6th P.M., Lincoln County, Kansas;

### Property 3

| | |
|---|---|
| **Name of Mortgagors:** | **Pertl Ranch Feeders LLC, a Kansas limited liability company** |
| **Name of Mortgage Document:** | **Mortgage and Security Agreement dated August 14, 2017** |

**Description of Property:**

The Northeast Quarter (NE/4) of Section Twenty (20), Township Eleven (11) South, Range Eighteen (18) West of the 6th P.M., Ellis County, Kansas;

The North Half (N/2) of Section Twenty-one (21), Township Eleven (11) South, Range Eighteen (18) West of the 6th P.M., Ellis County, Kansas.

## Property 4

| | |
|---|---|
| **Name of Mortgagors:** | **Pertl Ranch Feeders LLC, a Kansas limited liability company** |
| **Name of Mortgage Document:** | **Mortgage and Security Agreement dated August 14, 2017** |

**Description of Property:**

*Parcel 1:*
The West Half (W/2) of Section Twelve (12), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

*Parcel 2:*
The West Half (W/2) and the Southeast Quarter (SE/4) of Section Eleven (11), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

The Northeast Quarter (NE/4) of Section Eleven (11), Township Thirteen (13) South, Range Nineteen (19) West of the 6th P.M., Ellis County, Kansas.

## AMENDMENT NUMBER 1 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE

This Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule ("**Amendment No. 1**") dated effective as of August 16, 2017 by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "Borrower Parties"; and the Borrower Parties and the Lender are collectively referred to as the "Parties".

## RECITALS

A.      Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Loan Agreement**").

B.      In connection with the Loan Agreement, Borrower executed and delivered to Lender, the (i) Loan Agreement Schedule dated as of August 11, 2017 (the "**Loan Agreement Schedule**"), and (ii) other Loan Documents.

C.      Borrower has requested that Lender increase the maximum amount of Availability from Six Million Five Hundred Thousand Dollars ($6,500,000) to Seven Million Two Hundred Twenty Five Thousand Dollars ($7,225,000).

D.      Lender has agreed to increase the maximum amount of Availability from Six Million Five Hundred Thousand Dollars ($6,500,000) to Seven Million Two Hundred Twenty Five Thousand Dollars ($7,225,000).

E.      Borrower and Lender desire to amend the Loan Agreement and the Loan Agreement Schedule in accordance with the terms of this Amendment No. 1, to address, among other matters, the increase of the Availability.

F.      Capitalized terms used but not defined herein have the meanings set forth in the Loan Agreement.

{00332852.DOC; 1}

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.    **Amendments**. Subject to Section 2 below, effective as of the date of this Amendment No. 1, the Loan Agreement and the Loan Agreement Schedule are amended as follows:

A.    Section 1.12 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.12**    "**Availability**" means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) Seven Million Two Hundred Twenty Five Thousand Dollars ($7,225,000).

B.    Section 1.78 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.78**    "**Maximum Credit**" means the sum of (i) up to Seven Million Two Hundred Twenty Five Thousand Dollars ($7,225,000) subject to Availability, any Reserves and the Revolving Loan Commitment, and (ii) up to One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000), subject to the Appraisal, the Additional Appraisals, as applicable, any Reserves and the Term Loan Commitment.

C.    Section 1.97 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.97**    "**Revolving Loan Note**" means the 'Amended and Restated Secured Promissory Note (Revolving Loans)' in the principal amount of up to $7,250,000, as may be amended, restated, modified or supplemented from time to time, which 'Amended and Restated Secured Promissory Note (Revolving Loans)' amends and restates the 'Secured Promissory Note (Revolving Loans)' in the principal amount of up to $6,500,000 executed by Borrower dated as of August 11, 2017.

D.    Section 1(c) of the Loan Agreement Schedule is hereby deleted and restated in its entirety as follows:

(c) **Fees and Expenses.** Borrower shall pay to Lender the following fees:

**Closing Fee:**

A closing fee of $90,000, representing one percent (1%) of the principal amount of the full amount of the Maximum Credit, due and payable on the Closing Date of which $82,250 has been paid to Lender.

-2-

**Annual Line Fee:**

A fee equal to $72,250, representing one percent (1%) of the maximum amount of Availability (*i.e.* $7,225,000), due and payable on each of the Closing Date and the first anniversary thereof. Lender has received $65,000 on the Closing Date.

**Unused Line Fee:**

A fee equal to one half of one percent (0.5%) of the daily average unused portion of the maximum amount of Availability (*i.e.* $7,225,000), calculated on an annualized basis, due and payable monthly, in arrears.

**Loan Administration and Monitoring Fee:**

A fee equal to one half of one percent (0.5%) of the daily average used portion of Maximum Credit (without regard to Availability, Reserves or Appraisals), calculated on a monthly basis, due and payable monthly, in arrears.

**Audit Fees:**

Up to $950 per person, per day, plus out-of-pocket expenses, for not more than two (2) audits during each 12-month period of the Term; provided, that no such limitation shall apply following the occurrence of an Event of Default.

**Wire Fees:**

up to $15 per wire

2.      Effectiveness.   The effectiveness of this Amendment No. 1 is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

a.      A copy of this Amendment No. 1 duly executed by Borrower and delivered to Lender by e-mail on or before August 16, 2017 with the original of this Amendment No. 1 duly executed by Borrower and delivered to Lender on or before August 23, 2017;

b.      A copy of the 'Amended and Restated Secured Promissory Note (Revolving Loans)' duly executed by Borrower and delivered to Lender by e-mail on or before August 16, 2017 with the original of the 'Amended and Restated Secured Promissory Note (Term Loan)' duly executed by Borrower and delivered to Lender on or before August 23, 2017;

{00332852.DOC; 1}

c.     Lender's receipt of the balance of the 'Closing Fee' in the amount of $7,750 on or before August 16, 2017;

d.     Lender's receipt of the balance of the 'Annual Line Fee' in the amount of $7,750 on or before August 16, 2017; and

e.     Receipt by Lender on or before August 18, 2017, of all costs of Lender (including Lender's attorneys' fees and expenses) in respect of the transactions relating to the Loan Documents and this Amendment No. 1.

3.     <u>Miscellaneous</u>. Except as herein expressly amended by this Amendment No. 1, all of the terms and provisions of the Loan Agreement and the Loan Agreement Schedule shall continue in full force and effect, and the Loan Agreement and the Loan Agreement Schedule as amended by this Amendment No. 1, and the 'Amended and Restated Secured Promissory Note (Revolving Loans)' together with the other Loan Documents are hereby ratified and confirmed by Borrower Parties. In addition, the Guarantor hereby confirms, reaffirms and ratifies the Guarantees to which it is a party. The Borrower Parties acknowledge to Lender that (a) no offsets, counterclaims or defenses exist as of the date of this Amendment No. 1 with respect to any of the Loan Documents and the Obligations, and no Event of Default is in existence as of the date of this Amendment No. 1, and (b) by a resolution, all members of Borrower and all Managers of Borrower unanimously approved this Amendment No. 1, the 'Amended and Restated Secured Promissory Note (Revolving Loans)' and the transactions contemplated thereby. The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved. In addition to the representations, warranties and covenants set forth in the Loan Agreement, the Borrower Parties represent, warrant and covenant to Lender that prior to execution, they have been given the opportunity to have this Amendment No. 1 and the 'Amended and Restated Secured Promissory Note (Revolving Loans)' to be reviewed by legal counsel. This Amendment No. 1 may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

-4-

IN WITNESS WHEREOF, this Amendment No. 1 has been duly executed effective as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____
Name: Shane Pertl
Title: Manager / Member

By: _____
Name: Joyce M Pertl
Title: Member

**PERTL RANCH FEEDERS LLC**

By: _____
Name: Shane Pertl
Title: Manager / Member

**OUTLAW FARMS & TRUCKING LLC**

By: _____
Name: Shane Pertl
Title: Manager / Member

**GUARANTOR:**

_____
William S. Pertl a/k/a Shane Pertl

_____
Mindy J. Montgomery

[SIGNATURE PAGE 1- AMENDMENT NUMBER 1 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE]

-5-

{00332852.DOC; 1}

Ronald F. Pertl

Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
Ronald F. Pertl, Trustee

By: _____
Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
Richard Ells, Co-President

[SIGNATURE PAGE 2- AMENDMENT NUMBER 1 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE]

{00332852.DOC; 1}

Execution Version

## AMENDMENT NUMBER 2 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE

This Amendment Number 2 to the Loan and Security Agreement and to the Loan Agreement Schedule ("**Amendment No. 2**") dated effective as of October 17, 2017 by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

### RECITALS

A.    Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.    In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.    The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (together with the Original Loan Agreement and the Original Loan Schedule, respectively, the "**Loan Agreement**: and the "**Loan Schedule**", respectively).

D.    Borrower and Lender agreed to increase the maximum amount of Availability from Six Million Five Hundred Thousand Dollars ($6,500,000) to Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00) pursuant to that certain Amended and Restated Secured Promissory Note (Revolving Loans), dated August 16, 2017.

E.    Borrower has requested that Lender temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00) to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) for the period

commencing on November 15, 2017 through and including February 12, 2018 (the "Increase Period"), and that Lender temporarily increase the amount of the Availability and the Maximum Credit during such Increase Period accordingly.

F.      In consideration of Lender's consent and accommodation, Borrower has agreed to pay all of Lender's fees and costs including Lender's attorneys' fees and costs in respect of the transactions regarding this Amendment No. 2.

G.      Capitalized terms used but not defined herein have the meanings set forth in the Loan Agreement.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.      Amendments.  Subject to Section 2 below, effective as of the date of this Amendment No. 2, the Loan Agreement and the Loan Schedule, effective as of the date hereof, are amended as follows:

   (a) Section 1.12 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

   1.12      "Availability" means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) or (B) at all other times, Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00).

   (b) Section 1.78 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

   1.78      "Maximum Credit" means the sum of (i) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, up to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) and (B) at all other times, up to Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00), in each case, subject to Availability, any Reserves and the Revolving Loan Commitment, and (ii) up to One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000), subject to the Appraisal, the Additional Appraisals, as applicable, any Reserves and the Term Loan Commitment.

   (c) Section 1.97 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

   1.97      "Revolving Loan Note" means the Second Amended and Restated Secured Promissory Note (Revolving Loans)' in the principal amount of up to $7,925,000.00, as may be amended, restated, modified or supplemented from time to time.

(d) Section 3(c) of the Loan Agreement Schedule is hereby deleted and restated in its entirety as follows:

**(c) Fees and Expenses.**  Borrower shall pay to Lender the following fees:

**Closing Fee**:

A closing fee of $90,000, representing one percent (1%) of the principal amount of the full amount of the Maximum Credit, due and payable on the Closing Date.

**Annual Line Fee:**

A fee equal to $72,750, representing one percent (1%) of the maximum amount of Availability (*i.e.* at all times other than from October 17, 2017 through and including February 12, 2018, $7,275,000.00), due and payable on each of the Closing Date and the first anniversary thereof.

**Unused Line Fee:**

A fee equal to one half of one percent (0.5%) of the daily average unused portion of the maximum amount of Availability (*i.e.* $7,925,000 from October 17, 2017 through and including February 12, 2018, and at all other times, $7,275,000.00), calculated on an annualized basis, due and payable monthly, in arrears.

**Loan Administration and Monitoring Fee:**

A fee equal to one half of one percent (0.5%) of the daily average used portion of Maximum Credit (without regard to Availability, Reserves or Appraisals), calculated on a monthly basis, due and payable monthly, in arrears.

**Audit Fees:**

Up to $950 per person, per day, plus out-of-pocket expenses, for not more than two (2) audits during each 12-month period of the Term; provided, that no such limitation shall apply following the occurrence of an Event of Default.

**Wire Fees:**

up to $15 per wire

**Over Line Fee:**

A fee of forty eight thousand seven hundred fifty dollars ($48,750) earned as of October 17, 2017 and payable to the Lender in the following installments:

(i)     sixteen thousand two hundred fifty ($16,250) due on or before November 17, 2017;

(ii)    sixteen thousand two hundred fifty ($16,250) due on or before December 1, 2017; and

(iii)   sixteen thousand two hundred fifty ($16,250) due on or before January 1, 2018.

2.     Effectiveness.  The effectiveness of this Amendment No. 2 is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

(a)     A copy of this Amendment No. 2 duly executed by Borrower and delivered to Lender by e-mail on or before November 15, 2017 with the original of this Amendment No. 2 duly executed by Borrower and delivered to Lender on or before November 20, 2017;

(b)     A copy of the 'Second Amended and Restated Secured Promissory Note (Revolving Loans)' duly executed by Borrower and delivered to Lender by e-mail on or before November 15, 2017 with the original of the 'Second Amended and Restated Secured Promissory Note (Revolving Loans)' duly executed by Borrower and delivered to Lender on or before November 20, 2017;

(c)     Receipt by Lender of a payment by wire transfer of an amount equal to Sixteen Thousand Two Hundred Fifty Dollars ($16,250.00) as a first installment of Lender's over line fee in connection with increasing the Maximum Credit and maximum Availability of the Revolving Loans as set forth herein; and

(d)     Receipt by Lender on or before November 17, 2017, of all costs of Lender (including Lender's attorneys' fees and expenses) in respect of the transactions relating to this Amendment No. 2.

3.     Miscellaneous.  Except as herein expressly amended by this Amendment No. 2, all of the terms and provisions of the Loan Agreement and the Loan Agreement Schedule shall continue in full force and effect, and the Loan Agreement and the Loan Agreement Schedule as amended by this Amendment No. 2, and the 'Second Amended and Restated Secured Promissory Note (Revolving Loans)' together with the other Loan Documents are hereby ratified and confirmed by Borrower Parties.  In addition, the Guarantors, by their signatures below, hereby confirms, reaffirms and ratifies the Guarantees to which it is a party.  The Borrower Parties acknowledge to Lender that (a) no offsets, counterclaims or defenses exist as of the date of this Amendment No. 2 with respect to any of the Loan Documents and the Obligations, and no Event of Default is in existence as of the date of this Amendment No. 2, and (b) by a resolution, all members of Borrower

and all Managers of Borrower unanimously approved this Amendment No. 2, the 'Second Amended and Restated Secured Promissory Note (Revolving Loans)' and the transactions contemplated thereby.  The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved.  In addition to the representations, warranties and covenants set forth in the Loan Agreement, the Borrower Parties represent, warrant and covenant to Lender that prior to execution, they have been given the opportunity to have this Amendment No. 2 and the 'Second Amended and Restated Secured Promissory Note (Revolving Loans)' to be reviewed by legal counsel.  This Amendment No. 2 may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** this Amendment No. 2 has been duly executed as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____

Name: Shane Pertl

Title: _____ Owner-Manager

By: _____

Name: Joyce Pertl

Title: _____ Owner

**PERTL RANCH FEEDERS LLC**

By: _____

Name: Shane Pertl

Title: _____ Owner-Manager

**OUTLAW FARMS & TRUCKING LLC**

By: _____

Name: Shane Pertl

Title: _____ Owner-Manager

**GUARANTOR:**

_____

William S. Pertl a/k/a Shane Pertl

_____

Mindy J. Montgomery

[SIGNATURE PAGE 1- AMENDMENT NUMBER 2 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE]

_Ronald F. Pertl_

Ronald F. Pertl

_Joyce M. Pertl_

Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST
UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _Ronald F. Pertl_

    Ronald F. Pertl, Trustee

By: _Joyce M. Pertl_

    Joyce M. Pertl, Trustee


**LENDER:**


**GEMCAP LENDING I, LLC**


By: _____

    Richard Elis, Co-President


[SIGNATURE PAGE 2- AMENDMENT NUMBER 2 TO THE LOAN AND SECURITY AGREEMENT
AND TO THE LOAN AGREEMENT SCHEDULE]

Ronald F. Pertl

Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
Ronald F. Pertl, Trustee

By: _____
Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
Richard Ellis, Co-President

[SIGNATURE PAGE 2- AMENDMENT NUMBER 2 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE]

Execution Version

## AMENDMENT NUMBER 3 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE

This Amendment Number 3 to the Loan and Security Agreement and to the Loan Agreement Schedule ("**Amendment No. 3**") dated as of December 21, 2017 by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

### RECITALS

A.     Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.     In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.     The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to (i) that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (the "**Amendment No. 1 to Loan Agreement**") and (ii)  that certain Amendment Number 2 to Loan and Security and to the Loan Agreement Schedule, dated effective as of October 17, 2018 (together with the Original Loan Agreement, the Original Loan Schedule and the Amendment No. 1 to Loan Agreement, respectively, the "**Loan Agreement**: and the "**Loan Schedule**", respectively).

D.     Borrower has requested that Lender temporarily provide an Overadvance in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "**Temporary Overadvance Amount**") for the period commencing on the date hereof through and including January 15, 2018 (the "**Temporary Overadvance Period**").

E.     In consideration of Lender's consent and accommodation, Borrower has agreed to pay all of Lender's fees and costs including an accommodation fee and

{00311526 DOC; 3}

Lender's attorneys' fees and costs in respect of the transactions regarding this Amendment No. 3.

F.  Capitalized terms used but not defined herein have the meanings set forth in the Loan Agreement.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.  Amendments.  Subject to Section 2 below, effective as of the date of this Amendment No. 3, the Loan Agreement and the Loan Schedule, effective as of the date hereof, are amended as follows:

(a) Section 1 of the Loan Agreement is hereby amended by adding the following definition of "Accommodation Fee" in the appropriate alphabetical order::

"**Accommodation Fee**" has the meaning as set forth in Section 3(c) of the Loan Agreement Schedule.

(b) Section 1 of the Loan Agreement is hereby amended by adding the following definition of "Temporary Overadvance" in the appropriate alphabetical order::

"**Temporary Overadvance**" shall mean the Overadvance in the amount of Two Hundred Fifty Thousand Dollars during the Temporary Overadvance Period.

(c) Section 1 of the Loan Agreement is hereby amended by adding the following definition of "Temporary Overadvance Period" in the appropriate alphabetical order::

"**Temporary Overadvance Period**" shall mean the period commencing on December 21, 2017 through and including January 15, 2018.

(d) Section 3(c) of the Loan Agreement Schedule is hereby amended by adding the following clause at the end of such Section:

**Accommodation Fee:**

A fee of twenty five thousand dollars ($25,000.00) earned as of December 21, 2017 and payable to the Lender in the following installments:

(i)  five thousand dollars ($5,000.00) due on or before December 21, 2017; and

(ii)  twenty thousand dollars ($20,000.00) due on or before January 15, 2018.

2.      Effectiveness.  The effectiveness of this Amendment No. 3 is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

(a)      A copy of this Amendment No. 3 duly executed by Borrower and delivered to Lender by e-mail on or before December 21, 2017 with the original of this Amendment No. 3 duly executed by Borrower and delivered to Lender on or before December 28, 2017;

(b)      Receipt by Lender of a payment by wire transfer of an amount equal to Five Thousand Dollars ($5,000.00) as a first installment of Lender's Accommodation Fee in connection with the making of the Temporary Overadvance; and

(c)      Receipt by Lender on or before December 22, 2017, of all costs of Lender (including Lender's attorneys' fees and expenses) in respect of the transactions relating to this Amendment No. 3.

3.      Miscellaneous.  Except as herein expressly amended by this Amendment No. 3, all of the terms and provisions of the Loan Agreement and the Loan Agreement Schedule shall continue in full force and effect, and the Loan Agreement and the Loan Agreement Schedule as amended by this Amendment No. 3, together with the other Loan Documents are hereby ratified and confirmed by Borrower Parties.  In addition, the Guarantors, by their signatures below, hereby confirms, reaffirms and ratifies the Guarantees to which it is a party.  The Borrower Parties acknowledge to Lender that (a) no offsets, counterclaims or defenses exist as of the date of this Amendment No. 3 with respect to any of the Loan Documents and the Obligations, and no Event of Default is in existence as of the date of this Amendment No. 3, and (b) by a resolution, all members of Borrower and all Managers of Borrower unanimously approved this Amendment No. 3 and the transactions contemplated thereby.  The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved.  In addition to the representations, warranties and covenants set forth in the Loan Agreement, the Borrower Parties represent, warrant and covenant to Lender that prior to execution, they have been given the opportunity to have this Amendment No. 3 to be reviewed by legal counsel.  This Amendment No. 3 may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** this Amendment No. 3 has been duly executed as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____

Name: _____Shane Pertl_____

Title: _Owner, manager_____

By: _____

Name: _____Joyce Pertl_____

Title: _Owner, member_____

**PERTL RANCH FEEDERS LLC**

By: _____

Name: _____Shane Pertl_____

Title: _____Owner, Manager_____

**OUTLAW FARMS & TRUCKING LLC**

By: _____

Name: _____Shane Pertl_____

Title: _____Owner, Manager_____

**GUARANTOR:**

_____

William S. Pertl a/k/a Shane Pertl

_____

Mindy J. Montgomery

[SIGNATURE PAGE 1- AMENDMENT NUMBER 3 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE]

_Ronald F. Pertl_
Ronald F. Pertl

_Joyce M. Pertl_
Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST
UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _Ronald F. Pertl_
    Ronald F. Pertl, Trustee

By: _Joyce M. Pertl_
    Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
    Richard Elis, Co-President

[SIGNATURE PAGE 2- AMENDMENT NUMBER 3 TO THE LOAN AND SECURITY AGREEMENT
AND TO THE LOAN AGREEMENT SCHEDULE]

_____

Ronald F. Pertl


_____

Joyce M. Pertl


**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST
UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
    Ronald F. Pertl, Trustee


By: _____
    Joyce M. Pertl, Trustee




**LENDER:**


**GEMCAP LENDING I, LLC**


By: _____
    Richard Elis, Co-President




[SIGNATURE PAGE 2- AMENDMENT NUMBER 3 TO THE LOAN AND SECURITY AGREEMENT
AND TO THE LOAN AGREEMENT SCHEDULE]

Execution Version

## AMENDMENT NUMBER 4 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE

This Forbearance Agreement ("**Forbearance Agreement**") dated as of March 16, 2018 and effective as of January 15, 2018 (the "**Effective Date**") by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

### RECITALS

A.      Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.      In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.      The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to (i) that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (the "**Amendment No. 1 to Loan Agreement**"), (ii) that certain Amendment Number 2 to Loan and Security and to the Loan Agreement Schedule, dated effective as of October 17, 2017 (the "**Amendment No. 2 to Loan Agreement**"), and (iii) that certain Amendment Number 3 to Loan and Security and to the Loan Agreement Schedule, dated as of December 21, 2017 (the "**Amendment No. 3 to Loan Agreement**"), (together with the Original Loan Agreement, the Original Loan Schedule, the Amendment No. 1 to Loan Agreement and the Amendment No. 2 to Loan Agreement, respectively, the "**Loan Agreement**" and the "**Loan Schedule**", respectively).

D.      Pursuant to Amendment No. 2 Borrower and Lender agreed to temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00) to Seven Million Nine Hundred Twenty Five Thousand Dollars

($7,925,000.00) for the period commencing on November 15, 2017 through and including February 12, 2018, and that Lender temporarily increase the amount of the Availability and the Maximum Credit during such Increase Period accordingly.

E.      Pursuant to Amendment No. 3 to Loan Agreement, Borrower requested and the Lender temporarily provided an Overadvance in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "**Temporary Overadvance Amount**") for the period commencing on December 21, 2017 through and including January 15, 2018 (the "**Temporary Overadvance Period**").

F.      Borrower has requested that Lender temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) to Eight Million Five Hundred Thousand Dollars ($8,500,000.00) for the period commencing on February 6, 2018 through and including April 30, 2018, and that Lender temporarily increase the amount of the Availability and the Maximum Credit during such Increase Period accordingly.

G.      As of the date hereof, Borrower's Revolving Loans continue to be in excess of Availability and the Maximum Credit amount.

H.      As of the date hereof, the Borrower failed to make certain interest payments when due pursuant to the Loan Agreement.

I.      As of the date hereof, the Borrower failed to make certain payments of the Over Line Fee and the Accommodation Fee when due pursuant to the Loan Agreement.

J.      On February 20, 2018, AgCountry Farm Credit Services, PCA, as Agent for First Dakota National Bank filed a petition naming PR, Joyce Marie Pertl and Lender as defendants in the District Court of Russell County, Kansas and assigned case number 2018-CV-000017 seeking, *inter alia*, (a) judgment against PR and Joyce Marie Pertl for defaulted principal, interest and late charges, and (b) judgment ordering that the plaintiff's security interest in certain equipment be foreclosed (the "**AgCountry Claim**").

K.      Notwithstanding the foregoing, Borrower acknowledges that the failure to pay principal and interest monthly payments as well as Borrowers failure to direct all Proceeds to Lender, each constitute an Event of Default under the Loan Documents (the "**Specified Events of Default**") allowing the Lender to exercise its rights and remedies under the Loan Agreement and the other Loan Documents.

L.      Borrower and the Guarantors have requested that Lender forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the occurrence of the Specified Events of Default, with such forbearance to be subject to the terms and conditions set forth in this Forbearance Agreement.

M.      Lender is willing to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the Specified Events of

Default and to allow the Current Overadvance Amount provided Borrower is not in default of the Loan Agreement or the other Loan Documents, all upon and subject to the terms of this Forbearance Agreement.

N.      In consideration of Lender's consent and accommodation, Borrower has agreed to pay all of Lender's fees set forth in Sections 3 and 6 hereof and all costs including Lender's attorneys' fees and costs in respect of the transactions regarding this Forbearance Agreement and that may arise from time to time in connection with the AgCounty Claim.

O.      Capitalized terms used but not defined in this Forbearance Agreement shall have the meanings set forth in the Loan Agreement or the Forbearance and Amendments, as applicable.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.      Amendments. Subject to both Section 2 and Section 6 below, effective as of the date of this Amendment No. 4, the Loan Agreement and the Loan Schedule, effective as of the date hereof, are amended as follows:

(a) Section 1.12 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.12 "Availability"** means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) or (B) during the period commencing on February 12, 2018 through and including April 30, 2018, Eight Million Five Hundred Thousand Dollars ($8,500,000.00) or (C) at all other times, Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00).

(b) Section 1.78 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.78 "Maximum Credit"** means the sum of (i) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, up to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) or (B) during the period commencing on February 6, 2017 through and including April 30, 2018, up to Eight Million Five Hundred Thousand Dollars ($8,500,000.00) and (C) at all other times, up to Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00), in each case, subject to Availability, any Reserves and the Revolving Loan Commitment, and (ii) up to One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000), subject

to the Appraisal, the Additional Appraisals, as applicable, any Reserves and the Term Loan Commitment.

(c) Section 1.97 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.97** "**Revolving Loan Note**" means the Third Amended and Restated Secured Promissory Note (Revolving Loans)' in the principal amount of up to $8,500,000.00, as may be amended, restated, modified or supplemented from time to time.

2. Acknowledgments.

a. Recitals. Borrower and Guarantors agree to and with the terms and statements set forth in each of the Recitals. The terms of the Recitals are incorporated in this Forbearance Agreement as though fully set forth herein.

b. Acknowledgment of Default. Borrower and the Guarantors hereby acknowledge and agree that the Specified Events of Default have occurred and continue to occur and constitute Events of Default entitling Lender to presently exercise its rights and remedies under the Loan Agreement and the other Loan Documents, applicable law or otherwise, including, without limitation, charging interest at the Default Interest Rate.

c. Acknowledgement of Security Interests. Borrower and Guarantors hereby acknowledge, confirm and agree that Lender has and shall continue to have valid, enforceable and perfected first-priority liens upon, and security interests in, the Collateral heretofore granted to Lender pursuant to the Loan Agreement and the other Loan Documents.

d. Binding Effect of Documents. Borrower and the Guarantors hereby represent, warrant, acknowledge, confirm and agree that: (a) each of the Loan Documents to which it is a party has been duly executed and delivered by it, and each is in full force and effect and shall remain in full force and effect until all of the Obligations to Lender have been indefeasibly paid in full; (b) the agreements and obligations of Borrower and each of the Guarantors contained in each of the Loan Documents to which it is a party constitute the legal, valid and binding obligations of Borrower and each of the Guarantors, enforceable against them in accordance with their respective terms and each of the Borrower and the Guarantors has no defenses to any of the Loan Documents; and (c) Lender is and shall be entitled to the rights, remedies and benefits provided for in the Loan Agreement and the other Loan Documents and applicable law.

3. Forbearance. In reliance of the representations, warranties and covenants of the Borrower Parties contained herein, and subject to the terms and conditions of this Forbearance Agreement and receipt by Lender of all amounts, documents and instruments described in Section 6 hereof on or before the respective dates set forth therein, Lender agrees, subject to the conditions set forth herein, to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents solely on account of the occurrence and continuation of the Specified Events

of Default until either (A) Borrower fails to indefeasibly pay and satisfy in full all Obligations that are due and payable on or prior to April 30, 2018, or (B) for so long as any outstanding Obligations remain past due during the Forbearance Period (as defined below), Borrower fails to pay to Lender (x) an initial forbearance fee in the amount of (i) $25,000.00, due and payable on the date hereof, (ii) $25,000.00, due and payable on March 21, 2018, and (iii) $25,000.00, due and payable on March 26, 2018 (collectively, the "**Initial Forbearance Fee**"), which such Initial Forbearance Fee shall be fully earned on the date hereof, and (y) $25,000, due and payable on April 1, 2018 (the "**Additional Forbearance Fee**" and together with the Initial Forbearance Fee, the "**Forbearance Fee**"), which such Additional Forbearance Fee shall be fully earned on the April 1, 2018, or (C) Borrower fails to pay all taxes (including, without limitation, payroll taxes and ad valorem taxes) to the appropriate Governmental Authorities on the dates when due, or (D) Borrower fails to pay Lender all amounts due to Lender on the dates when due as outlined in paragraph 7 below, (E) Borrower on any date is in an Overadvance position greater than Two Hundred Fifty Thousand Dollars ($250,000.00), or (F) the AgCountry Claim is not resolved in a manner satisfactory to Lender in its sole discretion (the dates in (A), (B), (C), (D), (E) or (F), as applicable, the "**Forbearance Period**"); provided, that, the Borrower and each Guarantor hereby acknowledge and agree that if a Forbearance Default occurs at any time, the Lender may exercise all of their rights and remedies under the Loan Documents without further notice to the Borrower or any Guarantor, including the following: (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, and (ii) require Borrower, at Borrower's expense, to assemble and make available to Lender all of the Collateral at any place and time designated by Lender. As used herein, the term "**Forbearance Default**" means the occurrence of either of the following: (i) any failure of Borrower or the Guarantors to timely pay, or perform any covenant, undertaking or agreement in this Agreement, the Loan Agreement, or in any of the other Loan Documents; (ii) any inaccuracy of any representation or warranty in this Agreement, the Loan Agreement, or in any of the other Loan Documents; (iii) the failure of Borrower to timely perform any of the items set forth in (A) through and including (E) above, or (iv) a breach or default of any provision of this Forbearance Agreement; or (v) occurrence of an Event of Default other than the Specified Events of Default.

4.     Representations, Warranties and Covenants.

(a)     Each of the representations and warranties made by or on behalf of Borrower and the Guarantors to Lender in any of the Loan Documents to which it is a party was true and correct when made and in all material respects is true and correct on and as of the Effective Date with the same full force and effect as if each of such representations and warranties had been made by Borrower and the Guarantor on the Effective Date.

(b)     Except for the Specified Events of Default, no other Events of Default under the Loan Agreement exist.

(c)     This Forbearance Agreement has been duly authorized, executed and delivered to Lender by Borrower and the Guarantors and constitutes the legal, valid

-5-

and binding obligations of Borrower and the Guarantors, enforceable against them in accordance with its terms.

      (d)    The execution and delivery and performance of this Agreement by Borrower and the Guarantors will not violate any requirement of law or contractual obligation of Borrower or the Guarantors and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues.

      5.    Non-Release of Continuing Guarantee.    The 'Continuing Guarantee' executed by each of the Guarantors shall continue until all of the Obligations are indefensibly paid in full. William S. Pertl (a/k/a Shane Pertl), Ronald F. Pertl and Joyce M. Pertl, and Mindy J. Montgomery, each being Guarantors, by their signatures below, reaffirm their respective Guaranteed Obligations.

      6.    Effectiveness.    The effectiveness of this Forbearance Agreement is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

    a.    Lender's receipt of an original copy of this Forbearance Agreement duly executed by Borrower and the Guarantors;

    b.    Receipt by Lender of the first installment of the Forbearance Fee (ie., $25,000.00);

    c.    Receipt by Lender of a documentation fee for this Forbearance Agreement of $1,500.00; and

    d.    Borrower and the Guarantors shall have executed and delivered to Lender such other and further documentation as Lender may deem necessary or appropriate in its sole and absolute discretion to accomplish the terms set forth herein, each in form and substance acceptable to Lender.

      7. Payment Schedule.

    a.    On or before the date hereof, all December 2017 Revolving Loan and Term Loan payments (due in January 2018) must be paid in full;

    b.    On or before March 21, 2018, a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the January 2018 Revolving Loan and Term Loan payments (due in February 2018);

    c.    On or before March 26, 2018, a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the January 2018 Revolving Loan and Term Loan payments (due in February 2018) and the February 2018 Revolving Loan and Term Loan payments (due in March 2018);

d.      On or before April 9, 2018, a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the February 2018 Revolving Loan and Term Loan payments (due in March 2018);

e.      On or before April 23, 2018 a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the February 2018 Revolving Loan and Term Loan payments (due in March 2018) and the March 2018 interest and principal payments (due in April 2018);

f.      On or before April 30, 2018, payment in full of all past due amounts under the Loan Agreement and the other Loan Documents, including, without limitation, repayment in full of the Temporary Overadvance;

8.  Release of Lender and Related Parties.  As partial consideration for the agreement of Lender to forbear as provided herein, the Borrower Parties, jointly and severally, and on behalf themselves and their predecessors, successor and assigns, hereby release and forever discharge Lender and its officers, directors, agents, attorneys, managers, members, employees, successors and assigns of and from any and all claims of whatever kind, known or unknown, in contract, based upon statutory or common law, present or future, that they may have or may acquire, on account of any activities or omissions of Lender and those persons or entities hereby released, from the beginning of time through and including the present date, including but not limited to, any claims under or related to the Loan Agreement, the other Loan Documents or activities taken by Lender with respect to the Loan Agreement, the other Loan Documents or any of the matters described herein. The release provided in this paragraph shall survive the termination of this Forbearance Agreement.

9.      Reviewed by Attorneys.  Each Borrowers Party represents and warrants to Lender that it (a) understands fully the terms of this Forbearance Agreement and the consequences of the execution and delivery of this Forbearance Agreement, (b) has had this Forbearance Agreement reviewed by Van Osdol, PC, counsel to the Borrowers and the Guarantors and  (collectively, "**Borrower Parties Counsel**") and has discussed this Forbearance Agreement with Borrower Parties Counsel prior to its execution, and (c) has entered into this Forbearance Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person.  The Parties hereto acknowledge and agree that neither this Forbearance Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that the Parties hereto contributed substantially to the negotiation and preparation of this Forbearance Agreement and the other documents executed pursuant hereto or in connection herewith.

10.      Miscellaneous.  Except as herein expressly amended by this Forbearance Agreement, all of the terms and provisions of the Forbearance and Amendments, the Loan Agreement and the Loan Schedule shall continue in full force and effect and the foregoing together with the other Loan Documents are hereby ratified and confirmed by Borrower; provided, that, if there is any conflict or inconsistency between this

Forbearance Agreement and the one hand and the Forbearance and Amendments, the Loan Agreement and the Loan Schedule on the other hand, the terms of this Forbearance Agreement shall prevail.   The Borrower Parties acknowledge to Lender that no offsets, counterclaims or defenses exist as of the Effective Date with respect to any of the Loan Documents and the Obligations.   The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved. Time is of the essence with respect to the obligations of each of the Borrower Parties under this Forbearance Agreement. Sections 14.9, 14.10 and 14.11 are hereby incorporated by reference into this Forbearance Agreement and shall apply as if fully set forth herein mutatis mutandis. This Forbearance Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** this Forbearance Agreement has been duly executed as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____
Name: ___Shane Pertl_____
Title: ___Owner, Manager_____

By: _____
Name: ___Joyce Pertl_____
Title: ___Owner, member_____


**PERTL RANCH FEEDERS LLC**

By: _____
Name: ___Shane Pertl_____
Title: ___Owner, Manager_____

**OUTLAW FARMS & TRUCKING LLC**

By: _____
Name: ___Shane Pertl_____
Title: ___Owner, Manager_____


**GUARANTOR:**

_____
William S. Pertl a/k/a Shane Pertl

_____
Mindy J. Montgomery

[SIGNATURE PAGE 1- FORBEARANCE AGREEMENT]

_____
Ronald F. Pertl

_____
Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
Ronald F. Pertl, Trustee

By: _____
Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
Richard Elis, Co-President

[SIGNATURE PAGE 2 – FORBEARANCE AGREEMENT]

Execution Version

## AMENDMENT TO FORBEARANCE AGREEMENT AND AMENDMENT NUMBER 5 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE

This Amendment to Forbearance Agreement and Amendment Number 5 to the Loan and Security Agreement and to the Loan Agreement Schedule ("**Forbearance and Amendment Agreement**") dated as of May 17, 2018 and effective as of May 1, 2018 (the "**Effective Date**") by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

## RECITALS

A.    Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.    In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.    The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to (i) that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (the "**Amendment No. 1 to Loan Agreement**"), (ii) that certain Amendment Number 2 to Loan and Security and to the Loan Agreement Schedule, dated effective as of October 17, 2017 (the "**Amendment No. 2 to Loan Agreement**"), (iii) that certain Amendment Number 3 to Loan and Security and to the Loan Agreement Schedule, dated as of December 21, 2017 (the "**Amendment No. 3 to Loan Agreement**"), and (iv) that certain Amendment Number 4 to Loan and Security and to the Loan Agreement Schedule and Forbearance Agreement dated as of March 16, 2018 and effective as of January 15, 2018 ( the "**Amendment No. 4 to Loan Agreement and Forbearance Agreement**", together with the Original Loan Agreement, the Original Loan Schedule, the Amendment No. 1 to Loan Agreement, the Amendment No. 2 to Loan Agreement and the

Amendment No. 3 to Loan Agreement, respectively, the "**Loan Agreement**" and the "**Loan Schedule**", respectively).

D.     Pursuant to Amendment No. 2 Borrower and Lender agreed to temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00) to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) for the period commencing on November 15, 2017 through and including February 12, 2018, and that Lender temporarily increase the amount of the Availability and the Maximum Credit during such Increase Period accordingly.

E.     Pursuant to Amendment No. 4 to Loan Agreement and Forbearance Agreement Borrower requested and the Lender temporarily increased the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) to Eight Million Five Hundred Thousand Dollars ($8,500,000.00) for the period commencing on February 6, 2018 through and including April 30, 2018.

F.     As of the date hereof, Borrower's Revolving Loans continue to be in excess of Availability and the Maximum Credit amount.

G.     Borrower has requested that the Lender temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Eight Million Five Hundred Thousand Dollars ($8,500,000.00) to Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) for the period commencing on May 1, 2018 through and including May 31, 2018.

H.     As of the date hereof, the Borrower failed to make certain interest payments when due pursuant to the Loan Agreement.

I.     As of the date hereof, the Borrower failed to make certain payments of the Over Line Fee and the Accommodation Fee when due pursuant to the Loan Agreement.

J.     On February 20, 2018, AgCountry Farm Credit Services, PCA, as Agent for First Dakota National Bank filed a petition naming PR, Joyce Marie Pertl and Lender as defendants in the District Court of Russell County, Kansas and assigned case number 2018-CV-000017 seeking, *inter alia*, (a) judgment against PR and Joyce Marie Pertl for defaulted principal, interest and late charges, and (b) judgment ordering that the plaintiff's security interest in certain equipment be foreclosed (the "**AgCountry Claim**").

K.     Notwithstanding the foregoing, Borrower acknowledges that the failure to (i) pay principal and interest monthly payments as well as Borrowers, (ii) direct all Proceeds to Lender and (iii) maintain all insurance required under the Loan Agreement, each constitute an Event of Default under the Loan Documents (the "**Specified Events of Default**") allowing the Lender to exercise its rights and remedies under the Loan Agreement and the other Loan Documents.

L.     Borrower and the Guarantors have requested that Lender forbear from

-2-

exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the occurrence of the Specified Events of Default, with such forbearance to be subject to the terms and conditions set forth in this Forbearance and Amendment Agreement.

M.     Lender is willing to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the Specified Events of Default and to temporarily increase the maximum Availability and the Maximum Credit of the Revolving Loans provided Borrower is not in default of the Loan Agreement or the other Loan Documents, all upon and subject to the terms of this Forbearance and Amendment Agreement.

N.     In consideration of Lender's consent and accommodation, Borrower has agreed to pay all of Lender's fees set forth in Sections 3 and 6 hereof and all costs including Lender's attorneys' fees and costs in respect of the transactions regarding this Forbearance and Amendment Agreement and that may arise from time to time in connection with the AgCounty Claim.

O.     Capitalized terms used but not defined in this Forbearance and Amendment Agreement shall have the meanings set forth in the Loan Agreement or the Forbearance and Amendments, as applicable.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.     <u>Amendments.</u> Subject to both Section 2 and Section 6 below, effective as of the date of this Amendment No. 4, the Loan Agreement and the Loan Schedule, effective as of the date hereof, are amended as follows:

(a) Section 1.12 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.12 "Availability"** means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) or (B) during the period commencing on February 12, 2018 through and including April 30, 2018, Eight Million Five Hundred Thousand Dollars ($8,500,000.00) or (C) during the period commencing on May 1, 2018 through and including May 31, 2018, Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) or (D) at all other times, Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00).

(b) Section 1.78 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.78 "Maximum Credit"** means the sum of (i) (A) during the period commencing on October 17, 2017 through and including February 12, 2018, up to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) or (B) during the period commencing on February 6, 2018 through and including April 30, 2018, up to Eight Million Five Hundred Thousand Dollars ($8,500,000.00) or (C) during the period commencing on May 1, 2018 through and including May 31, 2018, Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) or (D) at all other times, up to Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00), in each case, subject to Availability, any Reserves and the Revolving Loan Commitment, and (ii) up to One Million Seven Hundred Twenty Five Thousand Dollars ($1,725,000), subject to the Appraisal, the Additional Appraisals, as applicable, any Reserves and the Term Loan Commitment.

(c) Section 1.97 of the Loan Agreement is hereby deleted and restated in its entirety as follows:

**1.97 "Revolving Loan Note"** means the Fourth Amended and Restated Secured Promissory Note (Revolving Loans)' in the principal amount of up to $8,850,000.00, as may be amended, restated, modified or supplemented from time to time.

2.      Acknowledgments.

        a.      Recitals. Borrower and Guarantors agree to and with the terms and statements set forth in each of the Recitals. The terms of the Recitals are incorporated in this Forbearance and Amendment Agreement as though fully set forth herein.

        b.      Acknowledgment of Default. Borrower and the Guarantors hereby acknowledge and agree that the Specified Events of Default have occurred and continue to occur and constitute Events of Default entitling Lender to presently exercise its rights and remedies under the Loan Agreement and the other Loan Documents, applicable law or otherwise, including, without limitation, charging interest at the Default Interest Rate.

        c.      Acknowledgement of Security Interests. Borrower and Guarantors hereby acknowledge, confirm and agree that Lender has and shall continue to have valid, enforceable and perfected first-priority liens upon, and security interests in, the Collateral heretofore granted to Lender pursuant to the Loan Agreement and the other Loan Documents.

        d.      Binding Effect of Documents. Borrower and the Guarantors hereby represent, warrant, acknowledge, confirm and agree that: (a) each of the Loan Documents to which it is a party has been duly executed and delivered by it, and each is in full force and effect and shall remain in full force and effect until all of the Obligations to Lender have been indefeasibly paid in full; (b) the agreements and obligations of Borrower and each of the Guarantors contained in each of the Loan Documents to which it is a party constitute the legal, valid and binding obligations of Borrower and each of the

Guarantors, enforceable against them in accordance with their respective terms and each
of the Borrower and the Guarantors has no defenses to any of the Loan Documents; and
(c) Lender is and shall be entitled to the rights, remedies and benefits provided for in the
Loan Agreement and the other Loan Documents and applicable law.

3. Forbearance. In reliance of the representations, warranties and covenants
of the Borrower Parties contained herein, and subject to the terms and conditions of this
Forbearance and Amendment Agreement and receipt by Lender of all amounts,
documents and instruments described in Section 6 hereof on or before the respective
dates set forth therein, Lender agrees, subject to the conditions set forth herein, to forbear
from exercising its rights and remedies under the Loan Agreement and the other Loan
Documents solely on account of the occurrence and continuation of the Specified Events
of Default until either (A) Borrower fails to indefeasibly pay and satisfy in full all
Obligations that are due and payable on or prior to June 30, 2018, or (B) for so long as
any outstanding Obligations remain past due during the Forbearance Period (as defined
below), Borrower fails to pay to Lender a forbearance fee in the amount of (i)
$25,000.00, due and payable on the date hereof, (ii) $25,000.00, due and payable on May
31, 2018, (iii) $25,000.00, due and payable on June 15, 2018, and (iv) $25,000.00, due
and payable June 30, 2018 (collectively, the "**Forbearance Fee**"), which such
Forbearance Fee shall be fully earned on the date hereof, or (C) Borrower fails to pay all
taxes (including, without limitation, payroll taxes and ad valorem taxes) to the
appropriate Governmental Authorities on the dates when due, or (D) Borrower fails to
pay Lender all amounts due to Lender on the dates when due as outlined in paragraph 7
below, or (E) the AgCountry Claim is not resolved in a manner satisfactory to Lender in
its sole discretion (the dates in (A), (B), (C), (D), (E) or (F), as applicable, the
"**Forbearance Period**"); provided, that, the Borrower and each Guarantor hereby
acknowledge and agree that if a Forbearance Default occurs at any time, the Lender may
exercise all of their rights and remedies under the Loan Documents without further notice to
the Borrower or any Guarantor, including the following: (i) accelerate the payment of all
Obligations and demand immediate payment thereof to Lender, and (ii) require Borrower, at
Borrower's expense, to assemble and make available to Lender all of the Collateral at any
place and time designated by Lender. As used herein, the term "**Forbearance Default**"
means the occurrence of either of the following: (i) any failure of Borrower or the
Guarantors to timely pay, or perform any covenant, undertaking or agreement in this
Agreement, the Loan Agreement, or in any of the other Loan Documents; (ii) any
inaccuracy of any representation or warranty in this Agreement, the Loan Agreement, or
in any of the other Loan Documents; (iii) the failure of Borrower to timely perform any
of the items set forth in (A) through and including (E) above, or (iv) a breach or default
of any provision of this Forbearance and Amendment Agreement; or (v) occurrence of an
Event of Default other than the Specified Events of Default.

4. Representations, Warranties and Covenants.

(a) Each of the representations and warranties made by or on behalf of
Borrower and the Guarantors to Lender in any of the Loan Documents to which it is a
party was true and correct when made and in all material respects is true and correct on
and as of the Effective Date with the same full force and effect as if each of such

-5-

representations and warranties had been made by Borrower and the Guarantor on the Effective Date.

    (b) Except for the Specified Events of Default, no other Events of Default under the Loan Agreement exist.

    (c) This Forbearance and Amendment Agreement has been duly authorized, executed and delivered to Lender by Borrower and the Guarantors and constitutes the legal, valid and binding obligations of Borrower and the Guarantors, enforceable against them in accordance with its terms.

    (d) The execution and delivery and performance of this Agreement by Borrower and the Guarantors will not violate any requirement of law or contractual obligation of Borrower or the Guarantors and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues.

   5. <u>Non-Release of Continuing Guarantee</u>. The 'Continuing Guarantee' executed by each of the Guarantors shall continue until all of the Obligations are indefensibly paid in full.  William S. Pertl (a/k/a Shane Pertl), Ronald F. Pertl and Joyce M. Pertl, and Mindy J. Montgomery, each being Guarantors, by their signatures below, reaffirm their respective Guaranteed Obligations.

   6. <u>Effectiveness.</u> The effectiveness of this Forbearance and Amendment Agreement is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

  a. Lender's receipt of an original copy of this Forbearance and Amendment Agreement duly executed by Borrower and the Guarantors;

  b. Receipt by Lender of the first installment of the Forbearance Fee (ie., $25,000.00);

  c. Receipt by Lender of a documentation fee for this Forbearance and Amendment Agreement of $1,500.00; and

  d. Borrower and the Guarantors shall have executed and delivered to Lender such other and further documentation as Lender may deem necessary or appropriate in its sole and absolute discretion to accomplish the terms set forth herein, each in form and substance acceptable to Lender.

7. <u>Payment Schedule</u>.

  a. On or before May 31, 2018, a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the April and May 2018 Revolving Loan and Term Loan payments;

b.      On or before June 15, 2018, a payment of Seventy Five Thousand Dollars ($75,000.00) to be applied toward the May and June 2018 Revolving Loan and Term Loan payments; and

c       On or before June 30, 2018, payment in full of all past due amounts under the Loan Agreement and the other Loan Documents.

8.  Release of Lender and Related Parties.   As partial consideration for the agreement of Lender to forbear as provided herein, the Borrower Parties, jointly and severally, and on behalf themselves and their predecessors, successor and assigns, hereby release and forever discharge Lender and its officers, directors, agents, attorneys, managers, members, employees, successors and assigns of and from any and all claims of whatever kind, known or unknown, in contract, based upon statutory or common law, present or future, that they may have or may acquire, on account of any activities or omissions of Lender and those persons or entities hereby released, from the beginning of time through and including the present date, including but not limited to, any claims under or related to the Loan Agreement, the other Loan Documents or activities taken by Lender with respect to the Loan Agreement, the other Loan Documents or any of the matters described herein. The release provided in this paragraph shall survive the termination of this Forbearance and Amendment Agreement.

9.      Reviewed by Attorneys.   Each Borrowers Party represents and warrants to Lender that it (a) understands fully the terms of this Forbearance and Amendment Agreement and the consequences of the execution and delivery of this Forbearance and Amendment Agreement, (b) has had this Forbearance and Amendment Agreement reviewed by Van Osdol, PC, counsel to the Borrowers and the Guarantors and (collectively, "**Borrower Parties Counsel**") and has discussed this Forbearance and Amendment Agreement with Borrower Parties Counsel prior to its execution, and (c) has entered into this Forbearance and Amendment Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person. The Parties hereto acknowledge and agree that neither this Forbearance and Amendment Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that the Parties hereto contributed substantially to the negotiation and preparation of this Forbearance and Amendment Agreement and the other documents executed pursuant hereto or in connection herewith.

10.      Miscellaneous.   Except as herein expressly amended by this Forbearance and Amendment Agreement, all of the terms and provisions of the Forbearance and Amendments, the Loan Agreement and the Loan Schedule shall continue in full force and effect and the foregoing together with the other Loan Documents are hereby ratified and confirmed by Borrower; provided, that, if there is any conflict or inconsistency between this Forbearance and Amendment Agreement and the one hand and the Forbearance and Amendments, the Loan Agreement and the Loan Schedule on the other hand, the terms of this Forbearance and Amendment Agreement shall prevail.  The Borrower Parties acknowledge to Lender that no offsets, counterclaims or defenses exist as of the Effective

Date with respect to any of the Loan Documents and the Obligations.  The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved. Time is of the essence with respect to the obligations of each of the Borrower Parties under this Forbearance and Amendment Agreement. Sections 14.9, 14.10 and 14.11 are hereby incorporated by reference into this Forbearance and Amendment Agreement and shall apply as if fully set forth herein mutatis mutandis. This Forbearance and Amendment Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** this Forbearance and Amendment Agreement has been duly executed as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____
Name: ____Joyce Pertl____
Title: ____Owner, Member____

By: _____
Name: __Shane Pertl__
Title: _Owner, Manager_

**PERTL RANCH FEEDERS LLC**

By: _____
Name: ____Shane Pertl____
Title: ___Owner, Manager___

**OUTLAW FARMS & TRUCKING LLC**

By: _____
Name: ____Shane Pertl____
Title: ____Owner, Manager____

**GUARANTORS:**

William S. Pertl a/k/a Shane Pertl

Mindy J. Montgomery

Ronald F. Pertl

Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST
UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
     Ronald F. Pertl, Trustee

By: _____
     Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
     Richard Elis, Co-President

[SIGNATURE PAGE 2 – FORBEARANCE AND AMENDMENT AGREEMENT]

**GUARANTORS:**

_____

William S. Pertl a/k/a Shane Pertl


_____

Mindy J. Montgomery


_____

Ronald F. Pertl


_____

Joyce M. Pertl


**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____

      Ronald F. Pertl, Trustee


By: _____

      Joyce M. Pertl, Trustee


**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____

      Richard Elis, Co-President


[SIGNATURE PAGE 2 – FORBEARANCE AND AMENDMENT AGREEMENT]

Execution Version

## AMENDMENT TO FORBEARANCE AGREEMENT AND AMENDMENT
## NUMBER 6 TO THE LOAN AND SECURITY AGREEMENT
## AND TO THE LOAN AGREEMENT SCHEDULE

This Amendment to Forbearance Agreement and Amendment Number 6 to the Loan and Security Agreement and to the Loan Agreement Schedule ("**Forbearance and Amendment Agreement**") dated as of July 31, 2018 and effective as of July 1, 2018 (the "**Effective Date**") by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

### RECITALS

A.      Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.      In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.      The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to (i) that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (the "**Amendment No. 1 to Loan Agreement**"), (ii) that certain Amendment Number 2 to Loan and Security and to the Loan Agreement Schedule, dated effective as of October 17, 2017 (the "**Amendment No. 2 to Loan Agreement**"), (iii) that certain Amendment Number 3 to Loan and Security and to the Loan Agreement Schedule, dated as of December 21, 2017 (the "**Amendment No. 3 to Loan Agreement**"), (iv) that certain Amendment Number 4 to Loan and Security and to the Loan Agreement Schedule and Forbearance Agreement dated as of March 16, 2018 and effective as of January 15, 2018 (the "**Amendment No. 4 to Loan Agreement and Forbearance Agreement**"), and (v) that certain Amendment Number 5 to Loan and Security and to the Loan Agreement Schedule and Forbearance Agreement dated as of May 17, 2018 and effective

as of May 1, 2018 (the "**Amendment No. 5 to Loan Agreement and Forbearance Agreement**", together with the Original Loan Agreement, the Original Loan Schedule, the Amendment No. 1 to Loan Agreement, the Amendment No. 2 to Loan Agreement, the Amendment No. 3 to Loan Agreement, and the Amendment No. 4 to Loan Agreement respectively, the "**Loan Agreement**" and the "**Loan Schedule**", respectively).

D.    Pursuant to Amendment No. 2 Borrower and Lender agreed to temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Two Hundred Seventy Five Thousand Dollars ($7,275,000.00) to Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) for the period commencing on November 15, 2017 through and including February 12, 2018, and that Lender temporarily increase the amount of the Availability and the Maximum Credit during such Increase Period accordingly.

E.    Pursuant to Amendment No. 4 to Loan Agreement and Forbearance Agreement, Borrower requested and the Lender temporarily increased the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Seven Million Nine Hundred Twenty Five Thousand Dollars ($7,925,000.00) to Eight Million Five Hundred Thousand Dollars ($8,500,000.00) for the period commencing on February 6, 2018 through and including April 30, 2018.

F.    As of the date hereof, Borrower's Revolving Loans continue to be in excess of Availability and the Maximum Credit amount.

G.    Pursuant to Amendment No. 5 to Loan Agreement and Forbearance Agreement, Borrower requested and the Lender agreed to temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Eight Million Five Hundred Thousand Dollars ($8,500,000.00) to Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) for the period commencing on May 1, 2018 through and including May 31, 2018.

H.    As of the date hereof, the Borrower failed to make certain interest payments when due pursuant to the Loan Agreement.

I.    As of the date hereof, the Borrower failed to make certain payments of the Over Line Fee and the Accommodation Fee when due pursuant to the Loan Agreement.

J.    On February 20, 2018, AgCountry Farm Credit Services, PCA, as Agent for First Dakota National Bank filed a petition naming PR, Joyce Marie Pertl and Lender as defendants in the District Court of Russell County, Kansas and assigned case number 2018-CV-000017 seeking, *inter alia*, (a) judgment against PR and Joyce Marie Pertl for defaulted principal, interest and late charges, and (b) judgment ordering that the plaintiff's security interest in certain equipment be foreclosed (the "**AgCountry Claim**").

K.    Notwithstanding the foregoing, Borrower acknowledges that the failure to (i) pay principal and interest monthly payments, (ii) direct all Proceeds to Lender, (iii) make the payments in the amounts and on the dates specified in Section 7 of Amendment

No. 5 to Loan Agreement and Forbearance Agreement, and (iv) maintain all insurance required under the Loan Agreement, each constitute an Event of Default under the Loan Documents (the "**Specified Events of Default**") allowing the Lender to exercise its rights and remedies under the Loan Agreement and the other Loan Documents.

L.       Borrower and the Guarantors have requested that Lender continue to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the occurrence of the Specified Events of Default, with such forbearance to be subject to the terms and conditions set forth in this Forbearance and Amendment Agreement.

M.       Lender is willing to continue to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents as a result of the Specified Events of Default and to temporarily increase the maximum Availability and the Maximum Credit of the Revolving Loans provided Borrower is not in default of the Loan Agreement or the other Loan Documents, all upon and subject to the terms of this Forbearance and Amendment Agreement.

N.       In consideration of Lender's consent and accommodation, Borrower has agreed to pay all of Lender's fees set forth in Sections 3 and 6 hereof and all costs including Lender's attorneys' fees and costs in respect of the transactions regarding this Forbearance and Amendment Agreement and that may arise from time to time in connection with the AgCounty Claim.

O.       Capitalized terms used but not defined in this Forbearance and Amendment Agreement shall have the meanings set forth in the Loan Agreement or the Forbearance and Amendments, as applicable.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

1.       [Reserved].

2.       Acknowledgments.

a.       Recitals.  Borrower and Guarantors agree to and with the terms and statements set forth in each of the Recitals.  The terms of the Recitals are incorporated in this Forbearance and Amendment Agreement as though fully set forth herein.

b.       Acknowledgment of Default.  Borrower and the Guarantors hereby acknowledge and agree that the Specified Events of Default have occurred and continue to occur and constitute Events of Default entitling Lender to presently exercise its rights and remedies under the Loan Agreement and the other Loan Documents, applicable law or otherwise, including, without limitation, charging interest at the Default Interest Rate.

c.       Acknowledgement of Security Interests.  Borrower and Guarantors hereby acknowledge, confirm and agree that Lender has and shall continue to have valid,

-3-

enforceable and perfected first-priority liens upon, and security interests in, the Collateral heretofore granted to Lender pursuant to the Loan Agreement and the other Loan Documents.

       d.     Binding Effect of Documents.    Borrower and the Guarantors hereby represent, warrant, acknowledge, confirm and agree that:  (a) each of the Loan Documents to which it is a party has been duly executed and delivered by it, and each is in full force and effect and shall remain in full force and effect until all of the Obligations to Lender have been indefeasibly paid in full; (b) the agreements and obligations of Borrower and each of the Guarantors contained in each of the Loan Documents to which it is a party constitute the legal, valid and binding obligations of Borrower and each of the Guarantors, enforceable against them in accordance with their respective terms and each of the Borrower and the Guarantors has no defenses to any of the Loan Documents; and (c) Lender is and shall be entitled to the rights, remedies and benefits provided for in the Loan Agreement and the other Loan Documents and applicable law.

       3.     Forbearance.  In reliance of the representations, warranties and covenants of the Borrower Parties contained herein, and subject to the terms and conditions of this Forbearance and Amendment Agreement and receipt by Lender of all amounts, documents and instruments described in Section 6 hereof on or before the respective dates set forth therein, Lender agrees, subject to the conditions set forth herein, to forbear from exercising its rights and remedies under the Loan Agreement and the other Loan Documents solely on account of the occurrence and continuation of the Specified Events of Default until either (A) Borrower fails to indefeasibly pay and satisfy in full all Obligations that are due and payable on or prior to June 30, 2018, or (B) for so long as any outstanding Obligations remain past due during the Forbearance Period (as defined below), Borrower fails to pay to Lender a forbearance fee in the amount of (i) $25,000.00, due and payable on the date hereof, (ii) $25,000.00, due and payable on July 16, 2018, (iii) $25,000.00, due and payable on July 23, 2018, (iv) 25,000.00, due and payable on July 30, 2018, (v) $25,000.00, due and payable August 6, 2018, and (v) $25,000.00, due and payable August 13, 2018 (collectively, the "**Second Forbearance Fee**"), which such Second Forbearance Fee shall be fully earned on the date hereof, or (C) Borrower fails to pay all taxes (including, without limitation, payroll taxes and ad valorem taxes) to the appropriate Governmental Authorities on the dates when due, or (D) Borrower fails to pay Lender all amounts due to Lender on the dates when due as outlined in paragraph 7 below, (E) the AgCountry Claim is not resolved in a manner satisfactory to Lender in its sole discretion, or (F) Borrower fails to pay Lender the Forbearance Fee on the dates set forth in Amendment No. 5 to Loan Agreement and Forbearance Agreement (the dates in (A), (B), (C), (D), (E) or (F), as applicable, the "**Forbearance Period**"); provided, that, the Borrower and each Guarantor hereby acknowledge and agree that if a Forbearance Default occurs at any time, the Lender may exercise all of their rights and remedies under the Loan Documents without further notice to the Borrower or any Guarantor, including the following: (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, and (ii) require Borrower, at Borrower's expense, to assemble and make available to Lender all of the Collateral at any place and time designated by Lender.  As used herein, the term "**Forbearance Default**" means the occurrence of either of the following:  (i) any failure of Borrower or the

-4-

Guarantors to timely pay, or perform any covenant, undertaking or agreement in this Forbearance and Amendment Agreement, the Loan Agreement, or in any of the other Loan Documents; (ii) any inaccuracy of any representation or warranty in this Forbearance and Amendment Agreement, the Loan Agreement, or in any of the other Loan Documents; (iii) the failure of Borrower to timely perform any of the items set forth in (A) through and including (E) above, or (iv) a breach or default of any provision of this Forbearance and Amendment Agreement; or (v) occurrence of an Event of Default other than the Specified Events of Default.

4.      Representations, Warranties and Covenants.

(a)      Each of the representations and warranties made by or on behalf of Borrower and the Guarantors to Lender in any of the Loan Documents to which it is a party was true and correct when made and in all material respects is true and correct on and as of the Effective Date with the same full force and effect as if each of such representations and warranties had been made by Borrower and the Guarantor on the Effective Date.

(b)      Except for the Specified Events of Default, no other Events of Default under the Loan Agreement exist.

(c)      This Forbearance and Amendment Agreement has been duly authorized, executed and delivered to Lender by Borrower and the Guarantors and constitutes the legal, valid and binding obligations of Borrower and the Guarantors, enforceable against them in accordance with its terms.

(d)      The execution and delivery and performance of this Forbearance and Amendment Agreement by Borrower and the Guarantors will not violate any requirement of law or contractual obligation of Borrower or the Guarantors and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues.

5.      Non-Release of Continuing Guarantee.  The 'Continuing Guarantee' executed by each of the Guarantors shall continue until all of the Obligations are indefensibly paid in full.  William S. Pertl (a/k/a Shane Pertl), Ronald F. Pertl and Joyce M. Pertl, and Mindy J. Montgomery, each being Guarantors, by their signatures below, reaffirm their respective Guaranteed Obligations.

6.      Effectiveness.  The effectiveness of this Forbearance and Amendment Agreement is conditioned upon and subject to the receipt by the Lender of each of the following on or before the dates set forth below:

a.      Lender's receipt of an original copy of this Forbearance and Amendment Agreement duly executed by Borrower and the Guarantors;

b.      Receipt by Lender of the first installment of the Second Forbearance Fee (ie., $25,000.00);

c.    Receipt by Lender of a documentation fee for this Forbearance and Amendment Agreement of $1,500.00; and

d.    Borrower and the Guarantors shall have executed and delivered to Lender such other and further documentation as Lender may deem necessary or appropriate in its sole and absolute discretion to accomplish the terms set forth herein, each in form and substance acceptable to Lender.

7. <u>Payment Schedule</u>. On or before August 15, 2018, payment in full of all past due amounts under the Loan Agreement and the other Loan Documents.

8. <u>Release of Lender and Related Parties</u>.  As partial consideration for the agreement of Lender to forbear as provided herein, the Borrower Parties, jointly and severally, and on behalf themselves and their predecessors, successor and assigns, hereby release and forever discharge Lender and its officers, directors, agents, attorneys, managers, members, employees, successors and assigns of and from any and all claims of whatever kind, known or unknown, in contract, based upon statutory or common law, present or future, that they may have or may acquire, on account of any activities or omissions of Lender and those persons or entities hereby released, from the beginning of time through and including the present date, including but not limited to, any claims under or related to the Loan Agreement, the other Loan Documents or activities taken by Lender with respect to the Loan Agreement, the other Loan Documents or any of the matters described herein. The release provided in this paragraph shall survive the termination of this Forbearance and Amendment Agreement.

9.    <u>Reviewed by Attorneys</u>. Each Borrowers Party represents and warrants to Lender that it (a) understands fully the terms of this Forbearance and Amendment Agreement and the consequences of the execution and delivery of this Forbearance and Amendment Agreement, (b) has had this Forbearance and Amendment Agreement reviewed by Van Osdol, PC, counsel to the Borrowers and the Guarantors and (collectively, "**Borrower Parties Counsel**") and has discussed this Forbearance and Amendment Agreement with Borrower Parties Counsel prior to its execution, and (c) has entered into this Forbearance and Amendment Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person. The Parties hereto acknowledge and agree that neither this Forbearance and Amendment Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that the Parties hereto contributed substantially to the negotiation and preparation of this Forbearance and Amendment Agreement and the other documents executed pursuant hereto or in connection herewith.

10.    <u>Miscellaneous</u>. Except as herein expressly amended by this Forbearance and Amendment Agreement, all of the terms and provisions of the Forbearance and Amendments, the Loan Agreement and the Loan Schedule shall continue in full force and effect and the foregoing together with the other Loan Documents are hereby ratified and confirmed by Borrower; <u>provided, that</u>, if there is any conflict or inconsistency between

this Forbearance and Amendment Agreement and the one hand and the Forbearance and Amendments, the Loan Agreement and the Loan Schedule on the other hand, the terms of this Forbearance and Amendment Agreement shall prevail.   The Borrower Parties acknowledge to Lender that no offsets, counterclaims or defenses exist as of the Effective Date with respect to any of the Loan Documents and the Obligations.   The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents referred to therein, including, without limitation, applicable law, all of which rights are hereby expressly reserved. Time is of the essence with respect to the obligations of each of the Borrower Parties under this Forbearance and Amendment Agreement. Sections 14.9, 14.10 and 14.11 are hereby incorporated by reference into this Forbearance and Amendment Agreement and shall apply as if fully set forth herein mutatis mutandis. This Forbearance and Amendment Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** this Forbearance and Amendment Agreement has been duly executed as of the day and year first above written.

**BORROWER:**

**PERTL RANCH, LLC**

By: _____
Name:   Shane Pertl
Title:   Owner-Manager

By: _____
Name:   Joyce M Pertl
Title:   Owner

**PERTL RANCH FEEDERS LLC**

By: _____
Name:   Shane Pertl
Title:   Owner-Manager

**OUTLAW FARMS & TRUCKING LLC**

By: _____
Name:   Shane Pertl
Title:   Owner-Manger

[SIGNATURE PAGE 1- FORBEARANCE AND AMENDMENT AGREEMENT]

**GUARANTORS:**

William S. Pertl a/k/a Shane Pertl

Mindy J. Montgomery

Ronald F. Pertl

Joyce M. Pertl

**RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006**

By: _____
   Ronald F. Pertl, Trustee

By: _____
   Joyce M. Pertl, Trustee

**LENDER:**

**GEMCAP LENDING I, LLC**

By: _____
   Richard Ellis, Co-President

[SIGNATURE PAGE 2 – FORBEARANCE AND AMENDMENT AGREEMENT]

Execution Version

## AMENDMENT TO FORBEARANCE AGREEMENT AND AMENDMENT NUMBER 7 TO THE LOAN AND SECURITY AGREEMENT AND TO THE LOAN AGREEMENT SCHEDULE AND TO THE TERM LOAN NOTE

This Amendment to Forbearance Agreement and Amendment Number 7 to the Loan and Security Agreement and to the Loan Agreement Schedule and to the Term Loan Note ("**Forbearance and Amendment Agreement**") dated as of August 27, 2018 (the "**Effective Date**") by and among (i) PERTL RANCH, LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PR**"), PERTL RANCH FEEDERS LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**PRF**"), and OUTLAW FARMS & TRUCKING LLC, a Kansas limited liability company with a principal place of business located at 107 S. Main Street, Lucas, KS 67648 ("**OFT**" and together with PRF and PR, jointly and severally, the "**Borrower**"), (ii) RONALD F. PERTL AND JOYCE M. PERTL LIVING TRUST UNDER AGREEMENT DATED SEPTEMBER 19, 2006, WILLIAM S. PERTL a/k/a SHANE PERTL, an unmarried individual, RONALD F. PERTL and JOYCE M. PERTL, husband and wife, and MINDY J. MONTGOMERY, an unmarried individual (collectively, the "**Guarantor**"), and (iii) and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, the "**Lender**"). The Borrower and the Guarantor are collectively referred to as the "**Borrower Parties**"; and the Borrower Parties and the Lender are collectively referred to as the "**Parties**".

### RECITALS

A.    Borrower and Lender are parties to the Loan and Security Agreement dated as of August 11, 2017 (the "**Original Loan Agreement**").

B.    In connection with the Loan Agreement, Borrower executed and delivered to Lender (i) the Loan Agreement Schedule dated as of August 11, 2017 (the "**Original Loan Schedule**"), and (ii) other Loan Documents.

C.    The Borrower and Lender amended the Original Loan Agreement and the Original Loan Schedule pursuant to (i) that certain Amendment Number 1 to the Loan and Security Agreement and to the Loan Agreement Schedule, dated as of August 16, 2017 (the "**Amendment No. 1 to Loan Agreement**"), (ii) that certain Amendment Number 2 to Loan and Security and to the Loan Agreement Schedule, dated effective as of October 17, 2017 (the "**Amendment No. 2 to Loan Agreement**"), (iii) that certain Amendment Number 3 to Loan and Security and to the Loan Agreement Schedule, dated as of December 21, 2017 (the "**Amendment No. 3 to Loan Agreement**"), (iv) that certain Amendment Number 4 to Loan and Security and to the Loan Agreement Schedule and Forbearance Agreement dated as of March 16, 2018 and effective as of January 15, 2018 (the "**Amendment No. 4 to Loan Agreement and Forbearance Agreement**"), (v) that certain Amendment Number 5 to Loan and Security and to the Loan Agreement Schedule and Forbearance Agreement dated as of May 17, 2018 and effective as of May 1, 2018 (the

"**Amendment No. 5 to Loan Agreement and Forbearance Agreement**"), and (vi) that certain Amendment to Forbearance Agreement and Amendment Number 6 to the Loan and Security Agreement and to the Loan Agreement Schedule dated as of July 31, 2018 and effective as of July 1, 2018 (the "**Amendment No. 6 to Loan Agreement and Forbearance Agreement**", together with the Original Loan Agreement, the Original Loan Schedule, the Amendment No. 1 to Loan Agreement, the Amendment No. 2 to Loan Agreement, the Amendment No. 3 to Loan Agreement, the Amendment No. 4 to Loan Agreement and the Amendment No. 5 to Loan Agreement respectively, the "**Loan Agreement**" and the "**Loan Schedule**", respectively).

D.      Pursuant to Amendment No. 5 to Loan Agreement and Forbearance Agreement, Borrower requested and the Lender agreed to temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Eight Million Five Hundred Thousand Dollars ($8,500,000.00) to Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) for the period commencing on May 1, 2018 through and including May 31, 2018.

E.      As of the date hereof, Borrower's Revolving Loans continue to be in excess of Availability and the Maximum Credit amount.

F.      As of the date hereof, the Borrower failed to make certain interest payments when due pursuant to the Loan Agreement.

G.      As of the date hereof, the Borrower failed to make certain payments of the Over Line Fee, the Accommodation Fee and the Annual Line Fee when due pursuant to the Loan Agreement.

H.      Borrower has requested that Lender temporarily increase the amount of the maximum Availability and the Maximum Credit of the Revolving Loans from Eight Million Eight Hundred Fifty Thousand Dollars ($8,850,000.00) to Ten Million Thousand Dollars ($10,000,000.00) for the Forbearance Period (as defined below).

I.      On February 20, 2018, AgCountry Farm Credit Services, PCA, as Agent for First Dakota National Bank filed a petition naming PR, Joyce Marie Pertl and Lender as defendants in the District Court of Russell County, Kansas and assigned case number 2018-CV-000017 seeking, *inter alia*, (a) judgment against PR and Joyce Marie Pertl for defaulted principal, interest and late charges, and (b) judgment ordering that the plaintiff's security interest in certain equipment be foreclosed (the "**AgCountry Claim**").

J.      (A) On August 6, 2018, Dreiling Bieker & Hoffman LLP, on behalf of Mary Alice Unrein (the "**Initial PACA Claimant**"), provided Lender with notice of a verified Agriculture Production Input Lien to be filed by Mary Alice Unrein with a retail cost of $57,143.63 in respect of wheat silage provided by Mary Alice Unrein to PRF (the "**Initial PACA Claim**"); and (B) In addition to the Initial PACA Claim, Borrower acknowledges and confirms that set forth on Schedule 2 attached hereto is a complete list of all claims against Borrower (together with the Initial PACA Claim, the "**PACA Claims**") under the